# EXHIBIT "1"

## In the Matter Of:

## BOND V. FEDERATED SERVICE

SU2021CV002440

---

## CHASTITY MILLSAPS

*August 02, 2022*

---



800.211.DEPO (3376)
EsquireSolutions.com

1          IN THE STATE COURT OF MUSCOGEE COUNTY
                     STATE OF GEORGIA
2

3  ANTONIO BOND,                    )
                                    )
4          Plaintiff,               )
                                    )  CIVIL ACTION
5  v.                               )
                                    )  FILE NO.  SU2021CV002440
6  FEDERATED SERVICE                )
   INSURANCE CO., ET AL.,           )
7                                   )
           Defendants.              )
8

9     _____

10        REMOTE VIDEOCONFERENCE DEPOSITION

11                       OF

12             CHASTITY MILLSAPS

13

14               August 2, 2022

15                 1:58 p.m.

16            McDonough, Georgia

17

18

19     Linda Panzica, CCR No. 2773

20

21

22

23

24

25



```
 1              APPEARANCES  OF  COUNSEL

 2

    ON  BEHALF  OF  THE  PLAINTIFF:
 3
    No  appearance  of  counsel  was  made  by  or  on  behalf
 4  of  the  Plaintiff

 5

 6  ON  BEHALF  OF  THE  DEFENDANTS:

 7  Zach  M.  Matthews,  Attorney  at  Law
    McMickle,  Kurey  &  Branch,  LLP
 8  217  Roswell  Street
    Suite  200
 9  Alpharetta,  Georgia  30009
    678.824.7800
10  zmatthews@mkblawfirm.com

11  and  via  Zoom

12  Bryan  G.  Forsyth,  Attorney  at  Law
    Hall  Booth  Smith,  P.C.
13  1301  1st  Avenue
    Suite  100
14  Columbus,  Georgia  31901
    706.243.6257
15  bforsyth@hallboothsmith.com

16

17  ALSO  PRESENT:

18  Lucas  Riahi,  Videographer

19

20

21

22

23

24

25
```



1                    INDEX OF EXAMINATION

2

3  WITNESS: CHASTITY MILLSAPS

4  EXAMINATION                                    PAGE

5  Cross-Examination By Mr. Matthews                 6

6

7

8                    INDEX TO EXHIBITS

9        THERE WERE NO EXHIBITS PRESENTED FOR

10                   IDENTIFICATION.

11                    * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1    REMOTE VIDEOCONFERENCE DEPOSITION

2    OF

3    CHASTITY MILLSAPS

4    August 2, 2022

5    (Reporter disclosure made pursuant to

6  Article 10.B of the Rules and Regulations of the

7  Board of Court Reporting of the Judicial Council of

8  Georgia.)

9    THE VIDEOGRAPHER:  Good afternoon.  We

10    are now on the record.  The time is now 1:58

11    p.m. Eastern Time on Tuesday, August 2, 2022.

12    This begins the videotaped deposition of

13    Chastity Millsaps taken in the matter of Bond

14    v. Federated Service, filed in the State Court

15    of Muscogee County, State of Georgia, case

16    number of which is SU2021CV002440.

17    The videographer today is Lucas Riahi.

18    The court reporter today is Linda Panzica.  We

19    are both representing Esquire Deposition

20    Solutions.

21    Counsel, will you, please, announce your

22    name and who you represent, after which, the

23    court reporter will swear in the witness?

24    MR. MATTHEWS:  I am Zach Matthews for

25    both defendants Young Oil and also Federated



 1  Insurance Company.

 2       And before we go any further, I just want

 3  to note:  Once again, plaintiff counsel has

 4  not shown up for these depositions, although

 5  they have been duly noticed and are on the

 6  docket, and also my staff sent him a link to

 7  this Zoom deposition.

 8       So it does not appear Mr. Breault will be

 9  joining us again.  And given his behavior so

10  far in not coming to these, we will assume he

11  does not intend to come and we will proceed.

12       MR. FORSYTH:  Bryan Forsyth, also for the

13  defendants.

14       THE COURT REPORTER:  Okay.  And due to

15  the unique hazards caused by the current

16  national health emergency surrounding

17  COVID-19, I will be swearing in the witness

18  remotely.

19       So at this time, will the parties,

20  please, stipulate to my remote swearing in of

21  the witness, and then I'll go ahead and swear

22  in the witness.

23       MR. MATTHEWS:  That is agreeable.

24       THE COURT REPORTER:  Thank you, Zach.

25  And, Chastity, will you raise your right hand,



1   please?

2           THE WITNESS:  (Complies.)

3           THE COURT REPORTER:  Thank you.

4           Do you solemnly swear the testimony

5   you're about to give will be the truth, the

6   whole truth and nothing but the truth, so help

7   you, God?

8           THE WITNESS:  Yes, ma'am.

9           THE COURT REPORTER:  Thank you.  You can

10  put your hand down.

11 Whereupon,

12              CHASTITY MILLSAPS,

13 was called as a witness herein and, first having

14 been duly sworn via Zoom, was examined and

15 testified as follows:

16              CROSS-EXAMINATION

17 BY MR. MATTHEWS:

18     Q    Okay.  Well, Ms. -- first of all, is it

19 Ms. Millsaps, M-I-L-L-S-A-P-S?

20     A    That's correct.

21     Q    Okay.  As you've heard, my name is Zach

22 Matthews.  I'm counsel for the defendants in this

23 case, and we just have a few questions for you,

24 mostly about your time at Georgia Spine and

25 Orthopaedics.  First thing I want to do is just



1 confirm that you are not represented by counsel of

2 any kind.  Can -- do you have a lawyer?

3      A     No, sir.

4      Q     Okay.  And you are not represented

5 specifically by, either a guy named Alex Smith or a

6 guy named Tom Grant, correct?

7      A     No, sir.

8      Q     You -- you agree with me?

9      A     Yes.

10      Q     Okay.  Have you heard from Mr. Smith or

11 Mr. Grant in connection with this deposition?

12      A     No, sir.

13      Q     Okay.  Do you know who those people are?

14      A     No, sir.

15      Q     All right.  What -- well, why don't we

16 start with the basic stuff.  Tell me when you were

17 employed by Georgia Spine.

18      A     I was employed by Georgia Spine from

19 20 -- about 2018 to '19.

20      Q     Okay.  And what was your job title there?

21      A     I worked as the patient ambassador front

22 desk, and medical records.

23      Q     I understand what the front desk and

24 medical records would be, but what is a patient

25 ambassador?



1      A    It's pretty much just front desk.  That's
2  what they called the front desk staffing.
3      Q    Okay.  Did you ever work as a care
4  coordinator in any way?
5      A    No, sir.
6      Q    Not a care coordinator.  Okay.  What --
7  if you don't mind me asking, what -- are you still
8  employed in the medical field today or have you
9  gone on to a different employment?
10     A    No, sir, I'm not in the medical field at
11  this time.
12     Q    Okay.  Thinking back to your time at
13  Georgia Spine, like I said, we mostly have record
14  keeping questions.  What kind of software were they
15  using?  Do you remember the name of it?
16     A    I do not.
17     Q    Would -- if I told you it was CareCloud,
18  would that ring a bell?
19     A    Yes.
20     Q    Okay.  Did you have access to the
21  CareCloud software yourself?
22     A    I did.
23     Q    And do you remember a section of
24  CareCloud called the pencil notes section?
25     A    Yes, sir.



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
9

1    Q    Can you just tell me what that was used
2    for?
3    A    That was pretty much any notes when you
4    spoke to any customers or anything that needed to
5    be put in there because of their -- causing their
6    medical history.
7    Q    Okay.  Was there any other note section
8    in the software where you would -- for an -- for
9    example, you'd take notes from, like, a phone
10   conversation?
11   A    We put that in the pencil notes.
12   Q    Okay.  One of the other witnesses has
13   also described another unit where you could go in,
14   you had to push a couple menu items apparently, and
15   then you could list in more detail the
16   conversations that you might have on the phone, for
17   example, with the plaintiff's lawyer.
18   Do you have any recollection of any of that?
19   A    No, sir, I don't remember that.
20   Q    Okay.  As the front desk person, did you
21   ever have cause to speak with the lawyers for
22   Georgia Spine patients yourself?
23   A    We -- I spoke with them more through
24   medical records than I did with the -- through
25   phone calls.  But we did speak with them.



1      Q    Just explain what you mean by that?  If
2  you don't mind.
3      A    So with the medical records, I would send
4  any documents that they were needing straight to
5  the attorneys.
6      Q    Okay.
7      A    Whether it was just documents that they
8  needed or if they needed to be certified documents.
9      Q    So for example, if an attorney sent a
10  request for a chart for a given patient, you would
11  help facilitate getting them back that chart?
12     A    Yes, sir.
13     Q    Okay.  What about if the lawyer
14  requesting the documents was the lawyer for the
15  patient, would you also talk to them?
16     A    We usually were -- the patient's lawyer,
17  yes, we would talk to them.
18     Q    Okay.  Did you ever have anything to do
19  with seeking from the patient's lawyer what they --
20  what we've -- we've heard called approval for
21  proposed treatment?  You know what I'm talking
22  about?
23     A    No, sir.
24     Q    Okay.  The description that was given by
25  one of your former colleagues -- did you know



1 someone named Dena Alexander?

2      A     It doesn't ring a bell.

3      Q     Okay.  Well, Ms. Alexander was a care

4 coordinator and she testified earlier yesterday

5 that, at times, there would be conversation with

6 the lawyers for the patients about whether to go

7 forward with treatment or not, and as she

8 characterized it, was kind of based on whether or

9 not the policies were big enough to cover the

10 treatment.

11      Did you ever have anything to do with that

12 process?

13      A     No, sir.

14      Q     Do you know anything about that process?

15      A     No, sir.

16      Q     Okay.  Look and see here, I had your name

17 on a particular document.  I was trying to find it.

18      Were you familiar with the CareCloud software

19 keeping what's called a "audit log"?  Did you know

20 about that?

21      A     No, sir.

22      Q     You don't?  Okay.  Who was your -- who

23 was your boss?  Who did you report to?

24      A     I reported to Mi'chell Alexander and

25 then -- and then they -- she went to a different



1 department, and then it was Nalia.  I don't

2 remember her last name.

3      Q     Would it be Nalia Abigantud?

4      A     Yes, sir.

5      Q     What were their job titles, your -- your

6 bosses' job titles?

7      A     They were the managers over the front

8 desk.

9      Q     Okay.  And did they also have

10 responsibility over the care coordinators?

11     A     I don't believe so.

12     Q     Who was in charge of the care

13 coordinators?

14     A     I'm not sure who was in charge over them.

15     Q     Did you -- did you know where they were,

16 the care coordinator, like, were they in the same

17 building with you or were they somewhere else?

18     A     No, sir, they were in a different

19 building.

20     Q     Okay.  Where -- let's -- let's back up

21 then.  Sorry about that.

22     Where did you work, specifically?

23     A     So I usually worked in the Stockbridge

24 office.  Every once in a while they would move me

25 to Tucker.



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
13

1      Q    Okay.  And where did the care
2  coordinators work?
3      A    Most of them worked in Roswell.  I think
4  some worked -- I think some worked in Atlanta.
5      Q    Did you know them, like, did you see them
6  in job duty functions or maybe Christmas parties or
7  something?
8      A    Yes, sir.
9      Q    Okay.  How many of them were there?
10     A    I believe there was about five or six.
11     Q    Do you know what their job duties were?
12     A    No, sir.
13     Q    Okay.  And do you know who their boss
14  was?
15     A    No, sir, I don't recall who their boss
16  was.
17     Q    Okay.  Give me a second here, Chastity.
18  I'm -- I've got a couple of additional records.
19     Okay.  I want to show you -- it's going to be
20  a little difficult on the screen here.  But this is
21  the CareCloud Suite.  Do you remember this page?
22     A    It looks like the pencil notes.
23     Q    Yes, ma'am, that's correct.  So this
24  particular pencil note has your name on it up here.
25  And I'll just read it for the record.  It says,



1 "Last updated by Chastity Millsaps on 10/21/19."

2 And I'm mostly am just curious about how the

3 software worked.

4       When you would do an update to this block on

5 the right-hand side, would it automatically put a

6 last update in there on the top?

7       A    Yes, sir.

8       Q    Okay.  If you opened the screen up and

9 you didn't make a change and you closed the screen

10 back down, but you had accessed it but you didn't

11 change anything, would it automatically give the

12 last updated or would it not show that?

13       A    Unless you saved it, it wouldn't change.

14       Q    Okay.  So in order to make that sort of

15 last updated by you to show up, you'd have to save

16 the change, correct?

17       A    Yes, sir.

18       Q    Okay.  Would it be common to open up a

19 screen in the pencil notes and then just push save

20 to close it?

21       A    I've done that a few times on accident.

22       Q    So you -- this kind of accidentally looks

23 like a change was made where really nothing was

24 changed; is that fair?

25       A    Yes, sir.



1      Q     Okay.   I understand that.   I probably do
2   the same thing in my software, to be honest.
3          All right.   Do you know how to interpret the
4   abbreviations in the CareCloud software?   Like, for
5   example, if I show you, that's the first -- the
6   first CareCloud entry for this person.   It says,
7   "RI" at the top, colon.   I'll read it.   It says,
8   "RI: attorney information for MVA 1/6/18."
9      A     Uh-huh.
10     Q     Do you know what that means?
11     A     I'm not -- I don't remember what the RI
12  stands for.
13     Q     Okay.   It's -- it's the same block that's
14  got the attorney's contact information down here.
15     A     Uh-huh.
16     Q     And I'm wondering if it might mean
17  referral information.   Do you think that's
18  possible?
19     A     Yes, sir.
20     Q     Okay.   Did -- in your experience, did
21  Georgia Spine get referrals from plaintiff's
22  lawyers?
23     A     Yes, sir.
24     Q     Okay.   How -- how did those typically
25  come in?   Would they come in through you at the



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
16

1 front desk or would they come in somewhere else?

2     A    I know that they usually would send an

3 email or phone call, and we'd send those to the

4 care coordinators.

5     Q    All right.  Let's break those two down.

6 If they sent an email referral, like, if a lawyer

7 wanted to say, hey, I got a new patient who's had a

8 car wreck and I want to refer them to Georgia Spine

9 for treatment, who would they email?  Would they

10 email the front desk or was there, like, a specific

11 email referral in box?

12     A    It was a certain email address.  It

13 wouldn't go to the front desk.

14     Q    What was that email address?

15     A    I don't remember the email address.

16     Q    Was it -- was it something that sounded

17 like referrals@Georgiaspineortho.com?

18     A    I -- I really don't recall it.

19     Q    Okay.  But there was a dedicated email in

20 box just for referrals, correct?

21     A    Yes, sir.

22     Q    Who would have access to that dedicated

23 referral in box?  Would there be, like, a care

24 coordinator in charge or somebody else?

25     A    It was usually -- not really sure who had



1  access to it.  I'm guessing possibly care

2  coordinator, but I really don't know.

3      Q    You don't know?  Okay.  Would it have

4  been something that you could have accessed

5  yourself from the front desk or not?

6      A    No, sir.

7      Q    And was the email in box that the

8  referrals came into just like an Outlook account?

9      A    Yes, sir.

10     Q    Okay.  So if it -- if it was an Outlook

11 account, would you agree that it would be possible

12 to go back and search that account to find a

13 particular patient?

14     A    Yes, sir.

15     Q    Okay.  All right.  Now you also mentioned

16 that sometimes referrals would come in by phone

17 call, right?

18     A    Yes, sir.

19     Q    Who -- who would get that call?  Would it

20 be you at the front desk or someone else?

21     A    It'd be the front desk.

22     Q    So you've answered some of those calls

23 yourself, I guess?

24     A    Yes, sir.

25     Q    Would -- if I just gave you an example,



1 would it be, like, you know, ring, ring, hello.

2 And I say, hello, my name is John Doe.  I'm an

3 attorney in Columbus and I've got a referral of a

4 patient?  Is that kind of how it would happen?

5      A    Yes, sir.

6      Q    What would you do next?  Would you refer

7 me to someone else or would you write it down or

8 how would that happen?

9      A    We usually send it to the care

10 coordinator line.

11      Q    So the care coordinators had their own,

12 like, internal phone line?

13      A    Yes, sir.

14      Q    Was there a particular care coordinator

15 that would answer that or was it just whoever

16 happened to be available?

17      A    I'm guessing it was whoever happened to

18 be available, because it wasn't to one.  It wasn't

19 just, like, to one person.

20      Q    Okay.  When those referrals came in, I

21 mean, you know, obviously whoever happened to

22 answer that, would they make a note somewhere that

23 there had been a new patient referred?

24      A    They usually had a note in this -- I know

25 that they had a pencil note with any information.



1    Q    Could that be that very first one that we
2 talked about that's got the RI on it?
3    A    Yes, sir, with the attorney information.
4    Q    All right.  So it sounds like if a phone
5 call referral came in, one of the first things they
6 would do would be to create -- you'd have to create
7 a CareCloud account for that patient first, right?
8    A    Yes, sir.
9    Q    In order -- I mean, 'cause my
10 understanding is, if you want to put a pencil note
11 in a given patient's chart, you first have to have
12 a, you know, a chart to put it in, right?
13    A    Yes, sir.
14    Q    Yeah.  So if a care coordinator receives
15 a referral from a phone call, would you expect the
16 very first note to be the referral information
17 note?
18    A    Yes, sir.
19    Q    Okay.  How many -- well, how long --
20 let's see, you were with Georgia Spine for -- it
21 sounds like about a year, a little more than a
22 year?
23    A    Yes, sir.
24    Q    Okay.  How many times do you think you
25 fielded calls personally from lawyers who were



1  trying to refer patients to Georgia Spine?

2      A    Usually, they would send emails.  We

3  would get one, maybe, once a day, if that.

4      Q    Okay.  So most referrals were by email,

5  right?

6      A    Yes, sir.

7      Q    But you would still get about a referral

8  phone call a day?

9      A    Get one, if that, yes, sir.

10     Q    Do you know anything about how Georgia

11 Spine would kind of, you know, hope to get this

12 business?  Like, did they go marketing or did they

13 pay for somebody to send them referrals or have,

14 like, a service?  How did that work?

15     A    They did have a marketing department.

16     Q    And what did the marketers do?  Did they

17 go see the plaintiff's lawyers?

18     A    I know that they would go out to the

19 attorney's office, but I don't know how they

20 marketed that way.

21     Q    Did Georgia Spine have any kind of, like,

22 some -- some places have like a Falcon's game box

23 that they would invite people to.  Was there

24 anything like that?

25     A    Not that I recall.



1    Q    Did Georgia Spine ever throw any parties
2 for -- for plaintiff's lawyers?
3    A    I know that when they had a opening for
4 the Roswell office, they did have them come out and
5 look at the Roswell office.
6    Q    And there were lawyers at that party?
7    A    Yes, sir.
8    Q    How big of a party was that, like,
9 hundreds of people or, like, twenty-five?
10    A    It may have been, like, 50 or so, 50,
11 maybe 50 to 75 people.
12    Q    Did you go to the party yourself?
13    A    I was there, yes, sir.
14    Q    About -- about when was that?  It would
15 have been, obviously, 2018, 2019.
16    A    It was when I -- closer to when I first
17 started, so it was 2018.
18    Q    Would it have been, like, summertime,
19 fall?
20    A    It would have been summer.
21    Q    Did you personally happen to know any of
22 those lawyers from just working with them?
23    A    No, sir.
24    Q    You couldn't have -- you couldn't
25 recognize anybody and say, oh, yeah, I know that



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
22

1  guy?

2      A      No, sir.

3      Q      Okay.  Okay.  Would there have been a

4  way, in your experience, to try to figure out how

5  many referrals a given lawyer had sent to Georgia

6  Spine?

7      A      Not that I would know.

8      Q      Would -- would you have been -- for

9  example, could you -- would you agree that you'd be

10  able to go into that Outlook email account and

11  search up their name and see how many emails there

12  were?

13      A      Yeah, you could look up -- yeah, in

14  Outlook, you could look up, like, the attorney's

15  office and it would show you all the -- all of the

16  emails that they sent.

17      Q      So for example, if you had, like, a bunch

18  of emails from -- take one at random, Morgan &

19  Morgan, you could go and look up Morgan & Morgan's

20  email address in Outlook, and then you'd get a --

21  you'd get a hit for every email they'd ever sent

22  that had a referral in it, right?

23      A      Yes, sir.

24      Q      Okay.  When you were there, did you ever

25  have any -- any instructions regarding handling



1 subpoenas or deposition notices or anything like

2 that?

3     A    That would -- that would be what the

4 certified records that I would -- I would just get

5 the records together, and then I would send it to

6 the manager of medical records.  And he would get

7 everything else together and send it off.  I would

8 just get the records and send it to him.

9     Q    During your time at Georgia Spine, did --

10 you said you mostly worked in the Tucker -- Tucker

11 office or Stockbridge office?

12    A    Stockbridge.

13    Q    Yeah.  When -- when you would go over to

14 the Tucker office, was there some reason for that,

15 like, you were just filling in over there or --

16    A    Yes, sir.  As front desk, I'd fill in.

17    Q    Okay.  Who hired you?

18    A    Mi'chell -- I'm sorry -- Mi'chell

19 Alexander and Lori.  They were the ones in that

20 interview.

21    Q    So Mi'chell is M-I-'-C-H-E-L-L, right?

22    A    Correct.

23    Q    I remember that.  Who is -- what's Lori's

24 last name?

25    A    I can't remember her last name right



1 offhand.

2       Q     Okay.  Did you ever have any interactions

3 with Dr. Bendiks himself?

4       A     I did in the Tucker office.

5       Q     Okay.  And what was that like?  Was he

6 just cordial to you?

7       A     Yes, sir.

8       Q     Okay.  Do you mind me asking why you

9 moved on?  Did you find a better opportunity or

10 something like that?

11      A     I actually got let go from there.

12      Q     Why did that happen?

13      A     Because we -- I sent some records that

14 weren't supposed to be sent and -- but it was

15 through email.

16      Q     Uh-huh.

17      A     I was corresponding with the attorney

18 that worked with Georgia Spine & Orthopaedics.

19      Q     Uh-huh.

20      A     And I took as I was supposed to send

21 them, and he told me I wasn't supposed to.

22      Q     Which attorney was that?  Was that Tom

23 Grant?

24      A     It was -- I don't remember his name.

25      Q     Okay.



1      A      'Cause he was only there, like, a month
2  or two before I was let go.

3      Q      Okay.  Was it an African-American
4  gentleman?

5      A      Yes, sir.

6      Q      Was it Alex Smith?

7      A      That sounds about right.

8      Q      Did you have the impression that Alex was
9  trying to tell you not to produce records that had
10  been requested?

11      A      Yes, sir.

12      Q      Did you believe that the request called
13  for those records to be produced?

14      A      I did ask him about those records --

15      Q      Uh-huh.

16      A      -- through an email, and I took it as,
17  when he emailed me back, to send the records.

18      Q      Okay.  And he -- but he obviously
19  differed in that opinion, I guess?

20      A      Yes, sir.

21      Q      Do you remember what attorney's office
22  was looking for those records?

23      A      No, sir, I do not.

24      Q      And what -- my name is Zach Matthews with
25  McMickle, Kurey & Branch.  Have you ever heard of



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

1  my name before?

2      A    I've not heard -- heard of your name.

3  I've heard of the law firm.

4      Q    Okay.  Had you ever heard -- was there

5  any -- was there any involvement in my law firm in

6  that exchange looking for records?

7      A    I wouldn't -- I don't remember who it was

8  with.

9      Q    Okay.  Fair enough.

10     Did you -- did you have a -- I'm just going to

11 ask this.  I don't know any other way to ask it.

12     Did you feel like there was something improper

13 about the way that they were handling records

14 requests?

15     A    In a way, yeah, because we didn't have

16 meetings all the time --

17     Q    Uh-huh.

18     A    -- on -- on certain things.  And then

19 we'd go through emails instead of actually talking

20 about it.

21     Q    Right.  So you would have liked there to

22 be more communication about what you were supposed

23 to do or not do?

24     A    Yes, sir.

25     Q    I understand that.  That's fair.  But



1  I -- what I'm more interested in is did you feel

2  like Georgia Spine was asking you to hide or

3  conceal records that had been asked for?

4      A    No, sir.

5      Q    That's not what you're saying, okay.

6  Was -- what about everything else involved there?

7  Did you have any -- did you have any concerns of

8  any kind about the way that Georgia Spine practiced

9  medicine?

10     A    No, sir.

11     Q    Did you understand that the bulk of the

12 patients that were coming in the door had lawsuits?

13     A    Yes, sir, for car accidents?

14     Q    Yes, ma'am.  Was that generally

15 understood by everybody that worked there?

16     A    Yes, sir.

17     Q    What -- what would people talk about with

18 respect to that in the business?  Would they just

19 say openly, yeah, we work on car wreck victims?

20     A    Yes, sir, people that had been in car

21 accidents.

22     Q    Yeah.  Did you ever have any sense that

23 there was any kind of, like, shenanigans going on

24 or people that were being overbilled or given

25 treatment they didn't need?



 1      A      Not to my knowledge.

 2      Q      Okay.   All right.   Ms. Millsaps, if you

 3  just give me just a second, I'm going to phone my

 4  colleague Bryan here and have a quick discussion

 5  off the record.   And we're just about done.

 6      A      Okay.

 7      Q      Thank you very much.   I'm going to pause

 8  this thing, okay?

 9             THE VIDEOGRAPHER:   Okay.   We are now

10      going off the record at 2:24.

11             (Whereupon, after a brief recess was

12  taken, the proceeding resumed.)

13             THE VIDEOGRAPHER:   We are now back on the

14      record at 2:27.

15  BY MR. MATTHEWS:

16      Q      Okay.   Ms. Millsaps, we really are almost

17  done.   I just wanted to ask you a couple more quick

18  questions about training on records requests.

19      A      Okay.

20      Q      When -- but since you were the person

21  that was responding to records requests, did you

22  ever have meetings or training, even when you first

23  started, about what you were going to be doing?

24      A      So I was trained on it, like, it -- they

25  would send me authorization for the records if it



1 was the customer's -- or sorry -- the patient's

2 attorney, and I would send them the record.  The

3 certified records were usually the other attorney.

4      Q    The defendant's attorney?

5      A    Yes, sir.  But we never really had

6 meetings.  It was just the one -- pretty much just

7 the training.

8      Q    Did you ever get told anything like, when

9 a request comes in for records, we'll send records

10 and bills but we won't send emails or pencil notes?

11      Did you ever have that kind of a discussion?

12      A    No, sir, 'cause when I -- when -- that

13 was what the email was about, because they were

14 just starting to talk about sending the pencil

15 notes.  And he said that I was supposed to send

16 them -- or I took it as I was supposed to send the

17 pencil notes, and I apparently wasn't.  But it was

18 something new that they were starting but we never

19 had training on it.

20      Q    Okay.  So -- and that -- that does get to

21 what I have in mind here.  You sent -- let me see

22 if I get this straight.  You sent pencil notes in

23 response to a discovery request, and then you got

24 fired for it because Alex Smith didn't think you

25 should have sent those; is that right?



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
30

1    A    Yes, sir.  He said that I wasn't supposed
2 to send them, but I took the email as I was
3 supposed to send them.

4    Q    Did you ever have -- even if you don't
5 remember the case, did you read the discovery
6 request that was sent to you?

7    A    I usually read over the -- or read over
8 the certified documents that came in.

9    Q    Right.  When the -- when you would get a
10 request for those documents, did you ever read the
11 list of things that the lawyer was asking for?

12    A    Yes, sir.

13    Q    And in the circumstance that you got
14 fired for, did the lawyer ask for the pencil notes?

15    A    Yes, sir, it was asking for the pencil
16 notes.

17    Q    And you provided them in response to the
18 request, and then Alex fired you for it?

19    A    Alex didn't fire me for it.  Lauri and
20 Nalia were the ones that came and gave me the
21 termination notice.

22    Q    Did they explain to you why they didn't
23 want to turn over the pencil notes?

24    A    No, sir.

25    Q    Did they say anything about how that was



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
31

```
 1  going to let the other side understand their
 2  business model better or anything like that?
 3       A    No, sir.
 4       Q    So you got -- just so I understand, you
 5  got a discovery request, you read it, it asked for
 6  the pencil notes, you put them together and
 7  provided them, and then they canned you for that?
 8       A    Well, because I never sent the pencil
 9  notes, I've reached out to Alex about it.
10       Q    Uh-huh.
11       A    And so I was shown how to get the pencil
12  notes before on how to generate -- or get a picture
13  of them or however to send them.  And so I took it
14  as I was -- by the email, I was supposed to send
15  them.  But they never -- I didn't send them 'til I
16  asked because that's not was -- that wasn't
17  something I normally sent out.
18       Q    Had there been a policy or something like
19  that about not sending pencil notes before that?
20       A    Yes, sir, we didn't ever send the pencil
21  notes.
22       Q    Were you instructed, don't send these
23  out?
24       A    So I -- when I first started, they --
25  they said no sending the pencil notes.
```



1     Q    Who told you that?

2     A    It was Garen.  I don't remember his last

3 name.  He was the one that trained me in medical

4 records.

5     Q    You say Darren, like D-A --

6     A    No, sir, Garen, G-A-R-E-N.

7     Q    Was it -- was it in the nature of, even

8 if they request these, we don't send them?

9     A    Yes, sir.

10    Q    Okay.  Did you have the impression that

11 they knew that those were something that should

12 have been turned over and they were trying not to

13 turn them over?

14    A    That I don't know.

15    Q    Okay.  And you say the policy on sending

16 pencil notes changed, or you thought it had

17 changed, right?

18    A    Uh-huh.  Yeah, they were talking about we

19 were going to start sending pencil notes.  And I

20 was trying to figure out how that worked through

21 email with Mr. Alex.

22    Q    Uh-huh.

23    A    And that's how the email got sent.

24    Q    So you were trying to figure out how it

25 worked, he emailed you back, you interpreted that

 1  as a green light to produce the pencil notes, and

 2  then he felt like that wasn't the right thing to do

 3  and you got terminated for it?

 4      A    Yes, sir.

 5      Q    Okay.  Do you mind telling me what day

 6  you were terminated?

 7      A    It was February 14th, that's Valentine's

 8  Day, right?

 9      Q    Valentine's Day, great, yeah.

10      A    Yeah.

11      Q    Of 2019?

12      A    Yes, sir.

13      Q    And when -- had you sent the pencil notes

14  out, like, a couple days before that or that same

15  day or what?

16      A    I believe it was that Friday before.

17  Monday -- that -- it -- it was either that Friday

18  before or the Monday of.

19      Q    And you don't remember what firm you sent

20  it to?

21      A    No, sir.

22      Q    Okay.  All right.  Ms. Millsaps, is there

23  anything I have not asked you about that that you

24  wanted to share with me?

25      A    No, sir.



1    Q    All right.  Well, hey, I really

2  appreciate your time today.  Thank you so much.

3  And I hope you have a very good day.

4    A    You, too.  Thank you.

5         THE VIDEOGRAPHER:  Okay, Counsel, before

6    we go off the record, would you like a copy of

7    your video synced with the transcript or not

8    synced?

9         MR. MATTHEWS:  A copy of the video, yes,

10   not synced.

11        THE VIDEOGRAPHER:  Great.  Is there

12   anything else you want to get on the record

13   before I take us off?

14        MR. MATTHEWS:  I don't think so.

15        THE COURT REPORTER:  All I'd like to

16   know -- one second, before we're off the

17   record, as far as your copy of the transcript,

18   Zach, same as yesterday, just an electronic?

19        MR. MATTHEWS:  Electronic, no rush.  Yes,

20   ma'am.

21        THE COURT REPORTER:  All right.  Thank

22   you so much, everyone.

23        THE VIDEOGRAPHER:  This concludes today's

24   deposition of Chastity Millsaps.  We are now

25   going off the record on Tuesday, August 2,

CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
35

```
 1        2022, at 2:34.

 2              (Whereupon, the above-styled matter

 3   concluded at 2:34 p.m. Eastern Standard Time.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



CHASTITY MILLSAPS                                   August 02, 2022
BOND V. FEDERATED SERVICE                                      36

```
1                 C E R T I F I C A T E
2    STATE OF GEORGIA
3    COUNTY OF COBB
4
5         I Linda Panzica, Certified Court Reporter and
6    Notary Public, within and for the State of Georgia,
7    do hereby certify:
8         That the deposition of CHASTITY MILLSAPS was
9    held via videoconferencing equipment.  The witness
10   and I were not in the same room.  The witness was
11   duly sworn in by me remotely pursuant to agreement
12   of all parties.  All parties stipulated that the
13   testimony was given as if the witness was sworn in
14   person and may proceed via videoconference rather
15   than in person due to the unique hazards caused by
16   the current national health emergency surrounding
17   COVID-19.  And that this transcript of said
18   testimony is a true record of the testimony given
19   by said witness.
20        The above certification is expressly withdrawn
21   upon the disassembly or photocopying of the
22   foregoing transcript, unless said disassembly or
23   photocopying is done under the auspices of Esquire
24   Deposition Solutions and the signature and original
25   seal is attached thereto.
```



800.211.DEPO (3376)
EsquireSolutions.com

CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

```
1        I further certify that I am not relative,
2   employee, attorney, or counsel of any of the
3   parties; nor am I financially interested in the
4   outcome of this matter.
5        This 2nd day of August 2022.
6
7
8                        Linda Panzica
                         Certified Court Reporter
9                        License No. 2773
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
38

```
 1                 D I S C L O S U R E

 2        Pursuant to Article 10.B of the Rules and

 3   Regulations of the Board of Court Reporting of the

 4   Judicial Council of Georgia, I make the following

 5   disclosure:

 6        I am a Georgia Certified Court Reporter.  I am

 7   here as an independent contractor of Esquire

 8   Deposition Solutions.

 9        Esquire Deposition Solutions was contacted by

10   the offices of MCMICKLE, KUREY & BRANCH, LLP to

11   provide court reporting services for this

12   deposition.  I am not taking this deposition under

13   any contract that is prohibited by O.C.G.A. §

14   15-14-37 (a) and (b).  I have no contract or

15   agreement to provide court reporting services with

16   any party to the case, any counsel in the case, or

17   any court reporter or reporting agency from whom a

18   referral might have been made to cover this

19   deposition.  Esquire Deposition Solutions will

20   charge its usual and customary rates to all parties

21   in the case, and a financial discount will not be

22   given to any party to this litigation.

23        This 2nd day of August 2022.

24                          Linda Panzica, CCR
                            Certified Court Reporter
25                          License Number 2773
```



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
Index: 1/6/18..bunch

---

**1**

1/6/18
  15:8
10.B
  4:6
10/21/19
  14:1
14th
  33:7
19
  7:19
1:58
  4:10

---

**2**

2
  4:4,11
  34:25
20
  7:19
2018
  7:19
  21:15,17
2019
  21:15
  33:11
2022
  4:4,11
  35:1
2:24
  28:10
2:27
  28:14
2:34
  35:1,3

---

**5**

50
  21:10,11

---

**7**

75
  21:11

---

**A**

abbreviations
  15:4
Abigantud
  12:3
above-styled
  35:2
access
  8:20
  16:22
  17:1
accessed
  14:10
  17:4
accident
  14:21
accidentally
  14:22
accidents
  27:13,21
account
  17:8,11,
  12 19:7
  22:10
additional

13:18
address
  16:12,14,
  15 22:20
African-american
  25:3
afternoon
  4:9
agree
  7:8 17:11
  22:9
agreeable
  5:23
ahead
  5:21
Alex
  7:5 25:6,
  8 29:24
  30:18,19
  31:9
  32:21
Alexander
  11:1,3,24
  23:19
ambassador
  7:21,25
announce
  4:21
apparently
  9:14
  29:17
approval
  10:20
Article
  4:6
assume
  5:10
Atlanta
  13:4

attorney
  10:9 15:8
  18:3 19:3
  24:17,22
  29:2,3,4
attorney's
  15:14
  20:19
  22:14
  25:21
attorneys
  10:5
audit
  11:19
August
  4:4,11
  34:25
authorization
  28:25
automatically
  14:5,11

---

**B**

back
  8:12
  10:11
  12:20
  14:10
  17:12
  25:17
  28:13
  32:25
based
  11:8
basic
  7:16
begins
  4:12

behavior
  5:9
bell
  8:18 11:2
Bendiks
  24:3
big
  11:9 21:8
bills
  29:10
block
  14:4
  15:13
Board
  4:7
Bond
  4:13
boss
  11:23
  13:13,15
bosses'
  12:6
box
  16:11,20,
  23 17:7
  20:22
Branch
  25:25
break
  16:5
Breault
  5:8
Bryan
  5:12 28:4
building
  12:17,19
bulk
  27:11
bunch



22:17

**business**
20:12
27:18
31:2

―――――――――

**C**

**call**
16:3
17:17,19
19:5,15
20:8

**called**
6:13 8:2,
24 10:20
11:19
25:12

**calls**
9:25
17:22
19:25

**canned**
31:7

**car**
16:8
27:13,19,
20

**care**
8:3,6
11:3
12:10,12,
16 13:1
16:4,23
17:1
18:9,11,
14 19:14

**Carecloud**
8:17,21,
24 11:18
13:21
15:4,6
19:7

**case**
4:15 6:23
30:5

**caused**
5:15

**causing**
9:5

**certified**
10:8 23:4
29:3 30:8

**change**
14:9,11,
13,16,23

**changed**
14:24
32:16,17

**characteriz
ed**
11:8

**charge**
12:12,14
16:24

**chart**
10:10,11
19:11,12

**Chastity**
4:3,13
5:25 6:12
13:17
14:1
34:24

**Christmas**
13:6

**circumstanc
e**
30:13

**close**
14:20

**closed**
14:9

**closer**
21:16

**colleague**
28:4

**colleagues**
10:25

**colon**
15:7

**Columbus**
18:3

**common**
14:18

**communicati
on**
26:22

**Company**
5:1

**Complies**
6:2

**conceal**
27:3

**concerns**
27:7

**concluded**
35:3

**concludes**
34:23

**confirm**
7:1

**connection**
7:11

**contact**
15:14

**conversatio
n**
9:10 11:5

**conversatio
ns**
9:16

**coordinator**
8:4,6
11:4
12:16
16:24
17:2
18:10,14
19:14

**coordinator
s**
12:10,13
13:2 16:4
18:11

**copy**
34:6,9,17

**cordial**
24:6

**correct**
6:20 7:6
13:23
14:16
16:20
23:22

**Council**
4:7

**counsel**
4:21 5:3
6:22 7:1
34:5

**County**
4:15

**couple**
9:14
13:18
28:17
33:14

**court**
4:7,14,
18,23
5:14,24
6:3,9
34:15,21

**cover**
11:9

**COVID-19**
5:17

**create**
19:6

**CROSS-
EXAMINATION**
6:16

**curious**
14:2

**current**
5:15

**customer's**
29:1

**customers**
9:4

―――――――――

**D**

**D-A**
32:5

**Darren**
32:5

**day**
20:3,8
33:5,8,9,
15 34:3

**days**
33:14

**dedicated**
16:19,22

**defendant's**
29:4

**defendants**
4:25 5:13
6:22

**Dena**
11:1



department
  12:1
  20:15

deposition
  4:1,12,19
  5:7 7:11
  23:1
  34:24

depositions
  5:4

description
  10:24

desk
  7:22,23
  8:1,2
  9:20 12:8
  16:1,10,
  13 17:5,
  20,21
  23:16

detail
  9:15

differed
  25:19

difficult
  13:20

disclosure
  4:5

discovery
  29:23
  30:5 31:5

discussion
  28:4
  29:11

docket
  5:6

document
  11:17

documents
  10:4,7,8,
  14 30:8,

10
Doe
  18:2
door
  27:12
due
  5:14
duly
  5:5 6:14
duties
  13:11
duty
  13:6

_____

E

earlier
  11:4
Eastern
  4:11 35:3
electronic
  34:18,19
email
  16:3,6,9,
  10,11,12,
  14,15,19
  17:7 20:4
  22:10,20,
  21 24:15
  25:16
  29:13
  30:2
  31:14
  32:21,23
emailed
  25:17
  32:25
emails
  20:2
  22:11,16,
  18 26:19

29:10
emergency
  5:16
employed
  7:17,18
  8:8
employment
  8:9
entry
  15:6
Esquire
  4:19
examined
  6:14
exchange
  26:6
expect
  19:15
experience
  15:20
  22:4
explain
  10:1
  30:22

_____

F

facilitate
  10:11
fair
  14:24
  26:9,25
Falcon's
  20:22
fall
  21:19
familiar
  11:18
February

33:7
Federated
  4:14,25
feel
  26:12
  27:1
felt
  33:2
field
  8:8,10
fielded
  19:25
figure
  22:4
  32:20,24
filed
  4:14
fill
  23:16
filling
  23:15
find
  11:17
  17:12
  24:9
fire
  30:19
fired
  29:24
  30:14,18
firm
  26:3,5
  33:19
Forsyth
  5:12
forward
  11:7
Friday
  33:16,17

front
  7:21,23
  8:1,2
  9:20 12:7
  16:1,10,
  13 17:5,
  20,21
  23:16
functions
  13:6

_____

G

G-A-R-E-N
  32:6
game
  20:22
Garen
  32:2,6
gave
  17:25
  30:20
generally
  27:14
generate
  31:12
gentleman
  25:4
Georgia
  4:8,15
  6:24
  7:17,18
  8:13 9:22
  15:21
  16:8
  19:20
  20:1,10,
  21 21:1
  22:5 23:9
  24:18
  27:2,8



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
Index: give..managers

give
  6:5 13:17
  14:11
  28:3
God
  6:7
good
  4:9 34:3
Grant
  7:6,11
  24:23
great
  33:9
  34:11
green
  33:1
guess
  17:23
  25:19
guessing
  17:1
  18:17
guy
  7:5,6
  22:1

**H**

hand
  5:25 6:10
handling
  22:25
  26:13
happen
  18:4,8
  21:21
  24:12
happened
  18:16,17,
  21

hazards
  5:15
health
  5:16
heard
  6:21 7:10
  10:20
  25:25
  26:2,3,4
hey
  16:7 34:1
hide
  27:2
hired
  23:17
history
  9:6
hit
  22:21
honest
  15:2
hope
  20:11
  34:3
hundreds
  21:9

**I**

impression
  25:8
  32:10
improper
  26:12
information
  15:8,14,
  17 18:25
  19:3,16
instructed
  31:22

instruction
s
  22:25
Insurance
  5:1
intend
  5:11
interaction
s
  24:2
interested
  27:1
internal
  18:12
interpret
  15:3
interpreted
  32:25
interview
  23:20
invite
  20:23
involved
  27:6
involvement
  26:5
items
  9:14

**J**

job
  7:20
  12:5,6
  13:6,11
John
  18:2
joining
  5:9

Judicial
  4:7

**K**

keeping
  8:14
  11:19
kind
  7:2 8:14
  11:8
  14:22
  18:4
  20:11,21
  27:8,23
  29:11
knew
  32:11
knowledge
  28:1
Kurey
  25:25

**L**

Lauri
  30:19
law
  26:3,5
lawsuits
  27:12
lawyer
  7:2 9:17
  10:13,14,
  16,19
  16:6 22:5
  30:11,14
lawyers
  9:21 11:6
  15:22
  19:25

  20:17
  21:2,6,22
light
  33:1
Linda
  4:18
link
  5:6
list
  9:15
  30:11
log
  11:19
long
  19:19
Lori
  23:19
Lori's
  23:23
Lucas
  4:17

**M**

M-I-'-C-H-
E-L-L
  23:21
M-I-L-L-S-
A-P-S
  6:19
made
  4:5 14:23
make
  14:9,14
  18:22
manager
  23:6
managers
  12:7



marketed
  20:20

marketers
  20:16

marketing
  20:12,15

matter
  4:13 35:2

Matthews
  4:24 5:23
  6:17,22
  25:24
  28:15
  34:9,14,
  19

Mcmickle
  25:25

means
  15:10

medical
  7:22,24
  8:8,10
  9:6,24
  10:3 23:6
  32:3

medicine
  27:9

meetings
  26:16
  28:22
  29:6

mentioned
  17:15

menu
  9:14

Mi'chell
  11:24
  23:18,21

Millsaps
  4:3,13
  6:12,19

14:1
28:2,16
33:22
34:24

mind
  8:7 10:2
  24:8
  29:21
  33:5

model
  31:2

Monday
  33:17,18

month
  25:1

Morgan
  22:18,19

Morgan's
  22:19

move
  12:24

moved
  24:9

Muscogee
  4:15

MVA
  15:8

————————

N

————————

Nalia
  12:1,3
  30:20

named
  7:5,6
  11:1

national
  5:16

nature
  32:7

needed
  9:4 10:8

needing
  10:4

note
  5:3 9:7
  13:24
  18:22,24,
  25 19:10,
  16,17

notes
  8:24 9:3,
  9,11
  13:22
  14:19
  29:10,15,
  17,22
  30:14,16,
  23 31:6,
  9,12,19,
  21,25
  32:16,19
  33:1,13

notice
  30:21

noticed
  5:5

notices
  23:1

number
  4:16

————————

O

————————

offhand
  24:1

office
  12:24
  20:19
  21:4,5
  22:15
  23:11,14

24:4
25:21

Oil
  4:25

open
  14:18

opened
  14:8

opening
  21:3

openly
  27:19

opinion
  25:19

opportunity
  24:9

order
  14:14
  19:9

Orthopaedic
s
  6:25
  24:18

Outlook
  17:8,10
  22:10,14,
  20

overbilled
  27:24

————————

P

————————

p.m.
  4:11 35:3

Panzica
  4:18

parties
  5:19 13:6
  21:1

party
  21:6,8,12

patient
  7:21,24
  10:10,15
  16:7
  17:13
  18:4,23
  19:7

patient's
  10:16,19
  19:11
  29:1

patients
  9:22 11:6
  20:1
  27:12

pause
  28:7

pay
  20:13

pencil
  8:24 9:11
  13:22,24
  14:19
  18:25
  19:10
  29:10,14,
  17,22
  30:14,15,
  23 31:6,
  8,11,19,
  20,25
  32:16,19
  33:1,13

people
  7:13
  20:23
  21:9,11
  27:17,20,
  24

person
  9:20 15:6



18:19
28:20

personally
19:25
21:21

phone
9:9,16,25
16:3
17:16
18:12
19:4,15
20:8 28:3

picture
31:12

places
20:22

plaintiff
5:3

plaintiff's
9:17
15:21
20:17
21:2

policies
11:9

policy
31:18
32:15

possibly
17:1

practiced
27:8

pretty
8:1 9:3
29:6

proceed
5:11

proceeding
28:12

process

11:12,14

produce
25:9 33:1

produced
25:13

proposed
10:21

provided
30:17
31:7

pursuant
4:5

push
9:14
14:19

put
6:10 9:5,
11 14:5
19:10,12
31:6

────────────

**Q**

questions
6:23 8:14
28:18

quick
28:4,17

────────────

**R**

raise
5:25

random
22:18

reached
31:9

read
13:25
15:7

30:5,7,10
31:5

reason
23:14

recall
13:15
16:18
20:25

receives
19:14

recess
28:11

recognize
21:25

recollectio
n
9:18

record
4:10 8:13
13:25
28:5,10,
14 29:2
34:6,12,
17,25

records
7:22,24
9:24 10:3
13:18
23:4,5,6,
8 24:13
25:9,13,
14,17,22
26:6,13
27:3
28:18,21,
25 29:3,9
32:4

refer
16:8 18:6
20:1

referral
15:17

16:6,11,
23 18:3
19:5,15,
16 20:7
22:22

referrals
15:21
16:20
17:8,16
18:20
20:4,13
22:5

referrals@
georgiaspin
eortho.com
16:17

referred
18:23

Regulations
4:6

remember
8:15,23
9:19 12:2
13:21
15:11
16:15
23:23,25
24:24
25:21
26:7 30:5
32:2
33:19

remote
4:1 5:20

remotely
5:18

report
11:23

reported
11:24

reporter
4:5,18,23

5:14,24
6:3,9
34:15,21

Reporting
4:7

represent
4:22

represented
7:1,4

representin
g
4:19

request
10:10
25:12
29:9,23
30:6,10,
18 31:5
32:8

requested
25:10

requesting
10:14

requests
26:14
28:18,21

respect
27:18

responding
28:21

response
29:23
30:17

responsibil
ity
12:10

resumed
28:12

RI
15:7,8,11



```
      19:2              25:17             17:6,9,           9:21,25          Stockbridge
                        28:25             14,18,24                             12:23
 Riahi                  29:2,9,           18:5,13          specific           23:11,12
      4:17              10,15,16          19:3,8,            16:10
                        30:2,3            13,18,23                           straight
 right-hand             31:13,14,         20:6,9           specificall         10:4
      14:5              15,20,22          21:7,13,         y                   29:22
                        32:8              23 22:2,           7:5 12:22
 ring                                     23 23:16                           stuff
      8:18 11:2   sending                 24:7             Spine               7:16
      18:1              29:14             25:5,11,           6:24
                        31:19,25          20,23             7:17,18         SU2021CV002
 Roswell                32:15,19          26:24             8:13 9:22       440
      13:3                                27:4,10,          15:21             4:16
      21:4,5      sense                   13,16,20          16:8
                        27:22             29:5,12           19:20           subpoenas
 Rules                                    30:1,12,          20:1,11,          23:1
      4:6        service                  15,24            21 21:1
                        4:14              31:3,20          22:6 23:9        Suite
 rush                   20:14             32:6,9           24:18              13:21
      34:19                               33:4,12,         27:2,8
                 share                    21,25                             summer
 ─────────             33:24                              spoke              21:20
                                    Smith                   9:4,23
        S        shenanigans         7:5,10                                 summertime
                        27:23         25:6               staff               21:18
 save                                29:24                 5:6
      14:15,19   show                                                       supposed
                        13:19       software            staffing            24:14,20,
 saved                  14:12,15     8:14,21              8:2               21 26:22
      14:13             15:5         9:8 11:18                               29:15,16
                        22:15        14:3              Standard             30:1,3
 screen                              15:2,4             35:3                31:14
      13:20      shown
      14:8,9,19         5:4 31:11   solemnly           stands              surrounding
                                     6:4                 15:12              5:16
 search          side
      17:12             14:5 31:1   Solutions          start               swear
      22:11                          4:20                7:16               4:23 5:21
                 sir                                     32:19              6:4
 section               7:3,7,12,   sort
      8:23,24          14 8:5,       14:14            started              swearing
      9:7              10,25                            21:17               5:17,20
                       9:19        sounded             28:23
 seeking               10:12,23     16:16              31:24              sworn
      10:19            11:13,15,                                           6:14
                      21 12:4,     sounds            starting
 send                 18 13:8,      19:4,21            29:14,18           synced
      10:3            12,15         25:7                                   34:7,8,10
      16:2,3          14:7,17,                       State
      18:9            25 15:19,    speak               4:14,15           ─────────
      20:2,13         23 16:21                                                 T
      23:5,7,8                                       stipulate
      24:20                                            5:20              talk
```



CHASTITY MILLSAPS
BOND V. FEDERATED SERVICE

August 02, 2022
Index: talked..Zoom

10:15,17
27:17
29:14

**talked**
19:2

**talking**
10:21
26:19
32:18

**telling**
33:5

**terminated**
33:3,6

**termination**
30:21

**testified**
6:15 11:4

**testimony**
6:4

**thing**
6:25 15:2
28:8 33:2

**things**
19:5
26:18
30:11

**Thinking**
8:12

**thought**
32:16

**throw**
21:1

**til**
31:15

**time**
4:10,11
5:19 6:24
8:11,12
23:9
26:16

34:2 35:3

**times**
11:5
14:21
19:24

**title**
7:20

**titles**
12:5,6

**today**
4:17,18
8:8 34:2

**today's**
34:23

**told**
8:17
24:21
29:8 32:1

**Tom**
7:6 24:22

**top**
14:6 15:7

**trained**
28:24
32:3

**training**
28:18,22
29:7,19

**transcript**
34:7,17

**treatment**
10:21
11:7,10
16:9
27:25

**truth**
6:5,6

**Tucker**
12:25
23:10,14

24:4

**Tuesday**
4:11
34:25

**turn**
30:23
32:13

**turned**
32:12

**twenty-five**
21:9

**typically**
15:24

———————

**U**

———————

**Uh-huh**
15:9,15
24:16,19
25:15
26:17
31:10
32:18,22

**understand**
7:23 15:1
26:25
27:11
31:1,4

**understanding**
19:10

**understood**
27:15

**unique**
5:15

**unit**
9:13

**update**
14:4,6

**updated**

14:1,12,
15

———————

**V**

———————

**Valentine's**
33:7,9

**victims**
27:19

**video**
34:7,9

**VIDEOCONFERENCE**
4:1

———————

**W**

———————

**wanted**
16:7
28:17
33:24

**witnesses**
9:12

**wondering**
15:16

**work**
8:3 12:22
13:2
20:14
27:19

**worked**
7:21
12:23
13:3,4
14:3
23:10
24:18
27:15
32:20,25

**working**
21:22

**wreck**
16:8
27:19

**write**
18:7

———————

**Y**

———————

**year**
19:21,22

**yesterday**
11:4
34:18

**Young**
4:25

———————

**Z**

———————

**Zach**
4:24 5:24
6:21
25:24
34:18

**Zoom**
5:7 6:14

