# EXHIBIT 4

IN THE STATE COURT OF GWINNETT COUNTY
STATE OF GEORGIA

```
                          )
SHAWN MILLER,             )
        Plaintiff,       ) CIVIL ACTION
                          ) FILE NO. 20-C-07241-S1
            vs.           )
                          )
OLD DOMINION FREIGHT LINE, )
INC., PROTECTIVE INSURANCE )
COMPANY, BILLIE ANNE BAKER, )
and JOHN DOE CORPORATION 1, )
        Defendants.      )
----------------------------/
```

Zoom Video-Conference, videotaped and stenographic deposition of ERIK T. BENDIKS, M.D., taken on behalf of PLAINTIFF, pursuant to the stipulations set forth below, before Meg Armistead, Certified Court Reporter, with all parties appearing remotely, commencing at the hour of 4:00 p.m., Wednesday, November 3, 2021.

BULL & ASSOCIATES, INC.
COURT AND DEPOSITION REPORTERS
315 West Ponce de Leon Avenue, Suite 650
Decatur, Georgia 30030
(404) 256-2886

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:
             JASON R. MANTON, Esq.
3            The Manton Law Firm, LLC
             418 Pirkle Ferry Road, Suite 112
4            Cumming, Georgia 30040
             Phone:  (678) 455-3257
5            Fax:  (678) 455-3469
             Email:  Jmanton41@yahoo.com
6
     FOR DEFENDANTS:
7            KEVIN P. BRANCH, Esq.
             McMickle, Kurey & Branch, LLP
8            217 Roswell Street, Suite 200
             Marietta, Georgia 30009
9            E-mail: KPB@mkblawfirm.com

10
     FOR GEORGIA SPINE & ORTHOPEDICS and DR. BENDIKS:
11           ALEXANDER M. SMITH, Esq.
             A.M. Smith Law Firm
12           400 Galleria Parkway, Suite 1500
             Atlanta, Georgia 30330
13           Phone:  (770) 627-7872

14

15

16

17

18

19

20

21

22

23

24

25
```

2

INDEX TO PROCEEDINGS
EXAMINATION INDEX


WITNESS:                                              PAGE
ERIK T. BENDIKS, M.D.

EXAMINATION

EXAMINATION by MR. JASON R. MANTON              28

EXAMINATION by MR. KEVIN P. BRANCH              64

FURTHER EXAMINATION by MR. MANTON               122

FURTHER EXAMINATION by MR. BRANCH               122

_____
EXHIBIT INDEX


Plaintiff's Exhibit No. 1                        30

Plaintiff's Exhibit No. 2                        33


Defendants' Exhibit No. 1                        87

Defendants' Exhibit No. 2                        101
(Defendant's Exhibits Retained)




            (In the following transcript, dashes [--] are
used to indicate an intentional or purposeful
interruption of a sentence, and ellipsis [...] is used
to indicate halting speech or an unfinished sentence in
dialogue, written material.)

1          (The Reporter's Disclosure was presented and

2    is attached.)

3          MR. BRANCH:  Mr. Smith, prior to the

4    deposition, this morning I emailed you a Bates-stamped

5    copy of documents associated with everything that we

6    have received in response to a subpoena that I also sent

7    you and a nonparty request for production of documents.

8          THE VIDEOGRAPHER:  Excuse me, sir.  Would you

9    like to record this?

10         MR. BRANCH:  I don't need a recording.  I just

11   want it on the record.

12         Previously, I had received an email from you

13   noting that an objection has been raised with Mr.

14   Coleman that allegedly indicated documents have not been

15   produced and suggesting that was because of privilege.

16   My question to you on the record, first -- and by the

17   way, let me confirm on the record -- everybody was just

18   here -- I gave you an opportunity to take as much as

19   time as you needed before we went on the record, and you

20   had responded to my questions to find the privilege log

21   that you sent -- allegedly sent, outlining the documents

22   that you withheld subject to privilege.

23         Provide me with a filing that you made with

24   the Court raising the objection, and then give me a list

25   of the documents that would have been on that privilege

1    log.  Can you respond to those questions?

2          MR. JASON R. MANTON:  I tell you what real

3    quick while he's -- before he gets ready to respond, I

4    want to make sure.  I know you referred to a subpoena,

5    then a nonparty request for documents.  Can you clarify:

6    Was it a nonparty request for documents?

7          MR. BRANCH:  Yeah.  I apologize if I said

8    "subpoena."  It's a nonparty request for documents.  I

9    I'm fine to -- Madam Court Reporter, I will do this --

10         MR. MANTON:  I want to make sure was it sent

11   by Ron and not you.

12         MR. BRANCH:  That's correct.

13         MR. MANTON:  I got a copy of it.

14         MR. BRANCH:  It was November 24, 2020.

15         MR. MANTON:  I'll have to go back and check,

16   and I'm sure I got it.  You said it was November what?

17         MR. BRANCH:  November 24th, 2020.  I'm happy

18   to forward a copy to Madam Court Reporter right now.  If

19   I can share my screen, I'm happy for everybody to take a

20   look at it.  I will tell you what.  Maybe we are --

21   let's do this.  Maybe we can take a little break, go to

22   the video record.  I can show you the nonparty request

23   for production of documents on the video record.

24         And, Mr. Smith, in the video record, you can

25   explain what the privilege log is, where the filing is,

1    where the objections are, and what documents have been

2    withheld.  So let's take a break.  Let the videographer

3    get started so we can take a look at it.

4           MR. MANTON:  Can you send me that by email

5    while we're on the break so I can take a look at it?

6           (A discussion was held off the record.)

7           MR. BRANCH:  We're about to go back on the

8    video record.  Once again, Mr. Smith, if you need time

9    to take a break to find for me the privilege log you

10   submitted, the objection you filed, and identification

11   of the documents you withheld before going on the video

12   record, I want to give all time you need when you come

13   on the video record so that you're organized and ready

14   to respond to my questions.  So take all the time you

15   need.

16           (A discussion was held off the record.)

17           (Video camera turned on.)

18           THE VIDEOGRAPHER:  We're on the record.  My

19   name is Lucas Danner.  I'm a notary public contracted by

20   Encore.  I am not financially interested in this action,

21   nor am I a relative or employee of any of the attorneys

22   or any of the parties.

23           Today is November 3rd, 2021.  The time is 4:17

24   p.m. Eastern time.  This video deposition is being taken

25   remotely via Zoom.  The name of the case is Shawn Miller

1    versus Old Dominion Freight, and it is filed in the

2    State Court Georgia for the County of Gwinnett.  The

3    case number is 20-C-07241-S1.

4            This is Volume I in the video-recorded

5    deposition of Dr. Erik Bendiks.  The attorney taking

6    this deposition is Jason Manton.  Would all attorneys

7    present please introduce themselves and state who you

8    represent, starting with the taking side.

9            MR. MANTON:  This is Jason Manton.  I'm here

10   representing the plaintiff, Shawn Miller.

11           MR. BRANCH:  I'm Kevin Branch.  I represent

12   the defendants.

13           MR. SMITH:  Alex Smith on behalf of nonparty

14   Georgia Spine Orthopaedics.  We're ready to proceed.

15           MR. BRANCH:  We're on the video record.  We

16   had started a transcript record discussing the Georgia

17   Spine & Ortho document production in this matter in

18   response to a request for production of documents that

19   Ron Coleman sent in this matter on November 24th, 2020.

20   I just emailed that to everybody.

21           And also let me go ahead -- if I can have

22   access from the court reporter, I will share my screen.

23           THE COURT REPORTER:  Let me go ahead and make

24   you the host, and you should be able to share your

25   screen.

7

1          MR. BRANCH:  Can everybody see that?

2          MR. JASON R. MANTON:  Yes.

3          MR. BRANCH:  So, Mr. Smith, this is the

4   request for production of documents that Ron Coleman

5   sent on November 24th, 2020.  We received documents in

6   response to that because I can show you where this

7   certificate was actually signed, and it was returned to

8   us.  And so the question I had is:  This morning I

9   emailed everybody first thing this morning with a

10  copy -- a Bates-stamped copy.  We had taken an

11  opportunity to Bates stamp all the documents that

12  Georgia Spine & Orthopedics had sent to us, those 75

13  pages of Bates-stamped documents to everyone that said,

14  look, this is all we received.  And, therefore, this is

15  what our understanding is going to be, is Georgia Spine

16  & Orthopedics' full file associated with this particular

17  patient.

18          At 3:33 I received an email advising that Ron

19  Coleman, prior counsel, had been told -- or communicated

20  that Georgia Spine & Orthopedics was objecting.  I

21  cannot find when we reviewed the documents any objection

22  that was filed by Georgia Spine & Orthopedics.  We

23  cannot find where -- because apparently the question or

24  the issue raised was a privilege log that was produced,

25  and I have reviewed the files and see no evidence that

1  an objection was raised or perfected in a proper manner

2  whatsoever.

3         So prior to coming on video record I posed to

4  Mr. Smith -- gave him all the time in the world he

5  wanted to note that when we came back on the written

6  record and video record, my question is going to be

7  multiple, which is:  Please provide me with a copy of

8  the objections that were filed so we can see them

9  because we can't find any filings in the documents that

10  suggest that was done.  If it was communicated another

11  way, send us copies of that.  I haven't seen that.

12         Give us a copy of the privilege log because we

13  don't have a privilege log.  And documents that have

14  been withheld, we'd like to have categories of documents

15  that have been withheld prior to the start of the

16  deposition today.  Mr. Smith, those are the questions we

17  have.

18         MR. MANTON:  And while -- before Mr. Smith

19  jumps in, I just want to -- let's make sure this request

20  is attached as part of this deposition, I guess, which

21  is kind of -- is not the deposition we thought we were

22  taking here today.

23         But in looking at the nonparty RPD, it looks

24  like it's pretty specific what Mr. Coleman was seeking.

25  It wasn't --

I know you've used the term "whole file" a couple of times, Kevin, but the actual nonparty request refers specifically to certain categories and types of things, and I think that needs to be noted here because it's -- I don't know what's withheld or not withheld. But to the extent what Kevin is describing is being sought, my first glance at it looks a little different than what Ron actually sent in the nonparty RPD.  But I could be wrong because I just started looking at this.

MR. BRANCH:  Yeah.  The one we have in the file includes a request for any and all documentation in your file in regards to the above-named patient.  I would expect that to mean what it says.  If you have a document in your file -- electronic, physical, or whatever -- we should have it.  And that's my question. Are we going to start off --

MR. MANTON:  Are you referring to the letter or to the -- or the actual request?

MR. BRANCH:  The request for production of documents that we're looking at right here.  If you'll look at it, we're scrolling down on the record.

MR. MANTON:  Okay.  I'm looking at it too. Okay.  I'm going by what you actually designated, but it sounds like you -- I don't know what you're looking for or not, to be honest with you.  Maybe I just need to be

10

1   quiet.

2         MR. BRANCH:   What we're looking for is honesty

3   and candidness, is what I'm --

4         MR. SMITH:   Right.  So here it is.  Mr. Ronald

5   Coleman sent over a request to respond to what Georgia

6   Orthopedic says.  That's abundantly clear.  In response

7   to his request, I outlined about eight items here

8   pertaining to medical records.  Georgia Spine sent over

9   medical records and bills in response to those requests.

10         Subsequently, now you have stated that you're

11  seeking additional ... additional documents which you've

12  outlined, and I want to talk about the 30(b)(6) notice

13  that you sent over that Georgia Spine & Orthopedics

14  looked at and said this is a detailed request for

15  records housed in the 30(b)(6) which should also be part

16  of this record as well, wherein Georgia Spine &

17  Orthopedics responded back.

18         At no point did Georgia Spine & Orthopedics

19  say it was withholding documents.  That's not it.

20  Georgia Spine & Orthopedics responded back to Mr.

21  Coleman's response with the medical records and with the

22  medical bills associated therewith.

23         MR. BRANCH:   Then can we agree at this point,

24  we do not have any and all other documentation included

25  in your file with regard to the named patient, and the

11

1    named patient being the plaintiff in this case, Shawn

2    Miller.  Is it -- can we agree that we don't have every

3    piece of documentation in Georgia Spine's file?

4         MR. SMITH:  As to the medical file, as to the

5    medical record, those have been produced.  The

6    additional information that was housed in the 30(b)(6)

7    notice of production of documents, those were additional

8    items that I, again, said that we can discuss -- I've

9    sent you an email on October 27th as to discuss that.

10   That was seven days before this deposition today.  I did

11   not receive a response.  And so when I sent the email

12   today, now I get the response of the alleged withholding

13   of the documents.

14        Now, do we agree to a 30(b)(6) deposition,

15   wherein we can ask additional questions at that time as

16   well?  So I don't know where you're getting it from,

17   that we are withholding documentation.

18        MR. BRANCH:  Because I made the request

19   because you're requested to, with regard to your clinic,

20   produce any -- there was a request -- I mean, if y'all

21   did something for Shawn Miller other than examine her

22   and treat her -- I mean, if y'all provided financial

23   services for her as her stockbroker, I get it.  You

24   don't have records.  If all your records are related to

25   the examination and treatment of Shawn Miller, which I

12

1   think we're going to find out is the case, then we

2   should at this point have any and all other

3   documentation included in your file with regard to the

4   named patient beyond a specific request.

5            And so what I'm getting the sense of today is

6   that you're telling me that we don't have any and all

7   other documentation included in your file with regard to

8   the above-named patient because I think you're

9   representing in the file with that we do not have all

10  documentation that Georgia Spine has regarding this

11  patient.  Is that a ... is that a fair comment?

12           MR. SMITH:  That's not ... that's not fair.

13  And as stated, we had produced in response the medical

14  bills and the medical records, right, pertaining to,

15  which you have stated that if you had those, then you

16  can proceed with the deposition.

17           MR. BRANCH:  What don't we have?

18           MR. SMITH:  As stated in your 30(b)(6), right,

19  that was sent over --

20           MR. BRANCH:  We're not talking about the

21  30(b)(6).  I'm going back to November 2020, when you

22  received a response that's in front of us.  I'm asking

23  because I review this -- unless you're going to tell me

24  that you have something that doesn't pertain to the

25  treatment of this individual or examinations or if y'all

13

1   did something for her other than medical treatment --

2   unless you're going to tell me that, then I'm expecting

3   to know what it is and what documents that you would

4   have that we don't have, given that Ron Coleman's

5   request asked for any and all other documentation

6   included in your file which regards the named patient.

7          So let's stay in 2020.  For 2020 to today,

8   what documents do -- does Georgia Spine have that I

9   don't have that somehow involves Shawn Miller?  As long

10  as it's involved in treatment -- if you're her

11  stockbroker, I don't care about that.  If it involves

12  medical treatment and her being in your clinic

13  whatsoever, then let's talk about what I don't have.

14          MR. SMITH:  So if it is your option to suspend

15  the deposition so that we can discuss those matters,

16  that's fine.  As stated before, the medical records and

17  the medical bills have been produced.

18          MR. BRANCH:  I can't suspend the deposition.

19  I didn't notice the deposition.  This is the plaintiffs'

20  deposition.  What I'm trying to figure out --

21          MR. SMITH:  With all due respect, you

22  mentioned suspending the deposition.  I didn't mention

23  that initially.

24          MR. BRANCH:  I'm trying to figure out -- I

25  don't have any option to suspend the deposition.  I'm

1    trying to figure out is if Plaintiff's doctor has been

2    candid and honest in producing records.  That's what I'm

3    trying to figure out.  Unless Jason is saying we're not

4    taking this deposition, I can object to it, but I can't

5    stop it.

6         MR. SMITH:  So as stated before, the medical

7    records and the bills were produced in accordance with

8    the request that Mr. Coleman sent over.

9         MR. BRANCH:  What don't we have?  Let's just

10   focus on what we don't have.  What didn't he give us?

11        MR. SMITH:  Again, as you sent over the

12   30(b)(6) notice -- because I don't want to talk about

13   this without in tandem with the 30(b)(6) notice.

14        MR. BRANCH:  You can't do --

15        (Simultaneous speakers.)

16        MR. BRANCH:  -- what documents from November

17   2020 until today have you not produced?

18        MR. SMITH:  As stated, the medical records and

19   bills.  They've already been produced.  So we keep going

20   over the same thing; right?

21        MR. BRANCH:  No.  You're ignoring my question

22   because you don't want to explain why Georgia Spine -- I

23   know why you don't want to do this because I know you're

24   looking on your screen right now and reading this.  It's

25   abundantly clear what you should have done, and you

1    don't want to tell me on the record what you didn't do.

2             What records have been in Georgia Spine's

3    possession from November 20th of 2020 to the present

4    that I don't have?  This is going to be my last time

5    asking because I think the records are super clear on

6    this.  What documents don't I have?

7             If you want to take the position you're not

8    going to discuss it, we'll deal with that later, after

9    this deposition.  But I'm just telling you, if I find

10   out that you have documents that I don't have that you

11   have had since November 24, 2020, to the present and we

12   take this deposition, you're going to have a motion for

13   sanctions by Monday.  As long as we're clear on that.

14            MR. SMITH:  Okay.  As stated, right -- I'll

15   say this again -- is that the medical records and bills

16   as requested by Mr. Coleman were produced.  The

17   additional information that was sent over recently by

18   you are matters that we can take up and we can discuss.

19   But our initial production was in line with what Mr.

20   Coleman requested.

21            MR. BRANCH:  I tell you what.  You sound

22   confident and comfortable in your position.  If you

23   don't want to tell me if there's no other records that's

24   not been produced, let's plow forward.  And I'm just

25   telling you -- because we've gone into this in minutae,

1    giving you an opportunity before we take this doctor's

2    deposition and spending time and energy on this to give

3    you a chance to say, "Yes, you're right," and you're

4    refusing to.

5            So let's go forward, and I'm going to make

6    sure I'm communicating clearly that if I find out you

7    have records that relate to the treatment of this

8    individual, her involvement in your clinic, and we

9    figure out we don't have any and all documentation

10   regarding this patient, we're going to take it up.  I

11   just want to make sure you're abundantly clear when I

12   say that.  Here's what you know.  You know that I know

13   what you have.

14           MR. SMITH:  Let's talk about this as well.  On

15   October 27th there was an email that was sent out for us

16   to have a discussion prior to this deposition.  We did

17   not receive a response.

18           MR. BRANCH:  This isn't concerning a 30(b)(6)

19   deposition.  I'm happy to talk with you prior to the

20   30(b)(6) deposition about your -- but today --

21           MR. SMITH:  No.  No.  No.  No.

22           MR. BRANCH:  -- we got ready for this

23   deposition, I expected to see your file that would be

24   consistently produced in response to this subpoena -- or

25   the nonparty request.

1          MR. SMITH:  You know what the --

2          (Simultaneous speakers.)

3          MR. BRANCH:  So if your position is that

4   you've given us everything you think is requested, then

5   we can deal with the discovery request with the Court.

6   I'm getting a sense you're telling me you don't want to

7   talk about the documents you haven't produced, but there

8   are documents that you haven't produced; is that fair to

9   say?

10         MR. SMITH:  My effort is always to move in

11  good faith.  I've already stated, hey, look can we set a

12  time to discuss these matters.  I did not get a response

13  back.  So that is my position.  And when I ask that we

14  work in good faith to set a time where we can discuss

15  these additional issues --

16         MR. MANTON:  I have a quick idea.  I'm sorry

17  to keep interrupting on this, but do you think we can go

18  off the record for about five minutes and, Kevin, you

19  and I can talk privately?  I've got a cell phone I can

20  give you.  You can give me yours, and you and I can just

21  talk about a couple of things?

22         MR. BRANCH:  I'm happy to, Jason.  Here's

23  the -- I'm trying to make a full record of this

24  because --

25         MR. MANTON:  I see.

18

1          MR. BRANCH:  -- they knew this, and Mr. Smith

2     knows this.

3          MR. MANTON:  Let's you and I have a

4     conversation --

5               (Simultaneous speakers.)

6          MR. BRANCH:  I wanted to get this on the

7     record.  The reason I'm asking these questions the way I

8     am, this isn't the first go-round about getting real

9     productions from them.  And so I'm making a record

10    because they know that I know what they have and what

11    they didn't produce.  And they know they should have

12    produced it, and we shouldn't even be having this

13    discussion.  But I'm trying to -- if they want to do it

14    this way, I'm fine with it.  But I'm telling you, we're

15    going to make issue of it.

16         MR. MANTON:  Let's take a quick break.  Kevin,

17    can you give me a phone number?  I'll call you real

18    quick.

19         THE VIDEOGRAPHER:  The time is 4:34 p.m.

20    Eastern.  Off the record.

21              (Video camera turned off.)

22              (A discussion was held off the record.)

23         MR. MANTON:  What I was talking with Kevin

24    about was trying to figure out if there's a practical

25    reason to go forward at this point or if there's things

1    we've got to sort out with a judge regarding some of

2    these things, relevancy and whatnot, because my concern

3    is, I don't want to go forward with the deposition here

4    today and then, depending on how -- if there's documents

5    that haven't been produced and the judge says that

6    they're relevant, then we have to come back and do this

7    deposition again.  I'm trying not to be redundant here.

8            At the same time, I'm very concerned that we

9    are coming up -- discovery is going to end soon, and,

10   you know, we're on a tight calendar.  And it's -- Dr.

11   Bendiks is busy, rightfully so, as we all are.  So it's

12   not always easy to get everybody together for one of

13   these depositions.  So when we finally got it done --

14   it's been noticed for a long time -- these things are

15   coming up at the last minute.  That's kind of

16   frustrating to me.  I think Kevin wanted to ask Alex a

17   couple of things about some particular types of records,

18   if they've been relevant or not or produced or not.

19   I'll let him take it from there.

20           MR. BRANCH:  We're back on the record for

21   video and record.  I'll ask this question.  I think this

22   will help us understand.  Can everybody see my screen?

23           MR. MANTON:  Yes, sir.

24           MR. BRANCH:  Mr. Smith, do you have an audit

25   log for this patient that would look like this?  And,

1    second, are there Pencil notes for this client that

2    would look like this?

3              MR. SMITH:  As noted before --

4              THE VIDEOGRAPHER:  Mr. Smith, do you want me

5    to start recording everybody?

6              MR. MANTON:  I don't think we need the video

7    for this.  I think just the court reporter is fine.

8              MR. SMITH:  Hold on one second because I want

9    to be clear as to this particular document which you're

10   showing me.  Where is this document from?

11             MR. BRANCH:  These are redacted copies of

12   documents that we received from you in other cases that

13   we know exist and have 30(b)(6) testimony about when

14   they were produced and what they were used for.  And so

15   my question is:  Do you have each type of these

16   documents for --

17             MR. SMITH:  One thing, I would hope that's not

18   a document that was under a confidentiality order that

19   was not supposed to be shown onscreen.  I would hope

20   that.  So let's note that first.

21             MR. BRANCH:  Yeah.  It was a redacted

22   document.  Answer the question:  Do you have a document

23   like that for Shawn Miller?

24             MR. SMITH:  As stated in the request that Mr.

25   Coleman sent over --

1          MR. BRANCH:  That's not my -- I don't want to

2    hear that.

3          (Simultaneous speakers.)

4          MR. SMITH:  The request that was sent over by

5    Mr. Coleman that requested documents regarding the

6    medical treatment and the examination of Mr. Shawn

7    Miller -- those documents were produced.  You have now

8    stated that you wanted additional documents specifically

9    regarding counsel notes that are administrative

10   documents.  You also stated that you wanted other

11   documents that were outlined in your notice to 30(b)(6).

12         MR. BRANCH:  I want to clarify on the record.

13   Is it going to be your position that there will be

14   nothing in the Pencil notes that will resemble or

15   reflect a document related to an examination or

16   treatment of this patient whatsoever?  That's your

17   position?

18         MR. SMITH:  My position is, is that the

19   examination of the patient -- all those documents,

20   right, are within the medical records that were

21   presented to you.

22         MR. BRANCH:  So I mean --

23         MR. SMITH:  Administrative communications are

24   never --

25         (Simultaneous speakers.)

22

1          MR. BRANCH:  Can we agree that you have Pencil

2     notes, that you have an audit log for Shawn Miller but

3     we just don't have them because it was your

4     interpretation they don't -- they don't do any --

5     they're not documentation related to treatment; is that

6     your position?

7          MR. SMITH:  Let's not misconstrue my

8     interpretation versus the interpretation that was

9     provided via the document production --

10          MR. BRANCH:  I just want to know if you have

11     that kind of documentation for Shawn Miller.

12          MR. SMITH:  As I already stated, when we're

13     talking about the 30(b)(6), I've already said we can

14     provide the supplemental information.  But we just --

15          (Simultaneous speakers.)

16          MR. BRANCH:  -- do you have that type of

17     document for this patient?  You said your position is

18     you didn't give it to us in response to the November 24,

19     2020, request for production because they don't relate

20     to treatment.  That's your position?

21          MR. SMITH:  You have the medical records and

22     the bills related to that Mr. Coleman requested, as he

23     said that you have all the records regarding the

24     examination of the patient.

25          MR. BRANCH:  Did you receive the November 24,

1    2020, request for production of documents on the screen?

2    Is there any dispute about that?

3         MR. SMITH:   Can you say that one more time for

4    me?

5         MR. BRANCH:   Is there any dispute that Georgia

6    Spine received a November 24, 2020, request for

7    production of documents that I showed on the screen?

8         MR. SMITH:   We received that.

9         MR. BRANCH:   That's why I want to make sure I

10   understand your position.   Your position is that the

11   Pencil notes and other documentation and Care Cloud

12   system don't include -- that is not documentation that

13   relates to her treatment?   That's your position?

14        MR. SMITH:   We're rehashing this same thing

15   over and over and over again; right?   So as I've stated

16   before, we can discuss those additional productions that

17   you outlined.   We can definitely do that.   I'm amenable

18   to that.   I've never stated that I'm not.   So if we want

19   to take that up, that's fine.   I think we've already got

20   a record that's clear as to my position.   And so if you

21   want to take it up additionally regarding those other

22   documents, that's fine.

23        MR. BRANCH:   Okay.   So is it your position

24   that we should have every clinical note, every

25   diagnostic image, and any record whatsoever that finds

1    what Dr. Bendiks reviewed and the care he provided to

2    this patient?  We should have those?

3              MR. SMITH:  You should have those.  As to the

4    additional documents, I've stated -- and I'll continue

5    to state it -- that we can take that up, and we can

6    discuss that.  This is a -- we're a nonparty in this

7    matter, and so I want to make their productions to

8    y'all.

9              MR. BRANCH:  So I just want to make sure that

10   I get the audit log, and the Care Cloud records is not

11   going to have anything in there that's going resemble --

12   or relate to treatment?  It's going to show us something

13   else like y'all were her stockbroker or consulting with

14   her or decorating her house?  None of that in there --

15   anything in there that's going to relate to a clinical

16   visit, a treatment that she received at your facility?

17             MR. SMITH:  As you noted, the information that

18   Dr. Bendiks reviewed in treating the patient, that's --

19   those items have been produced.  Now, if you're talking

20   about the administrative documents that were outlined in

21   your 30(b)(6), those additional documents are not

22   documents that we can discuss, and Georgia Spine does

23   not have a qualm with making additional productions.

24             MR. BRANCH:  Well, yeah, if we're going to

25   look at the documentation that you sent over and I don't

1    have to -- I'm not going find there really was another

2    piece of diagnostic image or somebody else's medical

3    records within the file or if there's other intake

4    sheets or anything like that?  I have everything?  Then

5    let's go forward, and I'll do a 30(b)(6) on all these

6    other issues.

7            But, you know, I am taking the position if we

8    get those records and they relate to treatment of this

9    patient, then I'm going to take the position that this

10   deposition went forward with a bad-faith document

11   production, and we will address it.  We'll leave it to

12   you because you know what's in those records.  But I

13   take the position unless they're related to something

14   that doesn't involve Dr. Bendiks laying hands on this

15   lady or getting her medicine or trying to figure out

16   what was wrong with her body, that's documentation in

17   the nature of treatment.  So understand my position.

18   But.

19            MR. SMITH:  Okay.  I'll just -- I'll finally

20   state I can't weigh in on whether you should suspend the

21   deposition or not.  What I can tell you is that the

22   documents that were produced were the medical records

23   that Dr. Bendiks relied on and he created in his

24   treatment of the patient.  The additional documents are

25   regarding administrative documents which you outlined in

26

1    your 30(b)(6), and we did not have an issue producing

2    that.  We can do a confidentiality agreement because

3    some of those productions are regarding trade secrets

4    and HIPAA-protected information; right?

5              MR. BRANCH:  Yeah.  I don't --

6              MR. SMITH:  We can take it up at a later time.

7              MR. BRANCH:  It's your decision as to whether

8    you think you're comfortable explaining to the Court

9    that whatever you withheld doesn't relate to treatment

10   of this patient.  If you're comfortable with that

11   position, you're going to have to take it if those

12   documents reflect it because I'm getting ready to take

13   this deposition based on your representations that

14   there's nothing that's been withheld that relates to the

15   treatment of this patient.  Let's go.

16             MR. MANTON:  Are we ready?

17             THE VIDEOGRAPHER:  Madam Court Reporter, I'll

18   ask you to swear in the doctor on the record, and I'll

19   start the video right now if everybody's ready.

20             (Video camera turned on.)

21             THE VIDEOGRAPHER:  We're on the record.  The

22   time is 4:50 p.m.

23             Madam Court Reporter, would you please swear

24   in the witness.

25                   ERIK T. BENDIKS, M.D.

27

1   was sworn as the witness.

2          MR. MANTON:  This will be deposition of Dr.

3   Erik Bendiks, taken by the plaintiff in this case.  The

4   deposition will be for purposes of preservation of

5   evidence, for use at trial, and all other purposes as

6   allowed by the Georgia Civil Practice Act.

7          Kevin, normally I say it's being taken for

8   trial and make all the objections here today, but I

9   think maybe with this one, it might be better to do a

10  standard -- you know, we reserve the objections, except

11  as to form of the question and responsiveness of the

12  answer.

13         MR. BRANCH:  I'm fine either way.

14         MR. MANTON:  I think we probably ought to

15  reserve objections except as to form and response.

16         MR. BRANCH:  Sounds good.

17                     EXAMINATION

18  BY MR. JASON R. MANTON:

19      Q    Doctor, if you could give us your full name.

20      A    Erik Thor Bendiks.

21      Q    And could you tell us what your profession is?

22      A    I'm an orthopedic spine surgeon.

23      Q    Are you licensed in Georgia?

24      A    Yes.

25      Q    How long have you been licensed in Georgia?

**A**    Since 2002.

**Q**    And are you in private practice right now?

**A**    Yes.

**Q**    What's the name of your practice?

**A**    Georgia Spine & Orthopedics.

**Q**    Where are your practice locations?

**A**    We have offices in Marietta, Roswell, Sandy Springs, Tucker, Stockbridge, Columbus.  I'm in our Tucker office.

**Q**    Where did you go to medical school?

**A**    I went to medical school at UT Southwestern in Texas in Dallas.

**Q**    When did you graduate?

**A**    '96.

**Q**    Are you board-certified?

**A**    Yes, in orthopedic surgery.

**Q**    Can you explain to the jury what it means to be board-certified?

**A**    Board-certified means that I attended an accredited orthopedic surgery residency, which is a five-year program.  During that time you have to have passed all of your written and oral exams.  And then after finishing all your training, you're then tested on your first two years of patients that you care for for the first two years, with additional written exams.

1    Once you've passed all of those tests, then you're

2    deemed board-certified in orthopedic surgery.

3        Q    Doctor, do you have in front of you -- and we

4    can send it to the court reporter as well.  It's labeled

5    as Exhibit 1, a copy of your CV.  If you could take a

6    look at that and confirm if it is, in fact, an accurate

7    copy of your latest CV.

8        A    Yes, it is.

9            MR. MANTON:  At this time I want to attach the

10   CV as Exhibit 1 and tender as well.

11           (Plaintiff's Exhibit No. 1 was marked for

12   identification.)

13           MR. BRANCH:  Do you want to share it on the

14   screen so we can see it as well?

15           MR. MANTON:  I thought the court reporter

16   could, but it doesn't sound like she can.  I cannot; so

17   that's why I sent everything to you.  The only thing

18   that we're going to be using is that CV, the medical

19   narrative report, and the two illustrations that you

20   have.

21           MR. BRANCH:  I'm sorry.  Was something sent

22   today?

23           MR. MANTON:  Yes.  It was this afternoon.

24           MR. BRANCH:  I'm just getting it.

25           MR. MANTON:  It was sent at 2:29.

1          MR. BRANCH:  I found it.  All right.  Go

2    ahead.  Sorry about that.

3          MR. MANTON:  So, Ms. Court Reporter, did you

4    get that down?  We attached the CV into the record.

5          THE COURT REPORTER:  Yes, I did.

6    Q    (By  Mr. Manton)  Dr. Bendiks, the reason

7    we've asked you to be here is, I understand you're a

8    treating physician for Shawn Miller.

9    A    Yes.

10   Q    When did you first see Shawn as a patient?

11   A    March 25th, 2020.

12   Q    I'm sorry.  When did you first see her?

13   A    March 25th, 2020.

14   Q    Did you see her July of 2019?

15         THE WITNESS:  I'm sorry.  I'm reading the

16   wrong numbers.

17         MR. MANTON:  That's okay.

18         THE WITNESS:  Yes.  They're out of date here.

19   A    All right.  Looks like July 31st, 2019.

20   Q    (By  Mr. Manton)  Doctor, there's also a

21   medical narrative that you prepared in your file that I

22   provided to all the parties and the court reporter today

23   labeled here as Exhibit 2.

24   A    Yes.

25   Q    Do you have a copy of that?

31

**A**      September 17th, 2020.

**Q**     If you would, take a look at that and if you would, confirm that that is a narrative that you prepared.

**A**      Yes, it is.

**Q**     Is that your signature on page 4 of the narrative?

**A**      Yes, it is.

**Q**     If you could, please take a second to look at that.  And could you confirm that it's an accurate summary of your treatment and opinions for Shawn Miller?

**A**      (Witness complies.)  Yes, it is.

**Q**     Now, one thing, that narrative report is not notarized; correct?

**A**      Correct.

**Q**     Can you tell us now under oath whether not that narrative is a truthful and accurate summary of your treatment and opinions of Shawn Miller?

**A**      It is.

**Q**     And have you reviewed that narrative report before today's deposition?

**A**      Yes.

MR. MANTON:  And at this time we would attach that as an exhibit to the deposition.

And, Kevin, I'm not trying to put that into

1    evidence to go back to a jury.  I know there's a

2    medical-narrative statute that would apply, but to the

3    extent that it is an exhibit here in the deposition and

4    he's referring to it, we're attaching it to his

5    deposition.

6            MR. BRANCH:  Yes.  And I would just object to

7    much of this as the basis of knowledge, lack of

8    foundation.

9            (Plaintiff's Exhibit No. 2 was marked for

10   identification.)

11   Q    (By Mr. Manton)  Dr. Bendiks, if you could,

12   please describe to us what symptoms or problems that

13   Shawn had when she first tame came to see you.

14   A    At the time she came in, she was noting neck

15   pain and headaches after a collision on November 19,

16   2018.  Those were her main concerns.

17   Q    And what kind of pain was she complaining of?

18   A    We describe or quantitate the pain based on a

19   10-point scale.  So zero is no pain.  10 is the worst

20   pain imaginable.  5 is somewhere in the middle.  She was

21   relaying that her pain was a little more left sided and

22   was anywhere from a 3 to 6 in intensity and worse with

23   movement of her neck and also some pain that was

24   shooting off into the arms as well.

25   Q    And what is your understanding of how long

1  she'd been experiencing that pain prior to seeing you on

2  that appointment date?

3      A    Since the collision that she had been in,

4  which was about nine or so months before, November 19,

5  2018.

6      Q    And what is your understanding of the medical

7  treatment that she had already been through before she

8  came to you as a patient?

9      A    She related having seen several different

10 specialists after the collision.  She first went to the

11 emergency room.  After that she went to Windemere

12 Medical Clinic.  Then she received several sessions of

13 physical therapy.  Unfortunately, she continued to have

14 pain.  She then went and did several sessions of

15 chiropractic care.  Unfortunately, the pains continued.

16 She then went to a pain clinic called Summit Pain and

17 had multiple injections in her neck.  After the rounds

18 of injections, they had given her some good to temporary

19 relief.  She then was seeing her primary care doctor and

20 continuing with chiropractic care.  And then she came to

21 visit with us after that.

22     Q    If you could, take us through what you did for

23 Shawn at that first appointment when you saw her.

24     A    In her first visit we took her history, so

25 what was going on with her.  We reviewed an MRI that she

34

1   brought with her.  MRI is basically a high-powered x-ray

2   that looks at the soft tissues on the body.  So it looks

3   at nerves, discs, muscles, ligaments, things like that.

4   And that was done of her neck.  She had a couple of MRIs

5   of her neck, one in January of 2019 and later on.  I

6   think 2020.  But the one in 2019 is the one that we

7   reviewed.

8          After going over her symptoms and her

9   treatment, we then did a physical exam on her.  What was

10  a physical-on-physical exam was difficulty with motion

11  in her neck and guarding with motion and pain with range

12  of motion in her neck.  There was also some nerve

13  irritation going in the neck caught by a Spurling

14  maneuver, and that was positive on the left side.  And

15  she had noted some signals that were a little bit worse.

16     Q    What did you say was positive on the left

17  side?

18     A    The Spurling test is tilt the head back and to

19  the right and then to the left, and then you also put

20  some direct pressure down.  And what that does is, it's

21  closing down the little holes where the nerves come out

22  and go off into the arms.  If there's something filling

23  up that hole, then there will be less room for the nerve

24  and potentially could result in pain.

25          So, for instance, if you have a disc

1    herniation -- a disc herniation is a -- the discs in the

2    neck are the moving parts.  They're basically jelly

3    doughnuts and shock absorbers.  And if you absorb too

4    much shock in the jelly doughnut, some of that jelly

5    comes squeezing out.  And it can squeeze out and push in

6    the hole where the nerves are coming out.  If you

7    accentuate that position and the disc is damaged on that

8    side and squeezing out, the nerve will get irritated,

9    and you can have some pain that shoots off into the left

10   side of the neck in the left arm.  And she had that on

11   the left side.

12          And then after that we also checked other

13   tests on physical exam.  You want to make sure that this

14   supposed neck pain isn't coming from something else.  It

15   could be coming from a shoulder problem.  So you want to

16   evaluate the shoulder, and we did.  We evaluated her

17   shoulder, and she did not have any problems with the

18   shoulders.  So I didn't think this was a shoulder issue.

19   It seemed to be more focused from the neck.  We reviewed

20   some X-rays of her neck and then came up with a

21   diagnosis and treatment plan for her.

22          Q    What was the diagnosis that you came up with?

23          A    The MRI showed two damaged discs in her neck,

24   C4-5 and C5-6 disc herniations.  So some of the jelly

25   had squeezed out.  The x-rays also showed straightening

of her neck.  Straightening of the neck is not a normal finding.  That's a finding that results from muscle spasms usually related to some type of injury.  And so that can go along with the injury that she had had.  So we did the x-rays, the physical exam, and the MRI, her history together, and I diagnosed her with painful disc damage at the C4-5 and C5-6 discs in her neck.

I told her at that time -- she had already gotten conservative care.  So in necks we'd like to see if we can give it -- at least give it a good two to three months to see if it will get better.  And in her particular case, she'd already gone well beyond that nine or so months approximately, with time, rest, pills, therapies, and injections.  And those are all the conservative-care options at our disposal as spine specialists.

If the time, the rest, the pills, the therapy, and the injections don't help, that's when we consider either living with it or considering surgery.  In her particular case, I felt that surgery would have a good option of helping her.  So I told her at that time I believe her pain is coming from those two damaged discs and your best option would be to do a surgery to remove the damaged discs and replace that with synthetic artificial discs.

1    **Q**    And just so we're clear, when you refer to it

2  as a damaged disc, are you -- is that the same as a

3  herniated disc in this case for Shawn?

4    **A**    Yes.

5    **Q**    And I know you touched on herniated discs

6  before.  If you could, I'd like for you to just explain

7  to the jury what a herniated disc is in relation to

8  Shawn's condition.  And I know you've got a medical

9  exhibit board there that sets forth her injuries.  If

10  you could refer to that.

11    THE WITNESS:  Okay.  Let's see what we can do

12  here.  Let me turn this.  Let's see.  I don't know if

13  that's easily visible or not easily visible.  Do I need

14  to bring the computer closer?

15    MR. MANTON:  I can see it.

16    THE WITNESS:  I can put it closer.

17    **A**    It says "Shawn Miller Cervical Injuries."

18  Those are -- "cervical" mean neck injuries.

19    **Q**    (By  Mr. Manton)  Okay.

20    **A**    We have a spine here.

21    **Q**    Doc, before you go further, I need to ask you:

22  Is that illustration a fair and accurate representation

23  of Shawn's neck condition?

24    **A**    It is.

25    **Q**    Okay.  So if you could then, just explain what

38

1    Shawn's condition and injuries were.

2         A    These will be able to help me be able to

3    explain it best.  So what we're dealing with here is the

4    MRI view, and then this is the schematic -- the picture

5    of what we're seeing on the MRI.

6              So the spine is made of balls called vertebrae

7    that are separated from each other by joints called

8    discs.  These are the joints.  These are the discs right

9    through here.  Okay.  And then the helpful thing is,

10   discs have a soft, squishy center, and they have a hard

11   outer shell, just like a jelly doughnut.  And it allows

12   for motion, and you can have movement there.  It also is

13   a shock absorber, and so if the discs experience more

14   energy or shock that's more than what the discs can

15   handle, it can get damaged.

16             When a disc experiences shock, what happens

17   is, the bones come together.  That pushes on that center

18   section, the center jelly section.  And the center jelly

19   section will push out towards the edges, front, back,

20   left, right.  The whole goal of that outer wall, that

21   tough outer shell, is going to hold that jelly in the

22   center and keep it from moving.  If that shock, though,

23   is more than what the wall can handle, that can get

24   torn, and then jelly can squeeze out of the doughnut.

25             What we're seeing here is, this is a normal

disc right here, 2-3 disc.  This is -- it says "C3"
right here.  That's short for Cervical 3, or the No. 3
neck bone.  That's the 4 neck bone.  That's the 5.
That's the 6 and then the 7 neck bone when we describe
the disc, based on above and below.  This disc which is
the 3-4 -- C3-4.  It's between the C3 bone and C4 bone.
And this down here, this disc right here, is the C5-6
disc because it's before the C5 bone and the C6 bone.

        And what we saw in Shawn's case was that there
was damage at these three discs, 3-4, 4-5, and 5-6 but
most notably at the 4-5 and 5-6 level.  And these --
this schematic shows a little bit of bulging going on
here, more so with the jelly squeezing out of the
doughnut here and more so at the 5-6 level as well.  And
problem is that along that back wall, there's little
nerve fibers in that back wall.  Those nerve fibers get
scratched and irritated, and you feel pain.

        Then on top of that, some of the chemicals
that are inside the disc that do a great job of being
shock-absorber chemicals, they're also supposed to do
the job in here.  They -- unfortunately, if they escape
from there, they can be very irritating to the
surrounding structures out here such as the bones that
are back here.  So this will cause a lot of pain and
spasm and burning and tingling.  It's great until it

1    gets damaged.

2           What we're seeing on the MRI view, which was

3    done on January 12th, 2019, as well as an MRI of Shawn,

4    this is the No. 2 bone.  That is No. 3 bone.  And here

5    is the 4 and 5.  And we can clearly see jelly squeezing

6    out of the doughnut.  The simplest way to look at this

7    right here, this disc right here is 6-7 disc right here,

8    totally normal, completely flat.

9           And what we're looking at back here is the

10   spinal cord.  That's this yellow structure right here,

11   which is gray on the MRI.  And the white around it is

12   the fluid, and that's good.  The fluid acts like an

13   airbag.  It's there to protect the spinal cord.  That's

14   a normal finding.  But we can clearly see, there's less

15   space right here, less fluid, because the jelly squeezed

16   out the back.  And then it gets back to normal.  It got

17   back to normal up here.  And there's a little bulge here

18   at this level.  But the majority of her troubles are

19   right here and right here.  I think a component of her

20   pain is also coming from this level, but I felt the

21   majority of the problem was here.

22           If we look on this view, these views over

23   here, what we're looking at is the places called axial

24   views.  That's basically taking a cut -- cutting right

25   through the neck, cutting through the body like a

                                                           41

sausage, and looking at the -- looking straight down from the head towards the legs; okay?  Then that L is for left, and R is for right.

What we're seeing here is, once again, the disc, the tough outer wall, all the way over here. We're looking at the 4-5 disc right here, and we've seen some of jelly has now torn through that back wall.  It's not big and thick like it should be.  It's been torn, and so then the jelly is squeezing out the back.  And that's causing some irritation and pain right here, and that's what we see in this view.

This is the MRI view -- same MRI from January 12, 2019.  And we see there's narrowing of that space right through here, and some of the disc is bulging out at the 4-5 level.  This is a hole where there's going to be a nerve shooting out into the right arm.  This is going to be a -- you can barely see a wisp of gray. That's going to be the nerve shooting off to the left arm.

In the next cut -- axial cut is looking at the next disc down, the 5-6.  It's sliced right through here.  That's what this looks like.  Once again, this is the front.  This is -- the throat is over here.  The back of the neck is here.  Right side over here, left side over here.  This is a nerve shooting off into the

1  right arm and nerve shooting off into the left arm.

2  Once again, we have a nice, thick wall of cartilage all

3  the way around the sides and front, but the back wall

4  has been torn through, and the disc material is

5  squeezing out the back.

6      Q    Okay.  And just a couple of little

7  housekeeping questions to ask.  Are the MRI images on

8  the board fair and accurate representations of Shawn's

9  actual MRI films?

10     A    They are.

11     Q    Is it a part of your normal practice to review

12  MRI films of your patients?

13     A    It is.

14     Q    So how would a medical condition such as

15  reflected on those boards affect a patient like Shawn?

16     A    Well, when once you damage that back wall, all

17  those nerves are set off.  They're firing constantly,

18  and those nerves can give you the sensations of pain.

19  Those nerves, depending on what they go to -- if they go

20  to muscles, they can cause spasms.

21         Her x-rays -- her neck was straight as a

22  board, and I can show that on pictures later if we need

23  to.  And that's not good.  You're not supposed to have a

24  straight neck.  Your neck's supposed to a nice gentle

25  curvature to it, and hers does not.  Those nerves were

firing to the muscle.  The muscle causes spasms, and

sometimes those muscles will -- when they fire can also

cause tension headaches.  And she does have some

headaches which is -- a component of her headaches could

be from muscle tension.  And she also -- I believe she

complained of some pains shooting off -- discomfort

shooting off into the arms, irritating these nerves

going off into the arms.  And that can give her the

sensations that she's having, going off into the arms.

Q     These herniated-damaged discs that you refer

to for Shawn, is that a normal part of your practice to

treat patients with those conditions?

A     Yes, it is.

Q     Did Shawn have symptoms that were consistent

with someone --

MR. BRANCH:  Scratch that.  Strike that.

Q     (By  Mr. Manton)  Did Shawn have symptoms

consistent with someone who has multiple herniated discs

in her neck?

A     Yes.

Q     So at this point after you reviewed the

initial MRI and met with Shawn -- I know you touched on

it a little bit -- what happened next as far as your

recommendations for Shawn at that point?

A     I told her, you know, at this point you've

44

1    exhausted conservative care.  You've done it all:  Time,

2    rest, pills, therapy, injections -- multiple injections.

3    I don't have any more options.  You can try to live with

4    it or consider surgery for it.  But at this point there

5    was nothing more that I thought that would be different

6    that would give her a chance for established relief.

7          She ultimately decided to see if she could

8    live with it.  I believe she ultimately pursued some

9    more pain-relieving treatments after getting some second

10    opinions with other different doctors.  She did some

11    other pain-relieving treatments that, unfortunately,

12    didn't really give her long-term help.  And she tried

13    pills as well, but the pills really weren't doing it

14    either.  She ultimately came back to see me March 25th

15    of 2020.

16      Q    So as a doctor, did you have any kind of

17    objection or problem with Shawn trying any other

18    nonsurgical treatment options, even though you

19    recommended the surgery originally?

20      A    No, not at all.  I'm a spine surgeon.  So when

21    I tell people to consider a surgery, that's very likely

22    to be the biggest surgery that they ever have in their

23    entire life.  That's a rather daunting thing.  I also

24    try to be very careful to tell my patients, listen, this

25    is causing pain, but I think chances of being paralyzed

1   is very low.  It's not zero but really low by not having

2   surgery.

3          So I don't want to over-call it via

4   sky-is-falling surgeon.  I want to let them know, you

5   got some damage there.  If you can suck it up and live

6   with it, I can live with it.  If you can't, okay.  Then

7   we need to consider the next step.  But for a person to

8   be told I'm going to have to cut their neck open and

9   there's a risk of death or paralysis, I could understand

10  why they would want to think about it, see if maybe some

11  other options might work better for them.

12  **Q**   So I think you mentioned it, but can you just

13  point out again:  When did you next see Shawn after

14  that?

15  **A**   March 25th, 2020.

16  **Q**   Okay.  And can you take us through that point

17  in your evaluation of Shawn after she came on March 25

18  of 2020?

19  **A**   Yes.  At that point she was about a year and a

20  half out from her injury.  She went and visited with

21  another spine surgeon, Dr. Velez, and then also visited

22  with pain specialist Dr. Patel.  She received more

23  injections in her neck, more pain-relieving procedures,

24  and then was recommended even more injections beyond

25  that.  Ultimately, she pursued just trying to live with

it, take various different pain medications to try to keep the symptoms under control.  But, unfortunately, that really wasn't working for her.  So that's why she came back.

Q    All right.  And did you ultimately perform surgery on Shawn's neck?

A    Yes.  Yes.  Ultimately I said, you know, I don't think I have another option.  There's not a new wrinkle here.  It's still the same two damaged discs. We got an updated MRI because the previous one was getting a little old.  The updated MRI was done March 20, 2020, and it still basically showed the same thing, two damaged discs.  So at that point, we ultimately proceeded with the surgery.  She had a neck surgery, I think, done on June 8th, 2020.  And we continued to follow her.

Q    What would you call that surgery, that surgery that you did on her?

A    The surgery that we did for her was disc replacement.  So it's basically changing the two damaged discs for maintenance.  You change out flat tires for new tires.

Q    And I want you to, if you could, explain to the jury what that disc replacement surgery involved and how it works and --

47

1    **A**    Sure.

2    **Q**    Is there an illustration that you have there

3    that can help explain it to the jury?

4    **A**    Yes.

5    THE WITNESS:  I'm going to go ahead and turn

6    around and put that up.

7    MR. MANTON:  Before you start talking about

8    it, once you get it up, if you'll just pause a minute,

9    I've got another question for you.

10    THE WITNESS:  All right.  Okay.  So we've got

11    the other visual aid here.  Can I go ahead and turn

12    around?

13    MR. BRANCH:  Yeah.

14    **Q**    (By Mr. Manton)  Can you turn it around so we

15    can see it?

16    **A**    Yeah.  Hold on a second.

17    MR. MANTON:  I think you need to raise your

18    camera a little bit.

19    THE WITNESS:  Working on that.

20    MR. MANTON:  Okay.

21    THE WITNESS:  Okay.

22    **Q**    (By Mr. Manton)  All right.  So let me ask

23    you, first:  Is that illustration board a fair and

24    accurate representation of the surgery that you

25    performed on Shawn Miller?

1      A    Yes, it is.

2      Q    And would that board be helpful to you in

3   explaining to the jury the surgical procedure that you

4   did on Shawn?

5      A    Yes, it would.

6      Q    All right.  If you could, then, explain to the

7   jury this surgical procedure that you did on her neck.

8      A    Sure.  Over we have schematics that are A

9   through F.  Beginning here we have Shawn asleep and face

10  up on the operating room table.  And then what we'll do

11  is, we'll make an incision on the neck.  Once we make

12  the incision on the neck, there are muscles that we have

13  to spread apart and move out of the way.  Once we get

14  past the muscles, then we start to get in more expensive

15  real estate.  There's blood vessels here, the carotid

16  artery and vein and nerves coming up and down here.  So

17  we have to gently move those to the side.  And then the

18  throat and the windpipe are in the middle.  We have to

19  move that in the other direction.

20          Once we pull those tissues apart, we actually

21  put in a metal contraption that pulls everything in

22  place called a retractor.  And that's depicted right

23  here.  This little metal contraption actually has arms

24  in it that will hold the tissues out of the way.  And

25  then we'll actually see the bones of the spine, and then

49

we have to use a special x-ray machine to count

vertebrae.  We have a portable x-ray machine that will

count the bones.  We can then identify which bones and

then consequently know which discs are troublemakers.

In order to remove the disc material depicted

right here, we have to first put in screws into the

bones.  And then with a special instrument, we'll spread

those apart, and that jacks open the disc space a little

bit more and allows us to be able to get in there and go

all the way to the back so that you can see the spinal

cord and take pressure off the spinal cord.  In order to

do that, we first make an incision with a knife, cutting

open the disc.  And then we use specialized instruments

here called pituitaries to tear out the material.  Then

we'll have to do that at the C4, and we have to do that

at C5-6 level; okay?

This next picture here in No. C shows a

different type of instrument coming  in all over that.

Once you remove most all of the material, you start by

removing material from the front and work your way

slowly to the back; otherwise, you can paralyze the

patient.  We're gently teasing that material out.  And

then once you get to that back wall, or what's left of

the back wall, we to have take that -- more tissue down,

which is what this little instrument is doing, removing

the last vestiges of any tissue that are left back here. And that's a different type of instrument that we use.

Next, we have what we see down on View D is ends of bones, this end, that end.  They're called end plates.  We have to scrape those to remove any little bits of cartilage so that when we put the implant in, it will fit properly.  That will be depicted right here, with the special instrument called a curette to scrape that little bit of bone which will then break down that little bit of leading bone.

And once we've done that, then we have to go ahead and take this little artificial disc implant and put it in there.  But we have to size it.  We have to get the right size.  It's kind of like measuring your shoe size.  It's not one size fits all.  We have all -- there are different sized implants.  We'll do different trials until we get the one that looks and fits the best.  And then based off that trial we'll then pick the final implant.

And what we're seeing here is, the implant is loaded onto a special instrument called a jig, and then we insert it gently into the disc space.  So we have to hammer it back into place and make sure that we gently hammer it and not push it back to the spinal cord and damage the spinal cord.  Here we've already implanted it

1   at the 5-6 level and 4-5 level.

2          Finally, this is the screw here as what it's

3   going to look like here after surgery.  On side view we

4   see the two metal implants.  There's a plastic core in

5   the center.  That's why you can see through it.  This is

6   what it looks like on the schematic with the two

7   implants in place.  They're called M6.  It's just a name

8   of a random implant.  There's different types of

9   implants.  Chevy, Ford, whatever, this one's called M6,

10  and it allows for continued movement here.  It basically

11  replaces the disc.  And it's not as good as our

12  God-given discs, but it's a very effective implant.

13         And these are final views that we see right

14  there.  It's an X-ray that was taken on August 10th,

15  2020, showing the implants in the new position.

16     Q    (By  Mr. Manton)  After the surgery what

17  happened next in Shawn's course of medical care?

18     A    After her surgery we then followed her for

19  routine postop visits.  She began to notice improvement

20  in her neck pain, as well as the headaches with time.

21  And we were able to wean her off medications after the

22  surgery.  And then she said she was feeling pretty good

23  as we continued to follow her all the way up through our

24  visits into 2021.  I think our final visits with her

25  were in September of this year, of 2021.  And at that

1   point she was doing well.  She'd already completed

2   physical therapy, and so we discharged her.

3       Q    Okay.  And I was going to ask you about that.

4   Did she have to complete a course of physical therapy

5   following this surgery?

6       A    Yes.  Yes, she did.

7       Q    And how long is that rehabilitative physical

8   therapy customarily for a surgeon -- for a patient like

9   Shawn?

10      A    Everybody is different.  You have to customize

11  it to the individual patient.  But it's usually six to

12  12 visits, somewhere in that general range.  It just

13  kind of depends on the individual --

14      Q    Was Shawn in that general extended range of

15  completed physical therapy?

16      A    Yes.

17      Q    So is Shawn's surgery considered a successful

18  outcome?

19      A    It depends on how you measure it.  I measure

20  it on a patient that's happy that she no longer has the

21  problems she came with.  And, yes; she said she's

22  better.  The pains that she had before surgery are now

23  much improved.

24      Q    In your records or report, I know there's a

25  term that -- maximum medical improvement that is

53

referred to with Shawn.  Is that a term that you use in your report?

A    Yes.  Sometimes it just refers to when I think a patient is as good as they're going to get.

Q    Okay.  Do you think that Shawn is at maximum medical improvement at this point?

A    Yes, I do.

Q    And, I guess, if you just could explain to the jury what that is.  It sounds like you may already have.  What does it mean when we say a patient like Shawn is at maximum medical improvement?

A    That this is as good as she gets.  There's no high chance of continued improvement beyond this point; that you've done everything that you can; and so there's really no reason to continue any further treatment at this point as a spine surgeon.

Q    With Shawn being at maximum medical improvement, does that mean that her neck is back to the way it was before this wreck?

A    No, it's not the same.  She was -- sustained some injuries to her neck.  Unfortunately, those injuries didn't improve over time, and ultimately she required surgery to fix them.  The surgery has replaced those damaged parts.  The problem is, is that the parts that we put in her are not as good as her God-given

1    parts.  They're pretty good, but they're not as good as

2    her original equipment manufacturer had for her.  So her

3    neck will never be what it was before.  So there is a

4    difference.  She's better, but she's not the way she was

5    before her injury.

6         Q    So are there any limitations for Shawn now

7    after the surgery, things you recommend she be cautious

8    with?

9         A    You know, I would avoid any impact activities.

10   If she said she was a runner or things like that, impact

11   activity is probably not good for artificial disc

12   replacement.  Avoid -- you know, if she told me she had

13   a job working as a house painter and had to do

14   repetitive neck extensions looking above her, that would

15   probably be a troublemaker for her.  I would avoid

16   exposure to vibration for any sustained period of time

17   if she told me she wanted to become a professional truck

18   driver or something like that.  There's a lot of

19   microvibrations with driving, and that's not ideal once

20   you damage a disc.  You have to keep in mind, Ms. Miller

21   is better than when she came, but she does have some

22   residual neck pain which could be attributed to that

23   C3-4 disc that we didn't address.  I didn't feel it was

24   bad enough to include, you know.

25            But the general principle of spine is less is

more.  So less invasive stuff you do, the better.  If

you have to do invasive stuff, keep it to a minimum.

And so you have to kind of make an educated decision at

that point how much you treat.  In her particular case,

I just didn't feel that the 3-4 disc rose to a level

that it needed to be included.

Q    Doctor, is it a normal part of your practice

to do impairment ratings for patients like Shawn?

A    Yes.  It's requested on -- sometimes,

sometimes not.  But, yes; it's a common thing.  The

American Medical Association does have guidelines for

giving impairment ratings.  Basically, it's a number

that describes the percent of body function that's been

lost as a result of an injury or the injury and

subsequent treatment.  And so orthopedic surgeons, we

routinely reference that book to be able to explain,

okay; what's the final status of this?  What is the

impact of this injury on this person?  And we apply a

number to that to be able to explain:  Okay, what does

this mean?

Q    Did you assess an impairment rating for Shawn?

A    Yes.  According to the AMA Guidelines, she

would qualify for a 20 percent impairment rating.

Q    What does that mean when you say "20 percent

impairment rating"?

1    **A**    That means she's lost 20 percent of her body

2    function as a result of this injury and subsequent

3    treatment.

4    **Q**    And can you clarify what resources you used to

5    issue that impairment rating?

6    **A**    It is the AMA Impairment Rating Guidelines,

7    Fifth Edition.

8    **Q**    Doctor, do you have an opinion as to what

9    caused the herniated disc in Shawn's neck that you

10    operated on her for?

11    **A**    She's in her fifties.  So it's important to

12    keep in mind that as we get older, there's plenty of

13    research that shows we can't develop injuries to the

14    body and then get over them and move on and not have any

15    symptoms at a later date.  In her particular case, she's

16    in her fifties.  So I don't have an MRI that was done

17    right before the collision.  That would be what would

18    help me the most, but what I do feel comfortable saying

19    is that her pain and need for treatment I believe stem

20    from this collision.  I don't have a better way to

21    explain why she developed neck pain and why she needed

22    all the treatment that she did, other than this

23    collision.

24         Now, what I ultimately do, I rely on x-rays,

25    physical exam, and MRIs to be able to pinpoint where

1    that's coming from.  After looking at all those things,

2    I believe it's the C4-5, C5-6 disc herniations that

3    result in her pain, as well as the C3-4, although to a

4    little lesser extent, the C3-4 disc as well.

5         Q    Okay.  And so just to be clear for the record,

6    based on your examinations and findings, do you believe

7    there's any relationship between the car wreck that

8    Shawn was in on November 19th of 2018 and the pain

9    that -- the symptoms she expressed to you and following

10   disc replacement surgery that you performed on her June

11   8 of 2020?

12        A    Yes; I believe that her pain in her neck and

13   the headaches that she sustained are a result of that

14   collision and that -- the treatment that she underwent

15   with Dr. Velez, all the different clinics she went to,

16   Dr. Patel, as well as myself -- all were the result of

17   that -- necessitated by that collision.

18        Q    Doctor, have you seen Shawn as a patient since

19   you prepared that medical narrative that was dated

20   September 17th of 2020?

21        A    Yes; we've been seeing her since then.  I

22   believe my last visit with her was September 28, 2021.

23        Q    Okay.  And what were you seeing her for at

24   that time?

25        A    At that point she was now a little over a year

out from her injury.  She was seeing ear, nose, and
throat doctor because she was concerned that maybe she
might have some reflux issues.  She was having some
front-of-the-neck discomfort and so wanted her to see
them.  They really didn't feel that it was a reflux
issue.  At that point I had recommended that she
consider doing some speech-therapy treatments.  She has
had previous neck surgery for parathyroid, which is a
different part of the neck.  But between that and then
the surgery that we did, that could leave her with a
little bit of discomfort on the front side of her neck.

Q    And you brought up this prior neck surgery for
parathyroid that she had.  Are you familiar with that
procedure?

A    Yes.

Q    Can you explain to the jury what that is?

A    The parathyroids are four little glands that
are embedded inside the thyroid gland, which is on the
front of the neck.  It's not all the way by the bone
that's deep inside where I'm working.  This more
superficial, under the skin and muscle, a little bit
lower down.  You have the thyroid with four little dots,
and those parathyroids help control calcium levels in
your body.  And her calcium levels were abnormal, and
ultimately she required a surgery to remove part of the

1  parathyroids in her neck.

2      **Q**    And was this before you ever saw her as a

3  patient?

4      **A**    Yes.

5      **Q**    All right.  Would a prior parathyroid

6  procedure like she had play any role in causing the

7  herniated discs in her neck that you saw on the MRI?

8      **A**    No.

9      **Q**    It's my understanding that Shawn also had a

10  history of kidney stones and hypercalcemia prior to this

11  car wreck that this case is about.  Would kidney stones

12  play any role in causing a herniated disc in Shawn's

13  neck that you operated on?

14      **A**    No.  Those were -- those conditions were

15  because her parathyroids weren't functioning correctly.

16  So that's why they ultimately did the surgery that they

17  did.

18      **Q**    Are you familiar with what hypercalcemia is?

19      **A**    Yes.  Elevated calcium levels in the blood.

20      **Q**    All right.  Would that have played any role in

21  the damaged discs that you performed surgery on Shawn's

22  neck for?

23      **A**    No.

24      **Q**    Same question about prior history of her

25  having gallstones.  Would prior history of gallstones

1    before this neck injury play any role in ultimately

2    needing the surgery that you performed on her?

3         A     No.

4         Q     Dr. Bendiks, in your practice do you ever come

5    across patients that you suspect may be lying about the

6    extent of their injuries?

7         A     I'm not a lie detector.  So I'm just not good

8    at that.  However, I have been in practice for almost 20

9    years, so you can get a sense of people who are giving

10   you a fair shake or not.  Yes; I have come across folks

11   like that.

12        Q     Are there any kind general things that make

13   you suspicious or might tip you off when someone you

14   think might be exaggerating the extent of their

15   injuries?

16        A     There's nothing in particular in general.

17   It's just you get a feeling.  You get a sixth sense.

18   And if I get that, usually I ask the patient to get a

19   second opinion.  Maybe I'm just not reading them

20   correctly or assimilating the information correctly.  I

21   never got that with Shawn, if that's what you're asking.

22        Q     And that's what I wanted to clarify.  Did you

23   ever come across anything in your treatment of Shawn and

24   your examinations of her and in looking at her MRI

25   results that made you think she was exaggerating to you

about her neck pain or problems?

**A**     No.   I didn't get that sense.   I mean it's important to remember that she's the one who decided to go away and try to live with the pain longer.   It wasn't like she was rushing off to do anything.   She was -- quite the contrary, she was doing her best to try to avoid any invasive treatment.

**Q**     Just a couple of few last questions.   Are the medical opinions you've given here today to a reasonable degree of medical certainty?

**A**     Yes, they are.

**Q**     In your examination, diagnosis, and treatment of Shawn, did you use methodology that your medical-specialty field considers to be reliable grounds for forming opinions and inferences in clinical medical practice?

**A**     Yes.

**Q**     Were you as careful in your examination, diagnosis, and treatment of Shawn as would be in your other professional work?

**A**     I was.

**Q**     If you could, what county do you live in, Doctor?

**A**     Fulton.

**Q**     Would it be a hardship on your practice and

your patients that you treat if you were required to

appear live in court to testify in this case?

    A    Yes, it would.  I mean, I'm in clinic four to

five days a week and then surgery as well that I squeeze

in between there.  So something is going to have to

give.  I'm canceling surgery, or I'm canceling clinic.

That's obviously going to affect patient care.

    Q    And were the bills that you and your practice

charged Shawn reasonable compared to what others in your

field of specialty charge?

    A    They are.

        MR. MANTON:  That's all the questions I have

for you.  Thank you, Doctor.

        THE WITNESS:  Thank you.

        MR. BRANCH:  I want to take a minute or two

break, and then I'll come back.  And, Doctor, I have

some questions for you as well.

        MR. MANTON:  That makes sense.

        THE VIDEOGRAPHER:  This is Lucas, the

videographer.  The time is 5:37 p.m.  We're going off

the record right now.

        (Video camera turned off.)

        (A recess was taken.)

        (Video camera turned on.)

        THE VIDEOGRAPHER:  The time is 5:43 p.m.

1    Pacific.  We're on the record.

2              MR. BRANCH:  Dr. Bendiks, good evening.  I'm

3    Kevin Branch.  Thank you for taking the time to be with

4    us today.  I have some questions in follow up on some

5    testimony that you just gave in the matter, the further

6    issues in this case.

7                          EXAMINATION

8    BY MR. KEVIN P. BRANCH:

9        Q    But to get started, you were a party on the

10   record before the deposition started about document

11   productions that Georgia Spine has provided in this

12   matter.  I just want to make sure I'm clear on what has

13   transpired.  My understanding is if there is a medical

14   record, diagnostic record, or anything that was

15   generated by your practice or received by your practice

16   pertaining to the medical treatment of Ms. Miller, we

17   should have that in document production that was sent to

18   us, should we not?

19             MR. MANTON:  Object to the form of the

20   question.

21             MR. BRANCH:  Doctor, you can answer the

22   question.

23       A    I'm assuming everything has been produced.  I

24   think you guys requested everything that's related to

25   examination of the patient, which is my physical exams

                                                        64

1    and treatment and the MRI.  So, yeah.

2        Q    (By  Mr. Branch)  And that's what -- I'm

3    asking a little bit more than that.  You were party to

4    the conversations that took place between counsel before

5    the deposition started, and it would be true based on

6    representations from your counsel that we should have

7    every medical record, diagnostic imaging, and anything

8    that you have has been produced to us, available for us

9    for the deposition; correct?

10           MR. SMITH:  I'm going to object to the form of

11   the question.

12           THE WITNESS:  I just answered the first time.

13   That was my answer.

14       Q    (By  Mr. Branch)  If there was diagnostic

15   image that you have that you relied upon in giving your

16   testimony today, I have that, per the representations of

17   Georgia Spine; right?

18       A    Oh, no.  You wouldn't have the images because

19   we don't have images.  Those are digital recordings.

20   You would have to go to the website to get those images,

21   like the MRI images.  I don't keep those or have the

22   ability to get them or send them to you.  That would

23   be -- American Health Imaging is one.  I think Image

24   Link might the other one.  So we don't keep the images.

25   We don't store those.  Elite.  Sorry.  It was Elite.

1    **Q**    **So then, Doctor, for purposes of your**

2    **testimony today, do you deny that your counsel**

3    **represented on the record before the deposition that we**

4    **should have all diagnostic images that you relied upon?**

5        **MR. SMITH:  I'm going to object to the form of**

6    **the question.**

7    **A    Once again, all the stuff that I have the**

8    **ability to get to you, I can.  The images I can't get**

9    **you those.  Those are on the website.  I'm happy to show**

10   **them to you on a computer if you want to see those.  I**

11   **think we can see them in a Zoom meeting.  But they**

12   **showed the relevant images on those diagrams that we**

13   **showed earlier.  If you want to look at the pictures on**

14   **the computer, we can do that.**

15       **MR. BRANCH:  I was -- I'll tell you this.**

16   **Let's take a little break.**

17       **Madam Court Reporter, do you have the ability**

18   **to read back the record?**

19       **THE COURT REPORTER:  The entire record?**

20       **MR. BRANCH:  I want to go back to the record**

21   **before the deposition and discuss with Dr. Bendiks Mr.**

22   **Smith's --**

23       **(Deposition interrupted.)**

24       **MR. BRANCH:  I want you to go back, and I want**

25   **to find the statements when I asked, Do we have all the**

1  diagnostic images?  I want you to find certified

2  diagnostic images from Mr. Smith.  I want you to -- when

3  we go back on the record, I want you to read that back.

4          MR. MANTON:  And I'm just going to put a

5  standing objection on the record, to the extent it's

6  calling for witness to give testimony about what his

7  lawyer said in a conversation before the deposition

8  started.  I have a standing objection to that.

9          MR. BRANCH:  We were told before -- I mean,

10  now that he told me before the deposition that we had

11  all the diagnostic images and I don't, he just gave

12  testimony or more to things they told me I would have in

13  my file that we don't.  Similar -- is that --

14          MR. SMITH:  All the matters that he relied

15  upon in providing his testimony today, those are things

16  that were produced.  I think he's already stated certain

17  information such as the information held by American

18  Health Imaging and such are documents you have to get

19  from them.

20          MR. BRANCH:  Madam Court Reporter, have you

21  found it?

22          THE COURT REPORTER:  I haven't heard anybody

23  say go off the record.

24          MR. BRANCH:  Off the record.

25          (A discussion was held off the record.)

1          (Video camera turned on.)

2          THE VIDEOGRAPHER:  We're on the record.  The

3     time is 5:52 p.m.

4          Q    (By Mr. Branch)  Dr. Bendiks, we're back on

5     the record.  I just want to clarify.  You were present,

6     were you not, on the video record during the

7     predeposition discussion between counsel regarding

8     documents that have been produced?

9          A    If by present you mean my camera was on?  Yes,

10    but I wasn't listening to you guys.  You guys were

11    arguing amongst yourselves.  So I leave you guys to

12    handle that.

13         Q    So you don't have any idea about any

14    representations that were made by your lawyer on the

15    record about what documents have been produced that

16    would be available to for the deposition?

17         A    No; you guys were talking all sorts of crazy

18    legalese.  All I heard from you was "imaging."  If you

19    want to save the judge and jury some time, I'm happy to

20    look at the images with you right now on the computer.

21         Q    We'll come back to look at the records that

22    were produced.  But my understanding is that as you sit

23    here today, you don't have access to and -- to respond,

24    you have not produced the images of Ms. Miller that were

25    taken of the MRIs?

1    **A    No; I don't have access to that.  I have**

2    **online access, but I can't copy those and send those**

3    **files to you guys.**

4    **Q    Okay.  Thank you.  As you sit here today, your**

5    **expectation is that you would not expect to see in the**

6    **Georgia Spine records any imaging?**

7    **A    No.  We don't keep pictures.  The MRI is from**

8    **AHI, and the other one is from Elite.  They keep it on**

9    **their websites, but I can access them online.**

10    **Q    Would you have a report of any sort when you**

11    **review the MRIs?**

12    **A    Yes; it's in the note.**

13    **Q    Yes.  So we should have a note with a review**

14    **and your interpretation of the MRI?**

15    **A    Yes.  It's in the first date of visit and the**

16    **subsequent one where we did the second MRI.**

17    **Q    And, Doctor, let me -- I want to talk to you**

18    **briefly about your practice.  My understanding is that**

19    **you are the owner of Georgia Spine & Orthopedics of**

20    **Atlanta, LLC.**

21    **A    Yes.**

22    **Q    Okay.  And do you also own -- the sole owner**

23    **of the Surgery Center of Roswell, where the surgery took**

24    **place?**

25    **A    Yes.**

1    **Q     Okay.   So nobody else has an ownership**

2    **interest in your business; is that fair?**

3    **A     The bank.   That's about it.**

4    **Q     Now, my understanding is your practice --**

5    **well, let me ask you this real quickly:   Has your**

6    **practice changed any in terms of the nature of the**

7    **practice and the volume of the practice in the last 24**

8    **months?**

9    **MR. MANTON:   Object to form.**

10   **Subject to the objection, you can answer.**

11   **A     I guess that with COVID, we've had some**

12   **decrease, switched more to telemedicine versus in-person**

13   **visits.   Definitely, I've seen that.**

14   **Q     (By  Mr. Branch)  Other that that, though, is**

15   **the type of patient and type of practice you're doing**

16   **still the same?**

17   **A     Yeah.   I tend to see spine patients, and I do**

18   **orthopedics.   That's who I see.**

19   **Q     Now, my understanding is that Georgia Spine**

20   **does not do any direct marketing to plaintiffs' lawyers**

21   **associated with referring patients who have an ongoing**

22   **legal claim.   You guys don't do direct marketing?**

23   **MR. MANTON:   Object to form.**

24   **A     We have a marketing team that goes out and**

25   **markets.**

1     **Q     (By  Mr. Branch)   Well, do you market directly**

2     **to plaintiffs' lawyers associated with referring**

3     **patients who have ongoing lawsuits -- personal-injury**

4     **lawsuits to Georgia Spine?**

5     **A     The marketing team handles all marketing, and**

6     **we market to anybody who can give us referrals.**

7     **Q     Okay.  So it would be your testimony as you**

8     **sit here today that Georgia Spine does that, that you go**

9     **out and directly market to plaintiffs' lawyers to refer**

10    **to you individuals who have been involved in accident**

11    **for you to treat them?**

12    **MR. SMITH:  Object to the form of the**

13    **question.**

14    **A     Once again, I just said my answer, which was:**

15    **We market to all sources that can refer patients to us**

16    **that are orthopedic related.**

17    **Q     (By  Mr. Branch)  So just so I understand**

18    **then, so would it be your position ... your position**

19    **that Georgia Spine engages in industry marketing and**

20    **marketing to plaintiffs' lawyers?**

21    **THE WITNESS:  You kind of cut out there.  I**

22    **didn't catch what you said.  Could you speak into**

23    **microphone again?  I didn't catch what you said.**

24    **MR. BRANCH:  Sure.**

25    **Q     (By Mr. Branch)  So your position would be**

71

1  that Georgia Spine does marketing directly to

2  plaintiffs' lawyers?

3      MR. SMITH:  Object to the form of the

4  question.

5      A    I'll say it for the third time so that you

6  understand it, and I'll say it slowly:  We market to all

7  referral sources.  Anybody that can potentially send

8  orthopedic patients to us, we're happy to see them.

9      Q    (By  Mr. Branch)  Do you know approximately

10  how much you spend each year marketing to plaintiffs'

11  lawyers who refer cases to you for people they're

12  representing?

13      A    No.

14      Q    In terms of success you're having with that

15  marketing, would you agree that about 30 percent of your

16  practice involves treating someone who has some form of

17  claim going associated with a motor vehicle accident or

18  slip-and-fall; correct?

19      A    It varies as the year goes on, but I would say

20  overall, it comes out to about that.  Seems to be about

21  a third is personal-injury related.  So assaults, car

22  accidents, slip-and-falls.  A third is work comp, and

23  third is everything else.  Really as the year goes on,

24  in the beginning of the year, people have haven't met

25  their deductibles.  So the percentages of those might be

72

1    higher as the year goes on.  I would say approximately;

2    yeah.

3        Q    In your experience, though, the workers' comp

4    portion of your practice where you're treating someone

5    who's making a claim against an employer raises it to as

6    much as 40 percent of your practice, has it not?

7        A    I'm sure at some point it has.  Like I said,

8    it varies during the year; so percentages will vary.

9    But, yes; I treat people who are injured, no matter how

10   they're injured.

11       Q    But at any given time, up to 70 percent of

12   your time is some individual who's making a claim

13   against someone else seeking money damages associated

14   with some injury that they claim was caused by somebody

15   else?

16       A    I have no idea.  They never tell me.  They

17   rarely ever tell me, "I hired an attorney, and I'm suing

18   somebody."  They come in saying, "I got injured at

19   work."  "I got run into," and that's the extent of it.

20   I'm concerned about what their anatomy -- pathoanatomy

21   is, not if they have a legal claim or don't have a legal

22   claim.

23       Q    Well, you'd agree, though, that -- I mean,

24   understanding that they have a legal claim, paying is

25   relevant knowledge to you because you understand that 70

1    **percent of the people that you're treating, you're**

2    **treating on a lien, are you not?**

3             **MR. MANTON:  Object to form.**

4        **A    No.**

5        **Q    (By  Mr. Branch)  Would you agree with this:**

6    **If you're treating them with a lien, that means you've**

7    **agreed to treat them, expecting them to have some other**

8    **source of recovery that they then pay you from a lawsuit**

9    **or workers' comp claim; isn't that true?**

10            **THE WITNESS:  You kind of cut out a little**

11   **bit.  I apologize.  Could you say that one more time?**

12            **MR. BRANCH:  Sure.**

13       **Q    (By  Mr. Branch)  You agree that you**

14   **understand the nature of your practice, Doctor, do you**

15   **not, so that if you're treating someone on a lien, it**

16   **means that you provided the treatment with the**

17   **expectation they're going to recover from someone in a**

18   **lawsuit or workers' comp claim and compensate you; you**

19   **understand that?**

20       **A    No; I don't understand that.  What I**

21   **understand is that the vast majority of the medical**

22   **community will not treat anybody without receiving**

23   **payment at the time of service.  I'm willing to go ahead**

24   **and help people that may not be able to pay for their**

25   **care at that time and delay their payment to later date.**

1    If you have a legal claim, great.  I will wait until it

2    settles.  It doesn't matter if it settles for them.

3    They still have a bill, and they owe.  I'm being nice

4    enough to wait for that rainy day.  If it doesn't work

5    out for them, then they have to do a payment plan.

6    That's fine.  I have patients that do that all the time.

7    But, you know, help -- trying to help somebody out who's

8    in a bad situation, that's what I try to do.

9        Q    So, Doctor, then you would be aware that 70

10   percent of your practice at any given time is you

11   representing someone who is in a personal injury claim

12   against someone else?  You don't have any knowledge of

13   that?

14       A    I do not, simply because now you're

15   confounding all the numbers.  Before, you said 70

16   percent with work comp and personal injury.  Now you're

17   saying 70 percent personal injury.  No; it's not that.

18   So the answer is no.

19       Q    So you don't dispute, Doctor, that 70 percent

20   of your practice involves treating someone on a lien

21   basis where you're -- do you know there's something

22   going on where you're expecting to get paid later?

23       A    I'll say it real slowly so that you can

24   understand that the percentage changes over time.  It's

25   about a third, a third, a third over the entire year.

75

1   But at the beginning of the year, it tends to be a

2   higher percentage, and as the year drags on, it gets to

3   be a lower percentage.  Hopefully, we all understand.

4       Q    Sure.  Thank you.  Just so we can make sure

5   that -- Doctor, can you see my screen?

6       A    Yes.

7       Q    Alex Smith is the attorney for Georgia Spine &

8   Orthopedics, is he not?

9       A    Yes.

10      Q    I want to read you something from an affidavit

11  that he submitted in an action that says, "Georgia

12  Sports [sic] treats an estimate of 70 percent of its

13  patients' population on a lien basis."

14           Do you see that?

15      A    Yes.

16      Q    Okay.  Thank you.  You wouldn't have any

17  reason to question whether Mr. Smith is knowledgeable

18  about Georgia Spine's practices?

19      A    No, I don't.

20      Q    Okay.  Doctor, you understand that you've been

21  involved in this business long enough to know that when

22  you're treating someone who has a personal injury suit

23  pending and you're treating them on a lien -- you

24  understand that the chances of you recovering are

25  consistent with them recovering in a lawsuit, is it not?

76

1              MR. MANTON:  Object to form.

2      A    I'm willing to go ahead and wait for payment,

3  but ultimately I expect to be paid.  And I have patients

4  that do that, that they didn't get their inheritance.

5  They didn't get their lawsuit win, and now we have them

6  do a payment plan for their care.

7      Q    (By  Mr. Branch)  Do you have any reason to

8  understand why an individual such as Ms. Miller who

9  have -- who may have health insurance may structure a

10  deal with you where they would not use their health

11  insurance in treating them?

12              MR. MANTON:  Object to form.

13      A    I'm out of network.  So I'm not in network

14  with health insurers.

15      Q    (By  Mr. Manton)  So you don't accept any

16  health insurance?

17      A    We have started recently a couple of plans.  I

18  don't know the specific ones, but we're on a couple of

19  plans; yes.

20      Q    Doctor, so --

21      A    That was back in 2019, I believe.  I'm not

22  really sure.

23              MR. MANTON:  Before I just go interrupting all

24  the time, I'd like to have a standing objection to all

25  questions regarding health insurance.

                                                        77

1          MR. BRANCH:  Sure.

2      Q    (By Mr. Branch)  Doctor, as the owner of your

3  practice, do you involve yourself in the actual running

4  of the financial affairs of practice?

5      A    Everything, soup to nuts.  I buy all the paper

6  clips and pencils.  I admit the patients at the front

7  door.

8      Q    Right.

9      A    I do the medical part.

10     Q    You should have an intimate understanding,

11 then, of the financial workings of your practice in

12 terms of who you represent and how you're represented

13 and how you're getting paid.  Would that be fair to say?

14          THE WITNESS:  Who do I represent?  I'm sorry.

15          MR. BRANCH:  Sure.  Patients you treat.

16     Q    (By  Mr. Branch)  You would agree that if

17 you're intimately involved in the financial affairs of

18 your practice, you should have a pretty good

19 understanding of documentation that exists, how you're

20 treating them, how you're getting paid; would that be

21 fair to say?

22     A    No; I am not intimately involved with the

23 finances of my practice.  I have an accountant that

24 handles that.

25     Q    Who then would better know and have the

78

1   ability to answer questions about how patients are being

2   handled on the financial basis with the practice?

3       A     Probably the person for that 30(b)(6) thing

4   that you have going on later in the month.  Mr. Miles

5   should be able to handle that better.

6       Q     Now my, understanding is, Doctor, that you see

7   about 2,000 new patients a year through your practice;

8   is that fair to say?

9       A     Yeah, approximately.  Like, COVID kind of made

10  things a little screwy.  But ish.

11      Q     Just making sure I understand.  So we're

12  talking about 70 percent at any given time of your

13  practice is going to be personal injury claim or

14  workers' comp claim that you're treating on a lien?

15  We're talking in the range of 70 percent of 2,000

16  patients you're seeing on that basis; is that fair to

17  say?

18      A     Yes, sir.  I guess so.

19      Q     So of the -- just taking those numbers of

20  about 2,000 people you see, about 1,400 of your patients

21  each year are somebody that's going to have a workers'

22  comp claim or personal injury claim that you're treating

23  on a lien basis; fair to say?

24      A     It might be, approximately.

25      Q     Do you know in terms of the revenue of your

1  practice what -- on a yearly basis what 70 percent of

2  the practice would reflect from a gross-income

3  standpoint?

4      A     No.

5      Q     Well, let's take this case.  You put $150,000

6  in this particular case.  Is this a standard file for

7  you or standard patient?

8      A     No; I don't -- I operate on, like, 3 percent

9  of what I see.  So everywhere that I operate on

10 patients, actually less than 3 percent.

11     Q     So you don't know as you sit here today what

12 the average patient treatment will cost for your

13 practice?

14     A     No.

15     Q     So let's take some simple numbers.  In this

16 particular case, $150,000 you've billed for this

17 particular patient.  If you have 1,400 lien patients

18 that you billed $150,000, that would be $210 million,

19 would it not?  Trust my math.

20     A     I'll trust your math; sure.

21     Q     70 percent of that would be $147 million.  Do

22 you know as you sit here today:  Is $150,000 in the

23 range of what you normally charge a patient?

24     A     No.  As I just said, most of that is surgical

25 charges, and I'm operating on 3 percent.  If I see 200,

I operate on around -- I don't know -- a hundred or so,
maybe 150ish maybe.  So pretty uncommon

Q    Doctor, my understanding -- let me ask you
this.  Do you have any sense of how many depositions
you've given on an annual basis for the 70 percent of
your practice that involves somebody with a claim of
some sort?

A    I do a couple of depositions a month.  COVID
kind of drove that down.  Now we're kind of picking back
up again.  I guess that seems to be what we do.

Q    Sounds like you're doing a deposition at least
every other week then, approximately?

A    No.  It's more frequent.  I'll say every other
week.  I'll say over the average of the last -- I don't
know -- eight, ten years maybe, whatever averages out to
that.  Just taking a rough guess.  As I said, COVID kind
of dropped that down a little bit.

Q    So I want to make sure I understand.  So
you've done a deposition every week to two weeks for
approximately eight years?

A    No.  I guess you didn't understand.  I said at
max, I do one, perhaps two, a month.  Say, for the last
two years with COVID, it's been less.

Q    So how many of them have been in the last
year?

1    **A**    I don't know exactly.  Let's just say -- I'll

2    guess again -- a couple a month.  I don't think it's

3    that many but might be.

4    **Q**    Doctor, have you had any meetings or

5    discussions with Mr. Manton in this case about Ms.

6    Miller?

7    **A**    Yes.  He called yesterday to find out where

8    I'd be today so he could mail or deliver these boards,

9    the illustrations.

10   **Q**    What about your care of Ms. Miller?  Did you

11   discuss with him the care that you provided for her?

12   **A**    Just he asked me if I remembered about her

13   case and did I know that I have a deposition tomorrow.

14   And I said "yes," and I read my medical records.

15   **Q**    Doctor, how do you get to a point where you

16   have about 70 percent of your practice where you're

17   representing someone that has some kind of claim, either

18   a personal injury suit or workers' comp claim?  Do you

19   have any sense of how it got to this point?

20   **A**    I guess just by being a good surgeon.  I've

21   been in practice for 20 years now, so a lot of people.

22   I've treated a lot of different people at this point.

23   But orthopedics is a specialty that mostly deals with

24   trauma.  That's the -- some of the biggest calls we get

25   for injuries -- or one of biggest is motor vehicle

collisions.  So we tend to see a fair amount of that.  I

don't take Medicare or Medicaid.  I did in the first

half of my practice.  I don't now.  It tends to be more

degenerative-based issues, so I tend to see a younger

population, and younger populations tend to be more

active.

Q    Sure.  And do you know in terms of -- let me

ask you this:  You've been giving 70 percent of your

practice with some sort of a claim paid, and you've

given, I think you said, in the range of about two

depositions a month for about eight years.  I trust,

Doctor, you understand how the -- how this the system

works in terms of patients having to prove that they

were injured in an accident and having to prove the

injury was caused by the accident in order for them to

recover.  I trust you understand that's how lawsuits

work; right?

          MR. MANTON:  Object to form.

A    Yes; I assume so.

Q    (By Mr. Branch)  So I trust you understood

today -- when Mr. Manton was asking whether you thought

the accident at issue had caused the injury to Ms.

Miller, I trust you understood that Mr. Manton was going

to stand up at the end of this case and show the jury

your deposition and stand up at the end and ask for

money based on your testimony.  I think you -- I trust
you understand that was going to happen?

     A     Well, I have no idea what his demands are, but
I can only assume that.

     Q     Understanding is fine.  I'm --

     A     I make my reasoning for what I think what's
wrong.  You guys asked me the questions.  He asked me do
I think this is related, and I said yes.  I believe it's
related for several different reasons.  I didn't have
these problems before.  She has these problems after
this event, the plausible mechanism of injury, which is
a collision.  Apparently some big freight truck hit her
car or something like that.  Can that result in a neck
injury?  Yes.  A plausible -- a mechanism that wouldn't
be so plausible would be if she told me, "I'm sitting at
a table, eating cereal, and all of a sudden I developed
neck and back pain and headaches."  I look at the
mechanism.

          I also look at objective testing to be able to
see, okay, does that explain it or not?  I said earlier,
it was the x-ray that shows straightening on the X-ray.
That's not normal.  You can't fake that.  That clearly
shows two damaged discs; okay?  That can also explain
it.

          And then finally what I do is, I make sure

84

1    that I don't overlook something else.  Just because the

2    lady comes in and says, "I hurt my neck in a car wreck,"

3    maybe it's something else.  Could be cancer.  Could be

4    infection.  Could it be autoimmune?  Could it be

5    metabolic?  Could be genetic.  I have to go through all

6    those things and just let the evidence point to where it

7    is.  And that's what the science is.  And the

8    evidence -- I don't a better way to explain why she has

9    neck pain that developed after a collision other than

10   because of that collision and then all the other data

11   points that we went over to explain why.  So that's why

12   I made that opinion.

13        Q    Thank you, Doctor.  My question is a little

14   different.  My question was actually:  I trust you

15   understand from the years that you've been involved in

16   this that when Mr. Manton asked you if you had an

17   opinion whether the accident caused the injury at issue

18   that you understood that that your testimony is going to

19   be shown to the jury and then Mr. Manton will cite your

20   testimony to the jury for the basis of asking for an

21   award?  You understand that will happen in this case, do

22   you not?

23             MR. MANTON:  Object to form.

24        A    I am.

25             THE WITNESS:  Sorry.  Go ahead.

1          MR. MANTON:  You're fine.

2     A    I don't know what you two lawyers are going to

3  decide to do.  I can assume that, but I have no earthly

4  idea what each side is going to do.  I assume.

5     Q    (By  Mr. Branch)  That's what I want to get,

6  Doctor, which is I think that we all have and anticipate

7  that you have a doctor-level understanding of the legal

8  process.  But you understand your testimony will be

9  integral in Plaintiff's requesting damages from the jury

10  in this case, do you not?

11     A    Yes.  You guys are not spine surgeons, and you

12  don't -- haven't been to medical school.  So you need

13  that person to be able to explain that.  And I'm the guy

14  who took care of Shawn; so I understand that's what you

15  guys are asking questions about.

16     Q    Sure.  Doctor, have you reviewed your list of

17  depositions history that you provided since

18  approximately 2015?  Have you ever reviewed that?

19     A    No.

20     Q    Just let me start by asking you this:  Are you

21  aware that our firm provided in another matter to your

22  counsel with a list of depositions that we obtained from

23  court reporters that you provided since 2015?  Were you

24  aware that happened?

25     A    No.

1    **Q    Okay.  Do you have any reason to dispute that**
2    **occurred?**

3    **A    No.**

4    **Q    Okay.  Are you aware that your counsel then**
5    **added to the list with additional depositions that the**
6    **court reporters didn't have but that you knew about to**
7    **give us a complete list of depositions that you've given**
8    **in the last few years?**

9    **MR. SMITH:  Object to the form of the**
10   **question.**

11   **Q    (By Mr. Branch)  Do you have any reason to**
12   **dispute that?**

13   **A    No.**

14   **Q    Let me -- I want to then -- let me show to**
15   **you -- Dr. Bendiks, can you describe that?**

16   **A    Yes.**

17   **Q    All right.  I'm going to scroll down through**
18   **it.  I want to go through this whole thing; then we'll**
19   **come back.  Doctor, those are records that I'm**
20   **identifying here, this list that we're going to attach**
21   **as Exhibit 1.**

22   **(Defendants' Exhibit No. 1 was marked for**
23   **identification.)**

24   **Q    (By Mr. Branch)  Do you have any reason to**
25   **doubt that since 2015, you've provided approximately 131**

1    depositions in litigation for patients that you've seen

2    and treated?

3            THE WITNESS:  Sorry.  131 since 2015?  Is that

4    what you said?

5            MR. BRANCH:  Right.

6        A    No.  I guess not.  I mean, just doing the math

7    in my head, I assume that comes out to about a little

8    over 20 a year.  So that's about one or two a month, as

9    I said before.

10       Q    (By  Mr. Branch)  Correct.  And so do you

11   know -- looking at this list, are you aware of any case

12   that you've ever had where you testified on behalf of a

13   patient in a deposition that the accident that was

14   involved in that case did not cause the injury that you

15   treated the patient for?

16       A    No.  Usually those never even get to a

17   deposition because I'm sending the patient out.

18   Nobody's ever willing to argue that.  I only take up

19   injured -- I only take care of injured patients.  I

20   don't take care of injured companies.  So people come in

21   and they're hurt, then I'll say it.  If it's not related

22   to a work injury or it's not related to an assault, I'll

23   say it.  But it never gets to a deposition, or those

24   cases would have been closed down, I would assume.  Once

25   again, I don't know.  You have to ask the lawyers that,

1   but I would assume there's never going to be a

2   deposition over that.

3      Q     So we shouldn't be able find in 120

4   depositions that you provided over the course of five

5   years where you've ever testified that the patient

6   wasn't injured by the accident at issue; fair to say?

7      A     The only time that you guys request

8   depositions is when you guys are going to court like

9   that.  So there must be enough evidence, I guess, on

10  either side, but they want to go to a deposition and

11  argue over it, when I clearly say in my notes I don't

12  believe this is related to whatever the event.

13  Lawnmower accident, an assault, a car accident, work

14  injury or whatever, I write that in the note or I write

15  it in -- it's called an independent medical evaluation,

16  and that usually is the end of it.  The medical

17  evaluation takes care of it.  I never -- I've never in

18  my 20 years had a deposition where I've said this is not

19  related and they argued it with the deposition.

20     Q     And I understood from your testimony a moment

21  ago that you only treat individuals that you believe

22  have been injured by some accident or by some

23  work-related injury.

24     A     No; I didn't say that.  I take care -- I'm

25  orthopedics; so we take care of musculoskeletal systems.

89

So that tends to be issues with bones, ligaments, muscles, tendons, discs, joints, things of nature.  My area of spine subtext would be the neck, maybe low back. And I tend to see a lot of younger people.  Younger people don't tend to have arthritis at that younger age or something like that.  They tend to have injuries, be it car accidents, football, weekends warriors, or work injury.  So I tend to see that.

Q    So just to make sure I understand your testimony, then, that in -- even if you had 120 depositions in the last five years, and never once have you testified that the accident that was involved in that case did not cause the injury for which you treated the plaintiff; true?

THE WITNESS:  I think you said since 2015; is that right?

MR. BRANCH:  Correct.

THE WITNESS:  That's seven years.

Q    (By Mr. Branch)  In seven years you've never testified in one deposition that the accident for which you treated the plaintiff was not -- the injury for which you treated was not caused by the accident at issue?  You can't think of one deposition where you've ever given -- where you denied that the accident caused the injury?

**A**    No, as I said before, because it never gets to that.  I either do an independent medical evaluation, and that -- nobody has ever come to me for a deposition after a medical evaluation when I said I don't think this is related and when I've written in my notes I don't think this is related.  I've never had a plaintiff's attorney try to push the supposed medical expert to disagree with that.  It's not related; so it's not related.  They're happy to go somewhere else and try to find another doctor who thinks it's related.  But if I don't believe it's related, I'll say it, and that's never once required a deposition in the last seven years and not in the last 20 years.

**Q**    Circling back, Doctor, I appreciate you volunteered a moment ago.  You gave us a host of things that you've done that you believe to try to assess whether the accident caused the injury at issue.  Why are you interested in that in this particular case?  Did Mr. Manton at some point early in the case ask you to give an opinion as to whether the accident caused the injury?

**A**    He just asked that a couple of minutes ago.

**Q**    I understand.

**A**    I gave him my opinion.

**Q**    Was the first time that you gave any

1  consideration into this case as to whether the accident

2  caused the injury when Mr. Manton asked you this during

3  the deposition a few minutes ago?  Or have you been

4  looking at that since the beginning of the case?

5      A     When I first saw the patient on July 31st,

6  2019, you know, they give me their history of what

7  happened.  And as I said before, okay; just because a

8  person tells me I think it happened because of this

9  football thing or because somebody hit me or because it

10 happened at work, I can't just base it off of that.  I

11 do have to look at all other potential explanations.

12 And this particular case, I don't have a better

13 explanation of why her pain has occurred, is because of

14 this accident.

15         But, ultimately, whether it's an accident or

16 some other reason, the bottom line is the pathology.

17 The pathology is two damaged discs.  The C3-4 is not

18 that bad.  The C4-5 and C5-6 discs are the damaged

19 discs.  And the only thing that matters is that they're

20 damaged and I believe they're causing her pain.  You

21 guys asked me:  What do you think cause her pain?  I'll

22 answer the question.

23     Q     I understand, and I appreciate you being

24 candid on that.  Sounds like when the patient came to

25 you, your focus then was treating this individual for a

1    physical condition, and you were not focused on deciding

2    whether she had been injured in some an automobile

3    accident; is that fair to say?

4    A    No.  Once again, if the patient says I believe

5    it's because of this, I'll let them know at the end, I

6    don't think so.  I don't think it's related.  In this

7    particular case, I don't think I wrote anything down.

8    The back pain was better.  The headaches were good.  It

9    was just her neck at that point.  And so that's why I

10   recommended she consider surgery for her neck.

11   Q    Sure.  Doctor, you would agree that -- I mean,

12   there's individuals who come to you that you've seen

13   before who have herniated discs in their cervical spine

14   who have not been involved in a motor vehicle accident

15   and have developed that symptomatology, have you not?

16   A    Yes.

17   Q    So that's what I'm trying to understand here.

18   When you started treating this patient, were you focused

19   on providing medical care to her, or were you focused on

20   deciding whether she had a compensable injury in civil

21   litigation?

22   A    Just medical care.

23   Q    All right.  And so fair to say, then, you

24   probably didn't go at this as some kind of investigator,

25   trying to figure out if she'd been injured in an

93

accident.  You were treating her for a medical

condition, and sounds like as a corollary, you were just

now asked in a deposition if you think this was caused

by an accident; is that fair to say?

A    I consider myself a little bit of a private

investigator.  That's what I'm doing.  I'm a health care

private investigator.  I've got to put all these pieces

of evidence together and see what the picture is and,

hopefully, come up with what I think is a more-likely-

than-not scenario for why they have that pain or

disability or pain and disability and then what I can do

as a spine specialist to be able to help them with that.

Q    So you did view yourself as an investigator in

this case then?

A    I think I just answered that question.

Q    So let me ask you:  As a role of an

investigator, would you agree that to be a good

investigator, you want to gather as much as information

as possible and sometimes you rule out certain pieces of

information as being irrelevant; and sometimes you

realize that some things are important?  But that's

critical to being a good investigator, is to get all the

information you can about the subject you're going to

make an opinion on; fair to say?

A    I'm not making an opinion on something.  I'm

94

1  trying to help Shawn with her neck pain.  I do want to

2  get as much as information as possible that's useful and

3  helpful to be able to come up with a diagnosis and a

4  treatment plan.

5  Q    I understand.  So fair to say, then, from your

6  testimony, you don't feel you're being asked to give an

7  opinion as to whether this accident caused the injury;

8  fair to say?

9  A    You seem to want to repeat what I say and then

10 put it in different forms.  If you just listen to what I

11 said, we can kind of move along a little quicker.  I

12 just treat the patient.  They have a neck problem.  I

13 help them with their neck pain.  That's what I do.

14 Q    Well, what I'm trying to understand then what

15 you viewed your role as this went along.

16 A    I'm a doctor.

17 Q    Do you consider that you're giving opinions in

18 this case as to whether this accident caused this

19 injury, or do you think you're not giving opinions on

20 this issue?

21     MR. MANTON:  Objection to form.

22 A    Mr. Manton asked me if I felt that it was

23 related; so I answered the question.

24 Q    (By  Mr. Branch)  Do you have a reason to

25 believe that's not an opinion?  Do you see an opinion as

1  being different than what you just said?

2      **A**    I'm a doctor.  That's my professional opinion.

3      **Q**    All right.  So then sounds like we can agree,

4  then, that you did believe that you were acting somewhat

5  as a medical investigator in this case.  And let me ask

6  you ask my question then, see if you agree:  Do you

7  agree that good investigators seek out all the

8  information they can get so they can either rule in or

9  rule out whether something is relevant to their

10  decision?

11          MR. MANTON:  Object to form.

12      **A**    As to their investigations?  I'll avoid the

13  metaphor as much as possible so we don't misunderstand

14  each other.  I'm a medical doctor, and I'd like to have

15  as much as information as possible that's germane to be

16  able to come to a diagnosis and a treatment.

17      **Q**    (By  Mr. Branch)  My understanding in this

18  particular case is, one of the things you indicated was

19  that when the patient came to you -- Ms. Miller came to

20  you, she was expressing that she was having pain in her

21  neck; fair to say?

22      **A**    Yes.  Left-sided neck pain, along with some

23  headaches and pain that would travel to the left arm and

24  occasionally into the right arm.

25      **Q**    Okay.  So -- and your -- my understanding is

1  your view of this was that there were some herniated

2  discs in her cervical spine that were causing that

3  condition?

4      **A**    Yes.   The 3-4 bulge was not as big a player in

5  the issue and then 4-5 disc and the 5-6 disc that are

6  the main sources of her trouble.

7      **Q**    I understand.   And my understanding from this

8  is, is that based on the medical history that she gave

9  you, it was your view in conjunction with the diagnostic

10 imaging that you had that you thought that this accident

11 could be the cause of the condition that she suffered;

12 fair to say?

13          MR. MANTON:   Object to form.

14     **A**    That her pain and treatment that she received

15 stemmed from this collision.

16     **Q**    (By  Mr. Branch)  And I think you indicated

17 that you had the MRIs that you performed after the

18 accident but you did not have any diagnostic imaging for

19 the patient prior to the accident to review; is that

20 fair to say?

21     **A**    I didn't perform any MRI.  She went and got

22 MRIs done at American Health Imaging.  And then we do

23 have x-rays, and then we have a subsequent MRI that's

24 done at Elite.

25     **Q**    And I think we're saying the same thing.  I

1    understand she went for an MRI, but you reviewed the

2    MRI; fair to say?  You reviewed the images?

3         A    Yes.

4         Q    You did not have the benefit of reviewing any

5    images or any diagnostic imaging that had been done on

6    her prior to the accident at issue; correct?

7         A    Correct.

8         Q    Okay.  Now, let's take a moment.  I want to

9    make sure you and I are on same page with regard to what

10   you have in your file.  Give me just a moment here.

11        Doctor, I'm going to share with you many

12   screen.  Can you see that?

13        A    Yes.

14        Q    Now, what we did was -- so that we can all be

15   on same page here, we took the time to add this Bates

16   stamp number to the top of the records.  And then we

17   this morning sent to your counsel copies of these

18   records just to confirm what we had.  I want to just

19   briefly -- and I don't want to take all the time in the

20   world, but I want to make sure we're on the same page

21   want to go through this with you.

22        I can do this.  I'm happy to email and let you

23   look through it really quickly.  I'm happy just to

24   scroll through it together, whichever you think will be

25   quicker, more efficient.  But I want to get a sense as

1    to any confirmation that I have all the records that you

2    have.

3              THE WITNESS:  That's fine.  Just so you

4    know -- I'm sorry -- it's 6:33.  I'm good until 7:00

5    o'clock.  I budget three hours for depositions.  Beyond

6    that, we'll have to adjourn and do it another day if we

7    need to.  I just want to make sure we try to get in the

8    information in that time available.

9      Q    (By  Mr. Branch)  Doctor, let's plow ahead

10   here.  Let's look into these records.

11     A    Yes.  Yes.

12             MR. BRANCH:  And we Bates-stamped them in

13   the --

14             THE WITNESS:  What is it you want me to do?

15             MR. BRANCH:  I want to know if we have all the

16   records that you have in this matter.

17             THE WITNESS:  I can't see that.  Could you at

18   least say what the dates are of the services or

19   something like that?  We've already read them before

20   with Mr. Manton.  Do you have the same stuff?

21             MR. BRANCH:  I don't think you went through

22   the records in that manner before this.  Listen.  I'm

23   happy to email them to you and give you a moment to take

24   a look at them so that you can flip through them and do

25   that more efficiently.  But I want to do that.

**A**     Let me see.  So I saw her on July 31st, 2019.

**Q**     (By  Mr. Branch)  Let me --

**A**     March 25th, 2020; and then after that we saw

her on May 12th, 2020.  We did surgery on June 8th,

2020.  We then saw her afterwards on June 16, 2020.

**Q**     Doctor --

**A**     July 15, 2020; August 18, 2020; August 10,

2021; September 7th, 2021; and September 28, 2021.  If

you have all those, I have all of those.

**Q**     Doctor, then in looking through your records

that you have available to you then, can you confirm you

don't have a copy of accident report for the accident

that occurred?

**A**     I don't see it there.  I have it here in front

of me right now.  This was given to me in a printed

sheet; so I have that.

**Q**     Who handed it to you?

        MR. SMITH:  Object form of the question.

**A**     My assistant in the office.

**Q**     (By  Mr. Branch)  How did she get it?

**A**     You or Mr. Manton forwarded it to us, I guess.

**Q**     Let's do this real fast --

**A**     But I have it right here if you want to go

over the report.  I can go over it with you.

**Q**     My question is -- let's take a look --

1          MR. BRANCH:  I'm going to reference what we're

2    going to mark as deposition Exhibit 2.

3          (Defendants' Exhibit No. 2 was marked for

4    identification.)

5     Q    (By  Mr. Branch)  Doctor, do you see these

6    records?

7          THE WITNESS:  Sorry?

8     Q    (By  Mr. Manton)  Do you see this?

9     A    We got a -- these are documents we got

10   yesterday.

11         MR. MANTON:  Are you screen sharing?  I can't

12   see it if you are.

13         MR. BRANCH:  I apologize.  It listed in mine

14   that it was sharing.

15         MR. MANTON:  That's okay.

16         MR. BRANCH:  There we go.

17    Q    (By Mr. Branch)  All right.  Doctor, so

18   taking -- do you see these records?  Do you see that?

19    A    Yes.

20    Q    Okay.  Tell me if -- tell me the accident

21   report that you see in front of you.  I'm scrolling

22   down.  There's Georgia.  You'll see I started off with

23   the Bates Stamp numbers.  I started with --

24         THE WITNESS:  When was that provided to you?

25         MR. SMITH:  I'm going to object to the form of

101

1    the question.  I think he's already answered this and

2    stated that it was just provided to him.

3            MR. BRANCH:  I want to put it on the record

4    because of the representations that were made before the

5    deposition started, the emails that were sent.

6            MR. SMITH:  Again, I'm just going to reserve

7    the objection and note that he's already answered that

8    question.

9        Q    (By  Mr. Branch)  Doctor, take a look.  I'm

10   going to scroll down and start with Georgia Spine &

11   Ortho -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14,

12   15, 16, 17, 18, 19 --

13           THE WITNESS:  I'll take your word for it.

14           MR. BRANCH:  Doctor, we're not going to do

15   that.  We're going to take your word for it.

16       Q    (By  Mr. Branch)-- 20, 21 --

17           THE WITNESS:  I just gave you my word, which

18   was, they were received yesterday.  It's right here.  I

19   can go --

20           MR. BRANCH:  If you'll listen to the question.

21   Please listen to the question.

22       Q    (By  Mr. Branch)  24 --

23           THE WITNESS:  We're wasting time.

24           MR. MANTON:  I object to the form of the

25   question.  There's not a question.  We're just counting

pages one by one.

          MR. BRANCH:  Correct.

     Q    (By  Mr. Branch)  The question is, Doctor:  Is
the accident report in the documents I'm showing you?

     A    Not -- no, not there because that was provided
to you before I received the police report, which was
yesterday.

     Q    And I just want to make sure.  So looking
through all the Bates-stamped documents that we've just
referenced ...

     A    Once again, I'm sorry.  I wasn't looking at
those pages.  I have to look at your face on the side
and then here.  So I missed a couple of pages.  But once
again, I'll take your word for it.  If it's there, it's
there.  If it's not, it's not.

     Q    I want to make sure that the record's clear.

     A    How much clearer can it be than "we got it
yesterday"?

     Q    (By Mr. Branch)  Doctor, the pages that we
went through, did you see an accident report anywhere?

     A    No.

     Q    Okay.  All right.  Did you -- what else did
you receive yesterday prior to the deposition?

          MR. SMITH:  Object to the form of the
question.

1    **Q      (By Mr. Branch)   Let me ask you this:   Do you**
2    **have photographs of the vehicles that --**

3    **A      That was it.**

4    **Q      Doctor, did you hear me?   Do you have any**
5    **photographs in your file of the vehicles that were**
6    **involved in the accident?**

7    **A      I don't believe so.   No.   Sometimes patients**
8    **show up, and they have -- everybody's got a smartphone;**
9    **so people oftentimes take pictures.   So possible she**
10   **might have showed it to me, but I don't remember if she**
11   **did.**

12   **Q      I understand.   So as you sit here today, you**
13   **have no recollection of seeing the photographs of the**
14   **vehicles involved in the accident, and you don't have**
15   **any photographs of the vehicle that were involved in the**
16   **accident?**

17   **A      Correct.   Yes.   I don't remember seeing them.**

18   **Q      All right.   Other than what the plaintiff told**
19   **you, do you have any documentation of seeing the type of**
20   **damage that was done to the vehicles in the accident?**

21   **A      Just the police report says the vehicle had**
22   **severe damage and was removed by a private tow truck.**

23   **Q      How did you get the accident report?**

24   **A      It was sent to me yesterday.**

25   **Q      By whom?**

1    **A**    You or Mr. Manton, I guess.

2         MR. BRANCH:  I didn't send it to you.

3         THE WITNESS:  I'm sorry?

4         MR. BRANCH:  I didn't send it to you.

5    **A**    Okay.  Mr. Manton sent it to me.  When I've

6    done these depositions, you guys asked me if I've seen

7    the police reports.  If I don't have it, I'll ask for it

8    if I have to do a deposition.  That's probably what

9    happened.

10   **Q**    (By  Mr. Branch)  Other than the accident

11   report, no other documentation whatsoever that relates

12   to the accident evidence as to the vehicles, anything of

13   that nature?

14        THE WITNESS:  Could you repeat that sentence?

15   No other documents that I have or that I've seen or that

16   I'm aware of?

17        MR. BRANCH:  All of above, sir.  Thank you.

18   **A**    No.

19   **Q**    (By  Mr. Branch)  All right.  Do you have any

20   dash-cam video from law enforcement?

21   **A**    No.

22   **Q**    All right.  So you have no clue how Ms. Miller

23   looked at the accident scene, what she was saying, how

24   she was acting?

25        **A**    Just what it says from the police report, that

1    she was complaining of pain in her neck, her back, and

2    her knee and that she was evaluated by the EMS service

3    and that her car had severe damage.  That's all.

4        Q    Thank you.  But you never requested to look at

5    any videos that might have been taken of her immediately

6    after the accident?

7        A    No.  No.

8        Q    And what I noticed in your discussion of the

9    records you have, you indicated that you have diagnostic

10   imaging that you perform.  Fair to say from the records

11   that we just looked through, you don't have any

12   diagnostic imaging in your file from any requests from

13   any other physicians; fair to say?

14            THE WITNESS:  I'm sorry.  Could you say that

15   one more time?

16            MR. BRANCH:  Absolutely.

17       Q    (By  Mr. Branch)  You referenced that you

18   looked at some MRIs that were postaccident.  Your file

19   doesn't contain any diagnostic imaging from any other

20   physicians other than what you were; fair to say?

21       A    No.  We have MRIs from American Health

22   Imaging, and that was from a different doctor.  It's

23   going to take me a little time to find the name because

24   it was a different doctor that ordered it.

25       Q    Fair to say that your records that you have

don't include any of the actual medical records from any other care that she sought after the accident?

A    I don't know if we have any chiro records or PT.  I don't think so.

Q    Okay.  That's for -- particularly, you don't have any chiropractic records from the chiropractic care that she had at any time?

A    Correct.  We just go over:  "Okay, what have you done?"  "I did 50 or so sessions of chiro.  It didn't help."  "I did 30 or so sessions of PT.  It didn't help."  "I went to Windemere Medical Clinic. I've been to summit Spine Center.  I've been to American Health Imaging."  We have that information.

Q    If Ms. Miller had ever in her life prior to the accident sought medical treatment complaining of pain in her neck and radiating from her neck, would you have liked to have seen that?

A    Sure, the more information the better.  I haven't been presented with any of that.  If you have it, I'd be happy to look at it right now.  I'm sure the jury would like to know if that exists; okay?  Is it important, Dr. Bendiks?  Great.  Let me look at it.  Let me check it out.

Q    Have you done anything to do a differential diagnosis on this case?

1    **A**    Yeah.   That's standard of medical care, is you

2    go through -- you amalgamate all the medical

3    information, and then you go through what the

4    differential diagnosis would be, which is:   Could it be

5    cancer?  Could it be infection?  Could it be autoimmune,

6    metabolic, genetic?  You have to go through all of those

7    different things, in addition to:   Could it be a damaged

8    disc or something else?

9    **Q**    What about, though, in terms of -- did you

10   rule out or do anything to consider when the injury

11   would have occurred in relation to the accident?  Did

12   you do a differential diagnosis for that opinion in the

13   case?

14   **A**    Sure.   That's part of the differential

15   diagnosis, is getting the information.  So if Ms.

16   Miller -- if she had come in and said, "I've been having

17   nagging neck pain for the last 15 years, and it's

18   progressively gotten worse," okay.   That would lead me

19   in a different direction from what I think might be

20   going on, perhaps so if she had a six-month history of

21   gradual, progressively worsening, along with difficulty

22   swallowing and weight loss or night sweats.   That would

23   lead me in another direction.   So there's a variety of

24   different things that we look at.   We look at history,

25   physical exam, review of system, imaging studies, x-rays

MRIs, CTs, whatever it might be, to come up with a
diagnosis based off of the differential diagnosis.

Q    Fair to say if you don't have the medical
history that speaks to those issues, you can't factor
them in one way or the other to rule them in or rule
them out; fair to say?

A    As I said, we did a history and physical exam.
We also do review of systems to go over all the
potential explanations.  But as I mentioned before, if
you have any medical records, I'm happy to look at them
right now and answer that right now.  Sounds like you
might have something; so let's check it out.  Let's see
it.  If you do, then that might change my opinion, but I
just haven't seen anything yet.  The only things I would
have got is her history, these reports from her
treatment elsewhere, the imaging studies that I've got.
That's all the information that I have.

Q    In your conversations with Ms. Miller, did you
have discussions as to whether she may have had
physicians that she was seeing before the accident for
neck pain?

A    Yes.  We do go into that and ask the patient,
and that's clearly stated on the second page of the
first visit.  There's no prior history of neck pain.
And what I want to know is -- I don't want to know if

you woke up one morning with a crick in your neck from

not sleeping well.  Everybody gets that.  I want to know

if you had something like what you're dealing with now.

That's what I want to know.

Q    Sure, something that may have required close

to a year's worth of, like, treatment for neck pain.

You'd be interested in things like that?

A    It would depend when that was and what it was.

Q    Sure.

A    Absolutely.  The more information, the better.

But it all depends on when, where, and what.

Q    Right.  And Ms. Miller never told you or gave

you any indication that there may be some kind of

treatment like that out there that you might want to

consider and take a look at; fair to say?

A    All I went into was:  Have you had a prior of

similar symptoms where you're dealing with pain?  So

neck pain shooting off in the arms, headaches, things

like that.

Q    And the answer is, is it not, Doctor, that she

didn't tell you anything that led you in the direction

of thinking you needed to get prior medical records to

see if she had prolonged periods of neck pain?

A    Pain similar to what she's got, yes.

MR. BRANCH:  Correct.

110

1          MR. MANTON:  Let us know when you get to a

2    stopping point.  We've been going over on hour.  Are you

3    getting to a stopping point?  A bathroom break might be

4    good.

5          MR. BRANCH:  That's fine.  I have a -- I'm

6    almost done, but I have a couple more areas.  I'm fine,

7    but he says he's leaving at 7:00, though.

8          MR. MANTON:  That's right.  I forgot about

9    that.  Let's keep going.

10   Q    (By Mr. Branch)  Doctor, I want to make sure I

11   have a full understanding of things that you have based

12   your opinion on that this automobile accident caused the

13   injuries for which you provided surgery.  It was the

14   conditions that Ms. Miller reported to you; correct?

15         THE WITNESS:  Your question is why I believe

16   the accident is source her pain problems?  Is that what

17   your question is?

18         MR. BRANCH:  Yeah.

19   Q    (By  Mr. Branch)  It was the medical history

20   she reported to you; correct?

21   A    It was the several things that I mentioned,

22   her not having these types of pains immediately

23   preceding the collision, having them after the

24   collision, having these pains as result of a plausible

25   mechanism.  Like, once again, could a collision between

111

a truck and a car cause spine injuries?  Yes; that can

happen.  And then going into objective findings; okay?

So I can't just base it on Ms. Miller saying, "I've got

this problem."  I got to see something." That's where

all these tests come into play -- x-rays, physical exam,

MRI -- to be able to show that.  You can't make an x-ray

or an MRI.  It is what it is.

What are all the other things that could

potentially explain this?  An infection, the cancer,

autoimmune, metabolic, genetic, all those issues.  So

what I'm left with is, I haven't seen any evidence that

can change my opinion.  Now, if you've got something,

I'm happy to see it.  I don't know if it will change it

or not until I see it.  If you don't have it, I can't --

if you won't show it, I can't look at it.  I can't

figure it out.

Q    Have you asked -- if you're questioning me as

the defendant in the lawsuit.

Have you asked Mr. Manton if he has any

additional records pertaining to Mrs. Miller that he'd

like to share with you that he thinks you should review?

Have you had those discussions with him?

A    No.  I'm -- I haven't, but I'm happy to ask

that too.  I'll take it from wherever.  So once again,

if you have -- do you have them?  I can look at them now

112

1   on the screen.  I can check them out.  That's why I'm

2   here; right?  I'm supposedly the medical expert.  So

3   show me the documents.  I don't mind, wherever the

4   evidence is that I can give you an expert opinion or

5   medical opinion on:  Do I think it's related or not?

6       Q    Thank you.  The question is:  Have you had a

7   discuss with Mr. Manton where you've asked him to

8   provide you with any medical records that you may have?

9          MR. MANTON:  Object to form.  Asked and

10   answered.  We got eight minutes left, guys.  Let's try

11   to wrap this up because I do get a redirect.  I mean,

12   Kevin, you've monopolized the time here since 5:00

13   o'clock.  At some point you need to quit asking the same

14   questions.

15       Q   (By Mr. Branch)  Doctor, if you would answer

16   my questions, it would help.

17          MR. MANTON:  He's already answered.

18       Q   (By  Mr. Manton)  Have you had any discussion

19   with Mr. Manton where you asked him to provide you with

20   a complete medical history for the plaintiff?

21       A   No.  I usually get it from the patient.  But

22   once again, wherever I get it from, I'm happy to review

23   it.

24       Q   Perfect.  And have you asked Ms. Miller -- did

25   you ever say to Ms. Miller, "I need to you to go collect

1  any medical records you have that predate the accident.

2  Bring them to me because I'm going to be asked to

3  provide an opinion in this case whether this accident

4  caused your injury, and I need to review those before I

5  can do that."

6         Did you ever have that conversation with her?

7     A    So asking a 57-year-old female for all of her

8  medical records since she was born and then to sift

9  through there?  No, I don't do that.  Actually, I've

10 never done that with any patient in my 20 years of

11 practice.

12    Q    Did you ask for five years before the

13 accident?

14    A    No.  I asked the patient -- that's the person

15 I'm treating -- "Have you had these types of problems

16 before, and if so, okay; get me more information."  The

17 online imaging companies that did the MRIs, they have a

18 pretty exhaustive record, but they're only a couple of

19 companies.  But they tend to be the bigger companies in

20 town.  So you have a good chance of seeing a prior

21 imaging.  I didn't see any of those on the website for

22 her, but that's not exhaustive.  There are imaging

23 companies out there.

24    Q    Doctor, did you review the intake records that

25 Ms. Miller provided?

114

1            **THE WITNESS:  Which ones?**

2            **MR. BRANCH:  The additional patient**

3    **information that she completed on July 31, 2019.**

4        **Q    (By  Mr. Branch)  Did you review those**

5    **documents in this case?**

6        **A    Explain to me.  What does it say on it?  I**

7    **usually look at the clinical intake sheet.  So it will**

8    **say if they have a history of diabetes or cancer or**

9    **prior surgeries or smokers things like that.**

10       **Q    Do you know --**

11       **A    If that's what you're referencing, then, yes.**

12       **Q    Do you know what the additional patient**

13   **information sheet is from Georgia Spine?**

14       **A    No, but, I mean, every doctor has a big old**

15   **stack of paperwork that we have people sign whenever**

16   **they first come in.  If that's the clinical intake thing**

17   **that you're referring to, then, yes; I've reviewed that.**

18       **Q    Okay.  And that's what -- so you've reviewed**

19   **any of clinical intake information that she provided.**

20   **Did you, in looking that, see any suggestions of prior**

21   **care that you may have wanted to explore that you**

22   **didn't?**

23       **A    The parathyroidectomy.  You've had prior**

24   **surgery in that area.  So that's helpful from a spine**

25   **perspective because we're going to be going back in**

1    there doing surgery.  Not exactly the same area but

2    close.  So you do want to be mindful:  Are you going

3    into prior scar?  Was that prior surgery because of a

4    cancer or some other thing?

5         Being that was quite a while in the past and

6    it's a different tissue plane, it's not something that I

7    really needed to have more information.  And I can also

8    look at the scan and see where is your incision.  It

9    tends to be pretty low in the neck.  And then my

10   incision tends to be higher up.  We're kind of working

11   in different areas.

12        Q    Tell me what medical records -- because I

13   don't see any records in your file associated with prior

14   surgery.  How did you get those records from her, and

15   where are they?

16        A    It said on her clinical intake sheet, a

17   partial parathyroidectomy.

18        Q    Understood.  So you took from what she

19   wrote --

20        A    Yes.

21        Q    -- but didn't get medical records to look at

22   actually what happened?

23        A    Yes.  I listen to my patients and the

24   information they provide me.  Absolutely.

25        Q    Doctor, I just want to make sure you don't

116

1    have any medical records in your file from Emory Johns

2    Creek.

3              THE WITNESS:  Do I have the emergency room

4    records?

5              MR. BRANCH:  Yes.

6         A    No, I do not.

7         Q    (By  Mr. Branch)  You don't have any records

8    in your file from Windemere Medical Clinic; true?

9         A    I don't believe so.

10        Q    You don't have any records in your file from

11   Phoenix Chiropractic.

12        A    Correct.

13        Q    You don't have any records in your file from

14   Summit Spinal Health Care?

15        A    Correct.  Let me double check.  It just -- I'm

16   pretty sure the chiropractor records, I don't have.  I

17   don't want to speak without being sure here.  I have one

18   visit from Windemere, medical record.  Looks like we got

19   that May 2020.  She had a televisit with a Nurse

20   Practitioner Hanniford, and she came in, I believe, for

21   a medical clearance.  Before we do a surgery on somebody

22   who's over 50, they have to get -- make sure that

23   they're healthy enough to have the surgery.  So we sent

24   her back to her primary care doctor to get her

25   clearance.

Q    What was date of that treatment, Doctor?

A    Looks like May 1st of 2020.

Q    So if I don't have that record like that,
that's fair to say I don't have your entire file?

A    If you don't have that, no.

Q    Doctor, I think you indicated that you saw her
in September of 2021.  Do you have a record from that
visit?

A    September.  I'm sorry.  You said September?

MR. BRANCH:  Of this year.

A    September.  Yes.  I also see the ER records
right here.  I do have ER from Emory.  Forgive me.  It
is March 18, 2020.  Let's see

Q    (By  Mr. Branch)  So you have ER records.
Then I don't have a full file.

A    And Dr. Patel.  I have him as -- a visit from
him on January 24, 2019.  And then November 30, 2018, it
was a Dr. Chad Lee -- I think it's the same group -- who
looks like they did an -- nope -- an injection.  The
things they list -- they don't list the injections
there.  Let's see.  Let's see.  Yeah.  That's what I
have.  And then I have a Resurgens record.  That was
March 18, 2020.  Let's see.  That is Resurgens.  Dr.
Preetesh Patel, October 16, 2019.  And they did
injections in the neck on that day.  And let's see.

118

1   7/16/2019 is also Resurgens.

2       Q    (By Mr. Branch)  I want to make sure you do

3   have ER records.  You have records from Resurgens.  You

4   have records from Phoenix Chiropractic from January

5   of --

6       A    Not Phoenix.  I don't see that anywhere.  I'm

7   not -- not the Phoenix stuff.

8       Q    All right.  Doctor, what other records do you

9   have from other facilities that are in your file?

10      A    Windemere, the Windemere clinic.

11      Q    You do have Windemere records?

12      A    Yeah.  That was the first one that I

13  mentioned.  This is annual physical exam, February 19,

14  2019.  Let's see.  Let's see what the last day is.  Hold

15  on one sec.  Some PT visits.  I got those.

16      Q    Doctor, can you tell from your file when you

17  got all these medical records?

18      A    Let's see here.  A lab on 12/7/18.  The

19  Windemere is 3/18/20.  Resurgens, same day.  Let's see.

20  Georgia Pain and Wellness, which I think is now called

21  Summit, same day.  Emory records, same day.  And then

22  Alliance the next day, 3/19/201.  Let's see what's in

23  Alliance. November 26, 2019, record -- let's see -- and

24  November 13th, 2019, and October 16, 2019.

25      Q    Doctor, where are you looking to find these

1    records?

2        **A**    I'm looking on my computer.

3        **Q**    Where on your ... what software?  What program

4    are you reviewing?

5        **A**    Our EMR system, Care Cloud.

6        **Q**    In Care Cloud?

7        **A**    Yes.

8        **Q**    Would part of the audit log show when these

9    records would be put into your system?

10           MR. SMITH:  Object to the form of the

11   question.

12       **A**    The dates that I gave you are on the side

13   here.  March 18 and March 19, 2020.

14       **Q**    (By  Mr. Branch)  All predating November 24,

15   2020?

16       **A**    Yes; these are all before November 2020.

17           MR. BRANCH:  Doctor, it's 7:00 o'clock.  So I

18   understand you have to go.

19           THE WITNESS:  Okay.  All right.  Thank you

20   very much?

21           MR. MANTON:  Three quick redirect questions.

22   It will take less than five minutes.  I promise you.

23           MR. BRANCH:  I'm suspending the deposition.  I

24   mean, I don't --

25           MR. MANTON:  That's not your call.  It's my

depo.

MR. BRANCH:  You've put on the record, then --
you've given the representation that you made to us
prior to the deposition about what we had and what I
just learned.  I'm not agreeing to suspending the
deposition.  We can disagree to disagree on that.  I
would put that on the record, and we can address it
later.

MR. MANTON:  Are you contending you don't have
any of those other records from all of the nonparty RPDs
you sent?

MR. BRANCH:  I'm contending that I have no
clue what he has because it's a moving target.

MR. MANTON:  Well, I think he just told you.
Just state on the record:  Did you not get all those
same records from the very same RPDs you sent to those
facilities?

MR. BRANCH:  I don't know what I have.  I
don't know what I have that he has.

MR. MANTON:  You sent nonparty RPDs to all
those people.  You have those records.

MR. BRANCH:  I have a screen and read
something that I have no clue what he has.

MR. MANTON:  I have three questions for you,
Doctor.

121

1          THE WITNESS:  All right.

2                    FURTHER EXAMINATION

3    BY MR. MANTON:

4        Q    Has Mr. Branch shown you any actual records or

5    evidence that would make you change your opinion that

6    Shawn's herniated discs were caused by the car wreck she

7    was involved in on November 19 of 2018?

8        A    No.

9        Q    Has Mr. Branch shown you any actual records or

10   evidence that would make you change your as reason why

11   Shawn needed the artificial-disc-replacement surgery

12   that you performed on her was due to the injury she

13   sustained in the car wreck she was involved in on

14   November 19th, 2018?

15       A    No.

16       Q    If he had offered you any medical records or

17   evidence here today to review that might be relevant for

18   your opinions, were you willing to review them?

19       A    Yes.

20            MR. MANTON:  That's all I have.

21            THE WITNESS:  Okay.

22            MR. BRANCH:  Doctor, just one more follow up.

23            THE WITNESS:  Okay.

24                    FURTHER EXAMINATION

25   BY MR. BRANCH:

                                                        122

1    **Q**    The records that you have, were any of them

2    provided to you by Mr. Manton?

3    **A**    That, I don't know.  It doesn't say source on

4    the image that I see.  It just says the date, and then

5    it has the descriptor of what it is next to it.

6    **Q**    Do you have any objection to reviewing -- you

7    understand if I called you directly, you wouldn't speak

8    to me as the adverse party in litigation, would you?

9           MR. MANTON:  Objection to form.  You're here

10   right now.  You've been cross-examining him 2-1/2

11   almost.  Give him what you got.

12   **Q**    (By  Mr. Branch)  I'm just saying, Doctor, if

13   I reached out to you, I trust everybody would object if

14   I tried to reach out to you individually; fair to say?

15          MR. MANTON:  There's actually measures --

16   there's actually provisions you can do under HIPAA.  And

17   that was actually my Supreme Court case.  It's Baker v.

18   Wellstar.  There's mechanisms.  If you want to talk to

19   him without a deposition, you can try.  But you didn't.

20          THE WITNESS:  I'm happy to talk to you right

21   now.

22          MR. BRANCH:  All right.  Well, let's suspend

23   until we figure out what he actually has in the way of

24   documents.  We'll have to come back and do this again.

25          MR. MANTON:  I don't agree that we're

123

1    suspending it.  But I know that's not my decision or

2    yours.  Ultimately, it's the judge's.  That fine.

3             THE COURT REPORTER:  Do you guys need this

4    transcribed?

5             MR. BRANCH:  Very quickly.  I need it as

6    quickly as possible.  I need the original part of the

7    discussions with Mr. Smith about the records.

8             MR. SMITH:  I'll need a copy of the same.

9             MR. MANTON:  I'll take a copy.  I don't need

10   it --

11            (Wi-Fi signal terminated.  Suspended at 7:08

12   p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

**GEORGIA:**

**FAYETTE COUNTY:**


    I hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption, and the colloquies, questions and answers were reduce to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

    The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of BULL AND ASSOCIATES, INC., Certified Court Reporters, and the signature and original seal is attached thereto.

    I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of such attorney or of any party, nor am I financially interested in the outcome of the action.


    This 9th day of November, 2021.


                              _____
                                MEG ARMISTEAD, Certified Court
                                Reporter (B-2011) My commission
                                expires March 31, 2022.

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of BULL AND ASSOCIATES, INC.

Bull and Associates, Inc. was contacted to provide court reporting services for this deposition. Bull and Associates, Inc. will not be taking this deposition under any contract that is prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).

Bull & Associates, Inc. has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.

Bull & Associates, Inc. will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37

(a)    Contracts for court reporting services, not related to a particular case or reporting incident, between a certified court reporter or any person with whom a certified court reporter has a principal and agency relationship and any attorney at law, party to an action, or party having a financial interest in an action, are prohibited. Attorneys shall not be prohibited from negotiating or bidding reasonable fees for services on a case-by-case basis.

(b)    In order to comply with subsection (a) of this Code Section, each certified Court Reporter shall make inquiry regarding the nature of the contract for his or her services directed to the employer or the person or entity regarding said Court Reporter's services as an independent contractor.

126

**A**

**A.M** 2:11
**ability** 65:22 66:8
  66:17 79:1
**able** 7:24 39:2,2
  50:9 52:21 56:16
  56:19 57:25 74:24
  79:5 84:19 86:13
  89:3 94:12 95:3
  96:16 112:6
**abnormal** 59:24
**above-named**
  10:12 13:8
**Absolutely** 106:16
  110:10 116:24
**absorb** 36:3
**absorber** 39:13
**absorbers** 36:3
**abundantly** 11:6
  15:25 17:11
**accentuate** 36:7
**accept** 77:15
**access** 7:22 68:23
  69:1,2,9
**accident** 71:10
  72:17 83:14,15,22
  85:17 88:13 89:6
  89:13,13,22 90:12
  90:20,22,24 91:17
  91:20 92:1,14,15
  93:3,14 94:1,4
  95:7,18 97:10,18
  97:19 98:6 100:12
  100:12 101:20
  103:4,20 104:6,14
  104:16,20,23
  105:10,12,23
  106:6 107:2,15
  108:11 109:20
  111:12,16 114:1,3
  114:13
**accidents** 72:22
  90:7
**accountant** 78:23
**accredited** 29:20
**accurate** 30:6
  32:10,17 38:22
  43:8 48:24
**Act** 28:6

**acting** 96:4 105:24
**action** 1:3 6:20
  76:11 125:20
  126:20,21
**active** 83:6
**activities** 55:9
**activity** 55:11
**acts** 41:12
**actual** 10:2,18 43:9
  78:3 107:1 122:4
  122:9
**add** 98:15
**added** 87:5
**addition** 108:7
**additional** 11:11,11
  12:6,7,15 16:17
  18:15 22:8 24:16
  25:4,21,23 26:24
  29:25 87:5 112:20
  115:2,12
**additionally** 24:21
**address** 26:11
  55:23 121:7
**adjourn** 99:6
**administrative**
  22:9,23 25:20
  26:25
**admit** 78:6
**adverse** 123:8
**advising** 8:18
**affairs** 78:4,17
**affect** 43:15 63:7
**affidavit** 76:10
**afternoon** 30:23
**age** 90:5
**agency** 126:13,20
**ago** 89:21 91:15,22
  92:3
**agree** 11:23 12:2,14
  23:1 72:15 73:23
  74:5,13 78:16
  93:11 94:17 96:3
  96:6,7 123:25
**agreed** 74:7
**agreeing** 121:5
**agreement** 27:2
**ahead** 7:21,23 31:2
  48:5,11 51:12
  74:23 77:2 85:25

99:9
**AHI** 69:8
**aid** 48:11
**airbag** 41:13
**Alex** 7:13 20:16
  76:7
**ALEXANDER**
  2:11
**alleged** 12:12
**allegedly** 4:14,21
**Alliance** 119:22,23
**allowed** 28:6
**allows** 39:11 50:9
  52:10
**AMA** 56:22 57:6
**amalgamate** 108:2
**amenable** 24:17
**American** 56:11
  65:23 67:17 97:22
  106:21 107:12
**amount** 83:1
**anatomy** 73:20
**ANNE** 1:6
**ANNOTATED**
  126:18
**annual** 81:5 119:13
**answer** 21:22 28:12
  64:21 65:13 70:10
  71:14 75:18 79:1
  92:22 109:11
  110:20 113:15
**answered** 65:12
  94:15 95:23 102:1
  102:7 113:10,17
**answers** 125:8
**anticipate** 86:6
**anybody** 67:22
  71:6 72:7 74:22
**apart** 49:13,20 50:8
**apologize** 5:7 74:11
  101:13
**apparently** 8:23
  84:12
**appear** 63:2
**APPEARANCES**
  2:1
**appearing** 1:15
**apply** 33:2 56:18
**appointment** 34:2

34:23
**appreciate** 91:14
  92:23
**approximately**
  37:13 72:9 73:1
  79:9,24 81:12,20
  86:18 87:25
**area** 90:3 115:24
  116:1
**areas** 111:6 116:11
**argue** 88:18 89:11
**argued** 89:19
**arguing** 68:11
**arm** 36:10 42:16,19
  43:1,1 96:23,24
**Armistead** 1:14
  125:23
**arms** 33:24 35:22
  44:7,8,9 49:23
  110:18
**artery** 49:16
**arthritis** 90:5
**Article** 126:3
**artificial** 37:25
  51:12 55:11
**artificial-disc-re...**
  122:11
**asked** 14:5 31:7
  66:25 82:12 84:7
  84:7 85:16 91:22
  92:2,21 94:3 95:6
  95:22 105:6
  112:17,19 113:7,9
  113:19,24 114:2
  114:14
**asking** 13:22 16:5
  19:7 61:21 65:3
  83:21 85:20 86:15
  86:20 113:13
  114:7
**asleep** 49:9
**assault** 88:22 89:13
**assaults** 72:21
**assess** 56:21 91:16
**assimilating** 61:20
**assistant** 100:19
**associated** 4:5 8:16
  11:22 70:21 71:2
  72:17 73:13

116:13
**Associates** 1:23
  125:14 126:6,7,8
  126:11,15
**Association** 56:11
**assume** 83:19 84:4
  86:3,4 88:7,24
  89:1
**assuming** 64:23
**Atlanta** 2:12 69:20
**attach** 30:9 32:23
  87:20
**attached** 4:2 9:20
  31:4 125:15
**attaching** 33:4
**attended** 29:19
**attorney** 7:5 73:17
  76:7 91:7 125:18
  125:19 126:20
**attorneys** 6:21 7:6
  126:21
**attributed** 55:22
**audit** 20:24 23:2
  25:10 120:8
**August** 52:14 100:7
  100:7
**auspices** 125:14
**autoimmune** 85:4
  108:5 112:10
**automobile** 93:2
  111:12
**available** 65:8
  68:16 99:8 100:11
**Avenue** 1:24
**average** 80:12
  81:14
**averages** 81:15
**avoid** 55:9,12,15
  62:7 96:12
**award** 85:21
**aware** 75:9 86:21
  86:24 87:4 88:11
  105:16
**axial** 41:23 42:20

_____

**B**

**b** 126:10,23
**B-2011** 125:24
**back** 5:15 6:7 9:5

11:17,20 13:21
18:13 20:6,20
33:1 35:18 39:19
40:15,16,24 41:9
41:16,16,17 42:7
42:9,24 43:3,5,16
45:14 47:4 50:10
50:21,23,24 51:1
51:23,24 54:18
63:16 66:18,20,24
67:3,3 68:4,21
77:21 81:9 84:17
87:19 90:3 91:14
93:8 106:1 115:25
117:24 123:24
**bad** 55:24 75:8
92:18
**bad-faith** 26:10
**Baker** 1:6 123:17
**balls** 39:6
**bank** 70:3
**barely** 42:17
**base** 92:10 112:3
**based** 27:13 33:18
40:5 51:18 58:6
65:5 84:1 97:8
109:2 111:11
**basically** 35:1 36:2
41:24 47:12,20
52:10 56:12
**basis** 33:7 75:21
76:13 79:2,16,23
80:1 81:5 85:20
126:22
**Bates** 8:11 98:15
101:23
**Bates-stamped** 4:4
8:10,13 99:12
103:9
**bathroom** 111:3
**began** 52:19
**beginning** 49:9
72:24 76:1 92:4
**behalf** 1:12 7:13
88:12
**believe** 37:22 44:5
45:8 57:19 58:2,6
58:12,22 77:21
84:8 89:12,21

91:11,16 92:20
93:4 95:25 96:4
104:7 111:15
117:9,20
**Bendiks** 1:12 2:10
3:4 7:5 20:11
25:1,18 26:14,23
27:25 28:3,20
31:6 33:11 61:4
64:2 66:21 68:4
87:15 107:22
**benefit** 98:4
**best** 37:23 39:3
51:18 62:6
**better** 28:9 37:11
46:11 53:22 55:4
55:21 56:1 57:20
78:25 79:5 85:8
92:12 93:8 107:18
110:10
**beyond** 13:4 37:12
46:24 54:13 99:5
**bidding** 126:21
**big** 42:8 84:12 97:4
115:14
**bigger** 114:19
**biggest** 45:22 82:24
82:25
**bill** 75:3
**billed** 80:16,18
**BILLIE** 1:6
**bills** 11:9,22 13:14
14:17 15:7,19
16:15 23:22 63:8
**bit** 35:15 40:12
44:23 48:18 50:9
51:9,10 59:11,21
65:3 74:11 81:17
94:5
**bits** 51:6
**blood** 49:15 60:19
**board** 38:9 43:8,22
48:23 49:2
**board-certified**
29:15,18,19 30:2
**boards** 43:15 82:8
**body** 26:16 35:2
41:25 56:13 57:1
57:14 59:24

**bone** 40:3,3,4,6,6,8
40:8 41:4,4 51:9
51:10 59:19
**bones** 39:17 40:23
49:25 50:3,3,7
51:4 90:1
**book** 56:16
**born** 114:8
**bottom** 92:16
**Branch** 2:7,7 3:7,9
4:3,10 5:7,12,14
5:17 6:7 7:11,11
7:15 8:1,3 10:10
10:19 11:2,23
12:18 13:17,20
14:18,24 15:9,14
15:16,21 16:21
17:18,22 18:3,22
19:1,6 20:20,24
21:11,21 22:1,12
22:22 23:1,10,16
23:25 24:5,9,23
25:9,24 27:5,7
28:13,16 30:13,21
30:24 31:1 33:6
44:16 48:13 63:15
64:2,3,8,21 65:2
65:14 66:15,20,24
67:9,20,24 68:4
70:14 71:1,17,24
71:25 72:9 74:5
74:12,13 77:7
78:1,2,15,16
83:20 86:5 87:11
87:24 88:5,10
90:17,19 95:24
96:17 97:16 99:9
99:12,15,21 100:2
100:20 101:1,5,13
101:16,17 102:3,9
102:14,20,22
103:2,3,19 104:1
105:2,4,10,17,19
106:16,17 110:25
111:5,10,18,19
113:15 115:2,4
117:5,7 118:10,14
119:2 120:14,17
120:23 121:2,12

121:18,22 122:4,9
122:22,25 123:12
123:22 124:5
**Branch)--** 102:16
**break** 5:21 6:2,5,9
19:16 51:9 63:16
66:16 111:3
**briefly** 69:18 98:19
**bring** 38:14 114:2
**brought** 35:1 59:12
**budget** 99:5
**bulge** 41:17 97:4
**bulging** 40:12
42:14
**Bull** 1:23 125:14
126:6,7,8,11,15
**burning** 40:25
**business** 70:2 76:21
**busy** 20:11
**buy** 78:5

---

**C**

**c** 50:17 125:1,1
126:10
**C3** 40:1,6
**C3-4** 40:6 55:23
58:3,4 92:17
**C4** 40:6 50:15
**C4-5** 36:24 37:7
58:2 92:18
**C5** 40:8
**C5-6** 36:24 37:7
40:7 50:16 58:2
92:18
**C6** 40:8
**calcium** 59:23,24
60:19
**calendar** 20:10
**call** 19:17 47:17
120:25
**called** 34:16 39:6,7
41:23 49:22 50:14
51:4,8,21 52:7,9
82:7 89:15 119:20
123:7
**calling** 67:6
**calls** 82:24
**camera** 6:17 19:21
27:20 48:18 63:22

63:24 68:1,9
**canceling** 63:6,6
**cancer** 85:3 108:5
112:9 115:8 116:4
**candid** 15:2 92:24
**candidness** 11:3
**caption** 125:7
**car** 58:7 60:11
72:21 84:13 85:2
89:13 90:7 106:3
112:1 122:6,13
**care** 14:11 24:11
25:1,10 29:24
34:15,19,20 37:9
45:1 52:17 63:7
74:25 77:6 82:10
82:11 86:14 88:19
88:20 89:17,24,25
93:19,22 94:6
107:2,6 108:1
115:21 117:14,24
120:5,6
**careful** 45:24 62:18
**carotid** 49:15
**cartilage** 43:2 51:6
**case** 6:25 7:3 12:1
13:1 28:3 37:12
37:20 38:3 40:9
56:4 57:15 60:11
63:2 64:6 80:5,6
80:16 82:5,13
83:24 85:21 86:10
88:11,14 90:13
91:18,19 92:1,4
92:12 93:7 94:14
95:18 96:5,18
107:25 108:13
114:3 115:5
123:17 126:12,12
126:16,19
**case-by-case**
126:22
**cases** 21:12 72:11
88:24
**catch** 71:22,23
**categories** 9:14
10:3
**caught** 35:13
**cause** 40:24 43:20

44:3 88:14 90:13
92:21 97:11 112:1
**caused** 57:9 73:14
83:15,22 85:17
90:22,24 91:17,20
92:2 94:3 95:7,18
111:12 114:4
122:6
**causes** 44:1
**causing** 42:10
45:25 60:6,12
92:20 97:2
**cautious** 55:7
**cell** 18:19
**center** 39:10,17,18
39:18,22 52:5
69:23 107:12
**cereal** 84:16
**certain** 10:3 67:16
94:19
**certainty** 62:10
**certificate** 8:7
**certification**
125:11
**certified** 1:14 67:1
125:14,23 126:5
126:19,19,23
**certify** 125:6,17
**cervical** 38:17,18
40:2 93:13 97:2
**Chad** 118:18
**chance** 17:3 45:6
54:13 114:20
**chances** 45:25
76:24
**change** 47:21
109:13 112:12,13
122:5,10
**changed** 70:6
**changes** 75:24
**changing** 47:20
**charge** 63:10 80:23
126:15
**charged** 63:9
**charges** 80:25
**check** 5:15 107:23
109:12 113:1
117:15
**checked** 36:12

**chemicals** 40:18,20
**Chevy** 52:9
**chiro** 107:3,9
**chiropractic** 34:15
34:20 107:6,6
117:11 119:4
**chiropractor**
117:16
**Circling** 91:14
**cite** 85:19
**civil** 1:3 28:6 93:20
**claim** 70:22 72:17
73:5,12,14,21,22
73:24 74:9,18
75:1,11 79:13,14
79:22,22 81:6
82:17,18 83:9
**clarify** 5:5 22:12
57:4 61:22 68:5
**clear** 11:6 15:25
16:5,13 17:11
21:9 24:20 38:1
58:5 64:12 103:16
**clearance** 117:21
117:25
**clearer** 103:17
**clearly** 17:6 41:5
41:14 84:22 89:11
109:23
**client** 21:1
**clinic** 12:19 14:12
17:8 34:12,16
63:3,6 107:11
117:8 119:10
**clinical** 24:24 25:15
62:15 115:7,16,19
116:16
**clinics** 58:15
**clips** 78:6
**close** 110:5 116:2
**closed** 88:24
**closer** 38:14,16
**closing** 35:21
**Cloud** 24:11 25:10
120:5,6
**clue** 105:22 121:13
121:23
**Code** 126:18,23
**Coleman** 4:14 7:19

8:4,19 9:24 11:5
15:8 16:16,20
21:25 22:5 23:22
**Coleman's** 11:21
14:4
**collect** 113:25
**collision** 33:15 34:3
34:10 57:17,20,23
58:14,17 84:12
85:9,10 97:15
111:23,24,25
**collisions** 83:1
**colloquies** 125:8
**Columbus** 29:8
**come** 6:12 20:6
35:21 39:17 61:4
61:10,23 63:16
68:21 73:18 87:19
88:20 91:3 93:12
94:9 95:3 96:16
108:16 109:1
112:5 115:16
123:24
**comes** 36:5 72:20
85:2 88:7
**comfortable** 16:22
27:8,10 57:18
**coming** 9:3 20:9,15
36:6,14,15 37:22
41:20 49:16 50:18
58:1
**commencing** 1:15
**comment** 13:11
**commission** 125:24
**common** 56:10
**communicated**
8:19 9:10
**communicating**
17:6
**communications**
22:23
**community** 74:22
**comp** 72:22 73:3
74:9,18 75:16
79:14,22 82:18
**companies** 88:20
114:17,19,19,23
**COMPANY** 1:6
**compared** 63:9

**compensable** 93:20
**compensate** 74:18
**complained** 44:6
**complaining** 33:17
106:1 107:15
**complete** 53:4 87:7
113:20
**completed** 53:1,15
115:3
**completely** 41:8
**complies** 32:12
**comply** 126:23
**component** 41:19
44:4
**computer** 38:14
66:10,14 68:20
120:2
**concern** 20:2
**concerned** 20:8
59:2 73:20
**concerning** 17:18
**concerns** 33:16
**condition** 38:8,23
39:1 43:14 93:1
94:2 97:3,11
**conditions** 44:12
60:14 111:14
**confident** 16:22
**confidentiality**
21:18 27:2
**confirm** 4:17 30:6
32:3,10 98:18
100:11
**confirmation** 99:1
**confounding** 75:15
**conjunction** 97:9
**consequently** 50:4
**conservative** 37:9
45:1
**conservative-care**
37:15
**consider** 37:18 45:14
45:21 46:7 59:7
93:10 94:5 95:17
108:10 110:15
**consideration** 92:1
**considered** 53:17
**considering** 37:19
**considers** 62:14

**consistent** 44:14,18
76:25
**consistently** 17:24
**constantly** 43:17
**consulting** 25:13
**contacted** 126:7
**contain** 106:19
**contending** 121:9
121:12
**continue** 25:4
54:15
**continued** 34:13,15
47:15 52:10,23
54:13
**continuing** 34:20
**contract** 126:9,24
**contract/agreem...**
126:11
**contracted** 6:19
**contractor** 126:25
**Contracts** 126:18
**contraption** 49:21
49:23
**contrary** 62:6
**control** 47:2 59:23
**conversation** 19:4
67:7 114:6
**conversations** 65:4
109:18
**copies** 9:11 21:11
98:17
**copy** 4:5 5:13,18
8:10,10 9:7,12
30:5,7 31:25 69:2
100:12 124:8,9
**cord** 41:10,13
50:11,11 51:24,25
**core** 52:4
**corollary** 94:2
**CORPORATION**
1:7
**correct** 5:12 32:14
32:15 65:9 72:18
88:10 90:17 98:6
98:7 103:2 104:17
107:8 110:25
111:14,20 117:12
117:15 125:10
**correctly** 60:15

61:20,20
cost 80:12
Council 126:4
counsel 2:1 8:19
  22:9 65:4,6 66:2
  68:7 86:22 87:4
  98:17 125:18
  126:12
count 50:1,3
counting 102:25
county 1:1 7:2
  62:22 125:4
couple 10:2 18:21
  20:17 35:4 43:6
  62:8 77:17,18
  81:8 82:2 91:22
  103:13 111:6
  114:18
course 52:17 53:4
  89:4
court 1:1,14,23
  4:24 5:9,18 7:2,22
  7:23 18:5 21:7
  27:8,17,23 30:4
  30:15 31:3,5,22
  63:2 66:17,19
  67:20,22 86:23
  87:6 89:8 123:17
  124:3 125:15,23
  126:5,7,18,19,19
  126:23,25
cover 126:14
COVID 70:11 79:9
  81:8,16,23
crazy 68:17
created 26:23
Creek 117:2
crick 110:1
critical 94:22
cross-examining
  123:10
CTs 109:1
Cumming 2:4
curette 51:8
curvature 43:25
customarily 53:8
customary 126:15
customize 53:10
cut 41:24 42:20,20

46:8 71:21 74:10
cutting 41:24,25
  50:12
CV 30:5,7,10,18
  31:4
——————
        D
D 51:3
Dallas 29:12
damage 37:7 40:10
  43:16 46:5 51:25
  55:20 104:20,22
  106:3
damaged 36:7,23
  37:22,24 38:2
  39:15 41:1 47:9
  47:13,20 54:24
  60:21 84:23 92:17
  92:18,20 108:7
damages 73:13
  86:9
Danner 6:19
dash-cam 105:20
dashes 3:20
data 85:10
date 31:18 34:2
  57:15 69:15 74:25
  118:1 123:4
dated 58:19
dates 99:18 120:12
daunting 45:23
day 75:4 99:6
  118:25 119:14,19
  119:21,21,22
  125:22
days 12:10 63:4
de 1:24
deal 16:8 18:5
  77:10
dealing 39:3 110:3
  110:17
deals 82:23
death 46:9
Decatur 1:24
decide 86:3
decided 45:7 62:3
deciding 93:1,20
decision 27:7 56:3
  96:10 124:1

decorating 25:14
decrease 70:12
deductibles 72:25
deemed 30:2
deep 59:20
defendant 112:18
Defendant's 3:16
defendants 1:7 2:6
  7:12
Defendants' 3:15
  3:16 87:22 101:3
definitely 24:17
  70:13
degenerative-bas...
  83:4
degree 62:10
delay 74:25
deliver 82:8
demands 84:3
denied 90:24
  125:12
deny 66:2
depend 110:8
depending 20:4
  43:19
depends 53:13,19
  110:11
depicted 49:22 50:5
  51:7
depo 121:1
deposition 1:12,23
  4:4 6:24 7:5,6
  9:16,20,21 12:10
  12:14 13:16 14:15
  14:18,19,20,22,25
  15:4 16:9,12 17:2
  17:16,19,20,23
  20:3,7 26:10,21
  27:13 28:2,4
  32:21,24 33:3,5
  64:10 65:5,9 66:3
  66:21,23 67:7,10
  68:16 81:11,19
  82:13 83:25 88:13
  88:17,23 89:2,10
  89:18,19 90:20,23
  91:3,12 92:3 94:3
  101:2 102:5
  103:23 105:8

120:23 121:4,6
  123:19 125:6
  126:8,9,14
depositions 20:13
  81:4,8 83:11
  86:17,22 87:5,7
  88:1 89:4,8 90:11
  99:5 105:6
describe 33:12,18
  40:4 87:15
describes 56:13
describing 10:6
descriptor 123:5
designated 10:23
detailed 11:14
detector 61:7
develop 57:13
developed 57:21
  84:16 85:9 93:15
diabetes 115:8
diagnosed 37:6
diagnosis 36:21,22
  62:12,19 95:3
  96:16 107:25
  108:4,12,15 109:2
  109:2
diagnostic 24:25
  26:2 64:14 65:7
  65:14 66:4 67:1,2
  67:11 97:9,18
  98:5 106:9,12,19
diagrams 66:12
dialogue 3:22
difference 55:4
different 10:7 34:9
  45:5,10 47:1
  50:18 51:2,16,16
  52:8 53:10 58:15
  59:9 82:22 84:9
  85:14 95:10 96:1
  106:22,24 108:7
  108:19,24 116:6
  116:11
differential 107:24
  108:4,12,14 109:2
difficulty 35:10
  108:21
digital 65:19
direct 35:20 70:20

70:22
directed 126:24
direction 49:19
  108:19,23 110:21
  125:9
directly 71:1,9 72:1
  123:7
disability 94:11,11
disagree 91:8 121:6
  121:6
disassembly 125:12
  125:13
disc 35:25 36:1,7
  36:24 37:6 38:2,3
  38:7 39:16 40:1,1
  40:5,5,7,8,19 41:7
  41:7 42:5,6,14,21
  43:4 47:19,24
  50:5,8,13 51:12
  51:22 52:11 55:11
  55:20,23 56:5
  57:9 58:2,4,10
  60:12 97:5,5
  108:8
discharged 53:2
disclosure 4:1
  126:1,4
discomfort 44:6
  59:4,11
discount 126:16
discovery 18:5 20:9
discs 35:3 36:1,23
  37:7,22,24,25
  38:5 39:8,8,10,13
  39:14 40:10 44:10
  44:18 47:9,13,21
  50:4 52:12 60:7
  60:21 84:23 90:2
  92:17,18,19 93:13
  97:2 122:6
discuss 12:8,9
  14:15 16:8,18
  18:12,14 24:16
  25:6,22 66:21
  72:11 113:7
discussing 7:16
discussion 6:6,16
  17:16 19:13,22
  67:25 68:7 106:8

113:18
**discussions** 82:5
  109:19 112:22
  124:7
**disposal** 37:15
**dispute** 24:2,5
  75:19 87:1,12
**Doc** 38:21
**doctor** 15:1 27:18
  28:19 30:3 31:20
  34:19 45:16 56:7
  57:8 58:18 59:2
  62:23 63:13,16
  64:21 66:1 69:17
  74:14 75:9,19
  76:5,20 77:20
  78:2 79:6 81:3
  82:4,15 83:12
  85:13 86:6,16
  87:19 91:10,14
  93:11 95:16 96:2
  96:14 98:11 99:9
  100:6,10 101:5,17
  102:9,14 103:3,19
  104:4 106:22,24
  110:20 111:10
  113:15 114:24
  115:14 116:25
  117:24 118:1,6
  119:8,16,25
  120:17 121:25
  122:22 123:12
**doctor's** 17:1
**doctor-level** 86:7
**doctors** 45:10
**document** 7:17
  10:14 21:9,10,18
  21:22,22 22:15
  23:9,17 26:10
  64:10,17
**documentation**
  10:11 11:24 12:3
  12:17 13:3,7,10
  14:5 17:9 23:5,11
  24:11,12 25:25
  26:16 78:19
  104:19 105:11
**documents** 4:5,7,14
  4:21,25 5:5,6,8,23

6:1,11 7:18 8:4,5
  8:11,13,21 9:9,13
  9:14 10:20 11:11
  11:19 12:7,13
  14:3,8 15:16 16:6
  16:10 18:7,8 20:4
  21:12,16 22:5,7,8
  22:10,11,19 24:1
  24:7,22 25:4,20
  25:21,22 26:22,24
  26:25 27:12 67:18
  68:8,15 101:9
  103:4,9 105:15
  113:3 115:5
  123:24
**DOE** 1:7
**doing** 45:13 50:25
  53:1 59:7 62:6
  70:15 81:11 88:6
  94:6 116:1
**Dominion** 1:5 7:1
**door** 78:7
**dots** 59:22
**double** 117:15
**doubt** 87:25
**doughnut** 36:4
  39:11,24 40:14
  41:6
**doughnuts** 36:3
**Dr** 2:10 7:5 20:10
  25:1,18 26:14,23
  28:2 31:6 33:11
  46:21,22 58:15,16
  61:4 64:2 66:21
  68:4 87:15 107:22
  118:16,18,23
**drags** 76:2
**driver** 55:18
**driving** 55:19
**dropped** 81:17
**drove** 81:9
**due** 14:21 122:12

―――――――
**E**
―――――――
**E** 125:1,1
**E-mail** 2:9
**ear** 59:1
**earlier** 66:13 84:20
**early** 91:19

**earthly** 86:3
**easily** 38:13,13
**Eastern** 6:24 19:20
**easy** 20:12
**eating** 84:16
**edges** 39:19
**Edition** 57:7
**educated** 56:3
**effective** 52:12
**efficient** 98:25
**efficiently** 99:25
**effort** 18:10
**eight** 11:7 81:15,20
  83:11 113:10
**either** 28:13 37:19
  45:14 82:17 89:10
  91:2 96:8
**electronic** 10:14
**Elevated** 60:19
**Elite** 65:25,25 69:8
  97:24
**ellipsis** 3:21
**else's** 26:2
**email** 2:5 4:12 6:4
  8:18 12:9,11
  17:15 98:22 99:23
**emailed** 4:4 7:20
  8:9
**emails** 102:5
**embedded** 59:18
**emergency** 34:11
  117:3
**Emory** 117:1
  118:12 119:21
**employee** 6:21
  125:17,19
**employer** 73:5
  126:24
**EMR** 120:5
**EMS** 106:2
**Encore** 6:20
**ends** 51:4
**energy** 17:2 39:14
**enforcement**
  105:20
**engages** 71:19
**entire** 45:23 66:19
  75:25 118:4
**entity** 126:24

**equipment** 55:2
**ER** 118:11,12,14
  119:3
**Erik** 1:12 3:4 7:5
  27:25 28:3,20
**escape** 40:21
**Esq** 2:2,7,11
**established** 45:6
**estate** 49:15
**estimate** 76:12
**evaluate** 36:16
**evaluated** 36:16
  106:2
**evaluation** 46:17
  89:15,17 91:2,4
**evening** 64:2
**event** 84:11 89:12
**everybody** 4:17
  5:19 7:20 8:1,9
  20:12,22 21:5
  53:10 110:2
  123:13
**everybody's** 27:19
  104:8
**evidence** 8:25 28:5
  33:1 85:6,8 89:9
  94:8 105:12
  112:11 113:4
  122:5,10,17
  125:10
**exactly** 82:1 116:1
**exaggerating** 61:14
  61:25
**exam** 35:9,10 36:13
  37:5 57:25 108:25
  109:7 112:5
  119:13
**examination** 3:1,5
  3:6,7,8,9 12:25
  22:6,15,19 23:24
  28:17 62:12,18
  64:7,25 122:2,24
**examinations**
  13:25 58:6 61:24
**examine** 12:21
**exams** 29:22,25
  64:25
**Excuse** 4:8
**exhausted** 45:1

**exhaustive** 114:18
  114:22
**exhibit** 3:11,12,13
  3:15,16 30:5,10
  30:11 31:23 32:24
  33:3,9 38:9 87:21
  87:22 101:2,3
**Exhibits** 3:16
**exist** 21:13
**exists** 78:19 107:21
**expect** 10:13 69:5
  77:3
**expectation** 69:5
  74:17
**expected** 17:23
**expecting** 14:2 74:7
  75:22
**expensive** 49:14
**experience** 39:13
  73:3
**experiences** 39:16
**experiencing** 34:1
**expert** 91:8 113:2,4
**expires** 125:24
**explain** 5:25 15:22
  29:17 38:6,25
  39:3 47:23 48:3
  49:6 54:8 56:16
  56:19 57:21 59:16
  84:20,23 85:8,11
  86:13 112:9 115:6
**explaining** 27:8
  49:3
**explanation** 92:13
**explanations** 92:11
  109:9
**explore** 115:21
**exposure** 55:16
**expressed** 58:9
**expressing** 96:20
**expressly** 125:11
**extended** 53:14
**extensions** 55:14
**extent** 10:6 33:3
  58:4 61:6,14 67:5
  73:19

―――――――
**F**
―――――――
**F** 49:9 125:1

**face** 49:9 103:12
**facilities** 119:9
  121:17
**facility** 25:16
**fact** 30:6
**factor** 109:4
**fair** 13:11,12 18:8
  38:22 43:8 48:23
  61:10 70:2 78:13
  78:21 79:8,16,23
  83:1 89:6 93:3,23
  94:4,24 95:5,8
  96:21 97:12,20
  98:2 106:10,13,20
  106:25 109:3,6
  110:15 118:4
  123:14
**faith** 18:11,14
**fake** 84:22
**familiar** 59:13
  60:18
**far** 44:23
**fast** 100:22
**Fax** 2:5
**FAYETTE** 125:4
**February** 119:13
**feel** 40:17 55:23
  56:5 57:18 59:5
  95:6
**feeling** 52:22 61:17
**fees** 126:22
**felt** 37:20 41:20
  95:22
**female** 114:7
**Ferry** 2:3
**fibers** 40:16,16
**field** 62:14 63:10
**Fifth** 57:7
**fifties** 57:11,16
**figure** 14:20,24
  15:1,3 17:9 19:24
  26:15 93:25
  112:16 123:23
**file** 1:4 8:16 10:1,11
  10:12,14 11:25
  12:3,4 13:3,7,9
  14:6 17:23 26:3
  31:21 67:13 80:6
  98:10 104:5

106:12,18 116:13
  117:1,8,10,13
  118:4,15 119:9,16
**filed** 6:10 7:1 8:22
  9:8
**files** 8:25 69:3
**filing** 4:23 5:25
**filings** 9:9
**filling** 35:22
**films** 43:9,12
**final** 51:19 52:13
  52:24 56:17
**finally** 20:13 26:19
  52:2 84:25
**finances** 78:23
**financial** 12:22
  78:4,11,17 79:2
  126:16,21
**financially** 6:20
  125:19
**find** 4:20 6:9 8:21
  8:23 9:9 13:1
  16:9 17:6 26:1
  66:25 67:1 82:7
  89:3 91:10 106:23
  119:25
**finding** 37:2,2
  41:14
**findings** 58:6 112:2
**finds** 24:25
**fine** 5:9 14:16
  19:14 21:7 24:19
  24:22 28:13 75:6
  84:5 86:1 99:3
  111:5,6 124:2
**finishing** 29:23
**fire** 44:2
**firing** 43:17 44:1
**firm** 2:3,11 86:21
**first** 4:16 8:9 10:7
  19:8 21:20 29:24
  29:25 31:10,12
  33:13 34:10,23,24
  48:23 50:6,12
  65:12 69:15 83:2
  91:25 92:5 109:24
  115:16 119:12
**fit** 51:7
**fits** 51:15,17

**five** 18:18 63:4 89:4
  90:11 114:12
  120:22
**five-year** 29:21
**fix** 54:23
**flat** 41:8 47:21
**flip** 99:24
**fluid** 41:12,12,15
**focus** 15:10 92:25
**focused** 36:19 93:1
  93:18,19
**folks** 61:10
**follow** 47:16 52:23
  64:4 122:22
**followed** 52:18
**following** 3:20 53:5
  58:9 126:4
**football** 90:7 92:9
**Ford** 52:9
**foregoing** 125:6,9
  125:12
**Forgive** 118:12
**forgot** 111:8
**form** 28:11,15
  64:19 65:10 66:5
  70:9,23 71:12
  72:3,16 74:3 77:1
  77:12 83:18 85:23
  87:9 95:21 96:11
  97:13 100:18
  101:25 102:24
  103:24 113:9
  120:10 123:9
**forming** 62:15
**forms** 95:10
**forth** 1:13 38:9
**forward** 5:18 16:24
  17:5 19:25 20:3
  26:5,10
**forwarded** 100:21
**found** 31:1 67:21
**foundation** 33:8
**four** 59:17,22 63:3
**freight** 1:5 7:1
  84:12
**frequent** 81:13
**front** 13:22 30:3
  39:19 42:23 43:3
  50:20 59:11,19

78:6 100:14
  101:21
**front-of-the-neck**
  59:4
**frustrating** 20:16
**full** 8:16 18:23
  28:19 111:11
  118:15
**Fulton** 62:24
**function** 56:13 57:2
**functioning** 60:15
**further** 3:8,9 38:21
  54:15 64:5 122:2
  122:24 125:17

———————

**G**

**Galleria** 2:12
**gallstones** 60:25,25
**gather** 94:18
**general** 53:12,14
  55:25 61:12,16
**generated** 64:15
**genetic** 85:5 108:6
  112:10
**gentle** 43:24
**gently** 49:17 50:22
  51:22,23
**Georgia** 1:1,24 2:4
  2:8,10,12 7:2,14
  7:16 8:12,15,20
  8:22 11:5,8,13,16
  11:18,20 12:3
  13:10 14:8 15:22
  16:2 24:5 25:22
  28:6,23,25 29:5
  64:11 65:17 69:6
  69:19 70:19 71:4
  71:8,19 72:1 76:7
  76:11,18 101:22
  102:10 115:13
  119:20 125:3
  126:4,5,18
**germane** 96:15
**getting** 12:16 13:5
  18:6 19:8 26:15
  27:12 30:24 45:9
  47:11 78:13,20
  108:15 111:3
**give** 4:24 6:12 9:12

15:10 17:2 18:20
  18:20 19:17 23:18
  28:19 37:10,10
  43:18 44:8 45:6
  45:12 63:6 67:6
  71:6 87:7 91:20
  92:6 95:6 98:10
  99:23 113:4
  123:11
**given** 14:4 18:4
  34:18 62:9 73:11
  75:10 79:12 81:5
  83:10 87:7 90:24
  100:15 121:3
  125:10 126:17
**giving** 17:1 56:12
  61:9 65:15 83:8
  95:17,19
**glance** 10:7
**gland** 59:18
**glands** 59:17
**go** 5:15,21 6:7 7:21
  7:23 17:5 18:17
  19:25 20:3 26:5
  27:15 29:10 31:1
  33:1 35:22 37:4
  38:21 43:19,19
  48:5,11 50:9
  51:11 62:4 65:20
  66:20,24 67:3,23
  71:8 74:23 77:2
  77:23 85:5,25
  87:18 89:10 91:9
  93:24 98:21
  100:23,24 101:16
  102:19 107:8
  108:2,3,6 109:8
  109:22 113:25
  120:18
**go-round** 19:8
**goal** 39:20
**God-given** 52:12
  54:25
**goes** 70:24 72:19,23
  73:1
**going** 6:11 8:15 9:6
  10:16,23 13:1,21
  13:23 14:2 15:19
  16:4,8,12 17:5,10

19:15 20:9 22:13
25:11,11,12,15,24
26:1,9 27:11
30:18 34:25 35:8
35:13 39:21 40:12
42:15,17,18 44:8
44:9 46:8 48:5
52:3 53:3 54:4
63:5,7,20 65:10
66:5 67:4 72:17
74:17 75:22 79:4
79:13,21 83:23
84:2 85:18 86:2,4
87:17,20 89:1,8
94:23 98:11 101:1
101:2,25 102:6,10
102:14,15 106:23
108:20 111:2,9
112:2 114:2
115:25,25 116:2
**good** 18:11,14
28:16 34:18 37:10
37:20 41:12 43:23
52:11,22 54:4,12
54:25 55:1,1,11
61:7 64:2 78:18
82:20 93:8 94:17
94:22 96:7 99:4
111:4 114:20
**gotten** 37:9 108:18
**gradual** 108:21
**graduate** 29:13
**gray** 41:11 42:17
**great** 40:19,25 75:1
107:22
**gross-income** 80:2
**grounds** 62:14
**group** 118:18
**guarding** 35:11
**guess** 9:20 54:8
70:11 79:18 81:10
81:16,21 82:2,20
88:6 89:9 100:21
105:1
**guidelines** 56:11,22
57:6
**guy** 86:13
**guys** 64:24 68:10
68:10,11,17 69:3

70:22 84:7 86:11
86:15 89:7,8
92:21 105:6
113:10 124:3
**Gwinnett** 1:1 7:2

**H**

**half** 46:20 83:3
**halting** 3:21
**hammer** 51:23,24
**handed** 100:17
**handle** 39:15,23
68:12 79:5
**handled** 79:2
**handles** 71:5 78:24
**hands** 26:14
**Hanniford** 117:20
**happen** 84:2 85:21
112:2
**happened** 44:23
52:17 86:24 92:7
92:8,10 105:9
116:22
**happens** 39:16
**happy** 5:17,19
17:19 18:22 53:20
66:9 68:19 72:8
91:9 98:22,23
99:23 107:20
109:10 112:13,23
113:22 123:20
**hard** 39:10
**hardship** 62:25
**head** 35:18 42:2
88:7
**headaches** 33:15
44:3,4,4 52:20
58:13 84:17 93:8
96:23 110:18
**health** 65:23 67:18
77:9,10,14,16,25
94:6 97:22 106:21
107:13 117:14
**healthy** 117:23
**hear** 22:2 104:4
**heard** 67:22 68:18
**held** 6:6,16 19:22
67:17,25
**help** 20:22 37:18

39:2 45:12 48:3
57:18 59:23 74:24
75:7,7 94:12 95:1
95:13 107:10,11
113:16
**helpful** 39:9 49:2
95:3 115:24
**helping** 37:21
**herniated** 38:3,5,7
44:18 57:9 60:7
60:12 93:13 97:1
122:6
**herniated-damag...**
44:10
**herniation** 36:1,1
**herniations** 36:24
58:2
**hey** 18:11
**high** 54:13
**high-powered** 35:1
**higher** 73:1 76:2
116:10
**HIPAA** 123:16
**HIPAA-protected**
27:4
**hired** 73:17
**history** 34:24 37:6
60:10,24,25 86:17
92:6 97:8 108:20
108:24 109:4,7,15
109:24 111:19
113:20 115:8
**hit** 84:12 92:9
**hold** 21:8 39:21
48:16 49:24
119:14
**hole** 35:23 36:6
42:15
**holes** 35:21
**honest** 10:25 15:2
**honesty** 11:2
**hope** 21:17,19
**hopefully** 76:3 94:9
**host** 7:24 91:15
**hour** 1:15 111:2
**hours** 99:5
**house** 25:14 55:13
**housed** 11:15 12:6
**housekeeping** 43:7

**hundred** 81:1
**hurt** 85:2 88:21
**hypercalcemia**
60:10,18

**I**

**idea** 18:16 68:13
73:16 84:3 86:4
**ideal** 55:19
**identification** 6:10
30:12 33:10 87:23
101:4
**identify** 50:3
**identifying** 87:20
**ignoring** 15:21
**illustration** 38:22
48:2,23
**illustrations** 30:19
82:9
**image** 24:25 26:2
65:15,23 123:4
**images** 43:7 65:18
65:19,20,21,24
66:4,8,12 67:1,2
67:11 68:20,24
98:2,5
**imaginable** 33:20
**imaging** 65:7,23
67:18 68:18 69:6
97:10,18,22 98:5
106:10,12,19,22
107:13 108:25
109:16 114:17,21
114:22
**immediately** 106:5
111:22
**impact** 55:9,10
56:18
**impairment** 56:8
56:12,21,23,25
57:5,6
**implant** 51:6,12,19
51:20 52:8,12
**implanted** 51:25
**implants** 51:16
52:4,7,9,15
**important** 57:11
62:3 94:21 107:22
**improve** 54:22

**improved** 53:23
**improvement**
52:19 53:25 54:6
54:11,13,18
**in-person** 70:12
**incident** 126:19
**incision** 49:11,12
50:12 116:8,10
**include** 24:12 55:24
107:1
**included** 11:24
13:3,7 14:6 56:6
**includes** 10:11
**independent** 89:15
91:2 126:25
**INDEX** 3:1,1,11
**indicate** 3:20,21
**indicated** 4:14
96:18 97:16 106:9
118:6
**indication** 110:13
**individual** 13:25
17:8 53:11,13
73:12 77:8 92:25
**individually** 123:14
**individuals** 71:10
89:21 93:12
**industry** 71:19
**infection** 85:4
108:5 112:9
**inferences** 62:15
**information** 12:6
16:17 23:14 25:17
27:4 61:20 67:17
67:17 94:18,20,23
95:2 96:8,15 99:8
107:13,18 108:3
108:15 109:17
110:10 114:16
115:3,13,19 116:7
116:24
**inheritance** 77:4
**initial** 16:19 44:22
**initially** 14:23
**injection** 118:19
**injections** 34:17,18
37:14,18 45:2,2
46:23,24 118:20
118:25

**injured** 73:9,10,18
83:14 88:19,19,20
89:6,22 93:2,25
**injuries** 38:9,17,18
39:1 54:21,22
57:13 61:6,15
82:25 90:6 111:13
112:1
**injury** 37:3,4 46:20
55:5 56:14,14,18
57:2 59:1 61:1
73:14 75:11,16,17
76:22 79:13,22
82:18 83:15,22
84:11,14 85:17
88:14,22 89:14,23
90:8,13,21,25
91:17,21 92:2
93:20 95:7,19
108:10 114:4
122:12
**inquiry** 126:23
**insert** 51:22
**inside** 40:19 59:18
59:20
**instance** 35:25
**instrument** 50:7,18
50:25 51:2,8,21
**instruments** 50:13
**insurance** 1:6 77:9
77:11,16,25
**insurers** 77:14
**intake** 26:3 114:24
115:7,16,19
116:16
**integral** 86:9
**intensity** 33:22
**intentional** 3:20
**interest** 70:2
126:21
**interested** 6:20
91:18 110:7
125:20
**interpretation** 23:4
23:8,8 69:14
**interrupted** 66:23
**interrupting** 18:17
77:23
**interruption** 3:21

**intimate** 78:10
**intimately** 78:17,22
**introduce** 7:7
**invasive** 56:1,2
62:7
**investigations**
96:12
**investigator** 93:24
94:6,7,13,17,18
94:22 96:5
**investigators** 96:7
**involve** 26:14 78:3
**involved** 14:10
47:24 71:10 76:21
78:17,22 85:15
88:14 90:12 93:14
104:6,14,15 122:7
122:13
**involvement** 17:8
**involves** 14:9,11
72:16 75:20 81:6
**irrelevant** 94:20
**irritated** 36:8 40:17
**irritating** 40:22
44:7
**irritation** 35:13
42:10
**ish** 79:10
**issue** 8:24 19:15
27:1 36:18 57:5
59:6 83:22 85:17
89:6 90:23 91:17
95:20 97:5 98:6
**issues** 18:15 26:6
59:3 64:6 83:4
90:1 109:4 112:10
**items** 11:7 12:8
25:19

**J**

**jacks** 50:8
**January** 35:5 41:3
42:12 118:17
119:4
**Jason** 2:2 3:6 5:2
7:6,9 8:2 15:3
18:22 28:18
**jelly** 36:2,4,4,24
39:11,18,18,21,24

40:13 41:5,15
42:7,9
**jig** 51:21
**Jmanton41@yah...**
2:5
**job** 40:19,21 55:13
**JOHN** 1:7
**Johns** 117:1
**joints** 39:7,8 90:2
**judge** 20:1,5 68:19
**judge's** 124:2
**Judicial** 126:4
**July** 31:14,19 92:5
100:1,7 115:3
**jumps** 9:19
**June** 47:15 58:10
100:4,5
**jury** 29:17 33:1
38:7 47:24 48:3
49:3,7 54:9 59:16
68:19 83:24 85:19
85:20 86:9 107:21

**K**

**keep** 15:19 18:17
39:22 47:2 55:20
56:2 57:12 65:21
65:24 69:7,8
111:9
**Kevin** 2:7 3:7 7:11
10:2,6 18:18
19:16,23 20:16
28:7 32:25 64:3,8
113:12
**kidney** 60:10,11
**kind** 9:21 20:15
23:11 33:17 45:16
51:14 53:13 56:3
61:12 71:21 74:10
79:9 81:9,9,16
82:17 93:24 95:11
110:13 116:10
**knee** 106:2
**knew** 19:1 87:6
**knife** 50:12
**know** 5:4 10:1,5,24
12:16 14:3 15:23
15:23 17:12,12,12
18:1 19:10,10,11

20:10 21:13 23:10
26:7,12 28:10
33:1 38:5,8,12
44:22,25 46:4
47:7 50:4 53:24
55:9,12,24 72:9
75:7,21 76:21
77:18 78:25 79:25
80:11,22 81:1,15
82:1,13 83:7 86:2
88:11,25 92:6
93:5 99:4,15
107:3,21 109:25
109:25 110:2,4
111:1 112:13
115:10,12 121:18
121:19 123:3
124:1
**knowledge** 33:7
73:25 75:12
**knowledgeable**
76:17
**knows** 19:2
**KPB@mkblawfi...**
2:9
**Kurey** 2:7

**L**

**L** 42:2
**lab** 119:18
**labeled** 30:4 31:23
**lack** 33:7
**lady** 26:15 85:2
**latest** 30:7
**law** 2:3,11 105:20
126:20
**Lawnmower** 89:13
**lawsuit** 74:8,18
76:25 77:5 112:18
**lawsuits** 71:3,4
83:16
**lawyer** 67:7 68:14
**lawyers** 70:20 71:2
71:9,20 72:2,11
86:2 88:25
**laying** 26:14
**lead** 108:18,23
**leading** 51:10
**learned** 121:5

**leave** 26:11 59:10
68:11
**leaving** 111:7
**led** 110:21
**Lee** 118:18
**left** 33:21 35:14,16
35:19 36:9,10,11
39:20 42:3,18,24
43:1 50:23 51:1
96:23 112:11
113:10
**Left-sided** 96:22
**legal** 70:22 73:21
73:21,24 75:1
86:7
**legalese** 68:18
**legs** 42:2
**Leon** 1:24
**lesser** 58:4
**let's** 5:21 6:2 9:19
14:7,13 15:9
16:24 17:5,14
19:3,16 21:20
23:7 26:5 27:15
38:11,12 66:16
80:5,15 82:1 98:8
99:9,10 100:22,25
109:12,12 111:9
113:10 118:13,21
118:21,23,25
119:14,14,18,19
119:22,23 123:22
**letter** 10:17
**level** 40:11,14
41:18,20 42:15
50:16 52:1,1 56:5
**levels** 59:23,24
60:19
**licensed** 28:23,25
**lie** 61:7
**lien** 74:2,6,15 75:20
76:13,23 79:14,23
80:17
**life** 45:23 107:14
**ligaments** 35:3 90:1
**liked** 107:17
**limitations** 55:6
**line** 1:5 16:19 92:16
**Link** 65:24

**list** 4:24 86:16,22
87:5,7,20 88:11
118:20,20
**listed** 101:13
**listen** 45:24 95:10
99:22 102:20,21
116:23
**listening** 68:10
**litigation** 88:1
93:21 123:8
126:17
**little** 5:21 10:7
33:21 35:15,21
40:12,15 41:17
43:6 44:23 47:11
48:18 49:23 50:8
50:25 51:5,9,10
51:12 58:4,25
59:11,17,21,22
65:3 66:16 74:10
79:10 81:17 85:13
88:7 94:5 95:11
106:23
**live** 45:3,8 46:5,6
46:25 62:4,22
63:2
**living** 37:19
**LLC** 2:3 69:20
**LLP** 2:7
**loaded** 51:21
**locations** 29:6
**log** 4:20 5:1,25 6:9
8:24 9:12,13
20:25 23:2 25:10
120:8
**long** 14:9 16:13
20:14 28:25 33:25
53:7 76:21
**long-term** 45:12
**longer** 53:20 62:4
**look** 5:20 6:3,5 8:14
10:21 18:11 20:25
21:2 25:25 30:6
32:2,9 41:6,22
52:3 66:13 68:20
68:21 84:17,19
92:11 98:23 99:10
99:24 100:25
102:9 103:12

106:4 107:20,22
108:24,24 109:10
110:15 112:15,25
115:7 116:8,21
**looked** 11:14
105:23 106:11,18
**looking** 9:23 10:9
10:20,22,24 11:2
15:24 41:9,23
42:1,1,6,20 55:14
58:1 61:24 88:11
92:4 100:10 103:8
103:11 115:20
119:25 120:2
**looks** 9:23 10:7
31:19 35:2,2
42:22 51:17 52:6
117:18 118:2,19
**loss** 108:22
**lost** 56:14 57:1
**lot** 40:24 55:18
82:21,22 90:4
**low** 46:1,1 90:3
116:9
**lower** 59:22 76:3
**Lucas** 6:19 63:19
**lying** 61:5

———————
**M**
**M** 2:11
**M.D** 1:12 3:4 27:25
**M6** 52:7,9
**machine** 50:1,2
**Madam** 5:9,18
27:17,23 66:17
67:20
**mail** 82:8
**main** 33:16 97:6
**maintenance** 47:21
**majority** 41:18,21
74:21
**making** 19:9 25:23
73:5,12 79:11
94:25
**maneuver** 35:14
**manner** 9:1 99:22
**Manton** 2:2,3 3:6,8
5:2,10,13,15 6:4
7:6,9,9 8:2 9:18

10:17,22 18:16,25
19:3,16,23 20:23
21:6 27:16 28:2
28:14,18 30:9,15
30:23,25 31:3,6
31:17,20 32:23
33:11 38:15,19
44:17 48:7,14,17
48:20,22 52:16
63:12,18 64:19
67:4 70:9,23 74:3
77:1,12,15,23
82:5 83:18,21,23
85:16,19,23 86:1
91:19 92:2 95:21
95:22 96:11 97:13
99:20 100:21
101:8,11,15
102:24 105:1,5
111:1,8 112:19
113:7,9,17,18,19
120:21,25 121:9
121:14,20,24
122:3,20 123:2,9
123:15,25 124:9
**manufacturer** 55:2
**March** 31:11,13
45:14 46:15,17
47:11 100:3
118:13,23 120:13
120:13 125:24
**Marietta** 2:8 29:7
**mark** 101:2
**marked** 30:11 33:9
87:22 101:3
**market** 71:1,6,9,15
72:6
**marketing** 70:20
70:22,24 71:5,5
71:19,20 72:1,10
72:15
**markets** 70:25
**material** 3:22 43:4
50:5,14,19,20,22
**math** 80:19,20 88:6
**matter** 7:17,19 25:7
64:5,12 73:9 75:2
86:21 99:16
**matters** 14:15

16:18 18:12 67:14
92:19
**max** 81:22
**maximum** 53:25
54:5,11,17
**McMickle** 2:7
**mean** 10:13 12:20
12:22 22:22 38:18
54:10,18 56:20,24
62:2 63:3 67:9
68:9 73:23 88:6
93:11 113:11
115:14 120:24
**means** 29:17,19
57:1 74:6,16
**measure** 53:19,19
**measures** 123:15
**measuring** 51:14
**mechanism** 84:11
84:14,18 111:25
**mechanisms**
123:18
**Medicaid** 83:2
**medical** 11:8,9,21
11:22 12:4,5
13:13,14 14:1,12
14:16,17 15:6,18
16:15 22:6,20
23:21 26:2,22
29:10,11 30:18
31:21 34:6,12
38:8 43:14 52:17
53:25 54:6,11,17
56:11 58:19 62:9
62:10,15 64:13,16
65:7 74:21 78:9
82:14 86:12 89:15
89:16 91:2,4,7
93:19,22 94:1
96:5,14 97:8
107:1,11,15 108:1
108:2 109:3,10
110:22 111:19
113:2,5,8,20
114:1,8 116:12,21
117:1,8,18,21
119:17 122:16
**medical-narrative**
33:2

**medical-specialty**
62:14
**Medicare** 83:2
**medications** 47:1
52:21
**medicine** 26:15
**meeting** 66:11
**meetings** 82:4
**Meg** 1:14 125:23
**mention** 14:22
**mentioned** 14:22
46:12 109:9
111:21 119:13
**met** 44:22 72:24
**metabolic** 85:5
108:6 112:10
**metal** 49:21,23 52:4
**metaphor** 96:13
**methodology** 62:13
**microphone** 71:23
**microvibrations**
55:19
**middle** 33:20 49:18
**Miles** 79:4
**Miller** 1:3 6:25
7:10 12:2,21,25
14:9 21:23 22:7
23:2,11 31:8
32:11,18 38:17
48:25 55:20 64:16
68:24 77:8 82:6
82:10 83:23 96:19
105:22 107:14
108:16 109:18
110:12 111:14
112:3,20 113:24
113:25 114:25
**million** 80:18,21
**mind** 55:20 57:12
113:3
**mindful** 116:2
**mine** 101:13
**minimum** 56:2
**minutae** 16:25
**minute** 20:15 48:8
63:15
**minutes** 18:18
91:22 92:3 113:10
120:22

**misconstrue** 23:7
**missed** 103:13
**misunderstand** 96:13
**moment** 89:20 91:15 98:8,10 99:23
**Monday** 16:13
**money** 73:13 84:1
**monopolized** 113:12
**month** 79:4 81:8,22 82:2 83:11 88:8
**months** 34:4 37:11 37:13 70:8
**more-likely-** 94:9
**morning** 4:4 8:8,9 98:17 110:1
**motion** 16:12 35:10 35:11,12 39:12
**motor** 72:17 82:25 93:14
**move** 18:10 49:13 49:17,19 57:14 95:11
**movement** 33:23 39:12 52:10
**moving** 36:2 39:22 121:13
**MRI** 34:25 35:1 36:23 37:5 39:4,5 41:2,3,11 42:12 42:12 43:7,9,12 44:22 47:10,11 57:16 60:7 61:24 65:1,21 69:7,14 69:16 97:21,23 98:1,2 112:6,7
**MRIs** 35:4 57:25 68:25 69:11 97:17 97:22 106:18,21 109:1 114:17
**multiple** 9:7 34:17 44:18 45:2
**muscle** 37:2 44:1,1 44:5 59:21
**muscles** 35:3 43:20 44:2 49:12,14 90:2

**musculoskeletal** 89:25

**N**
**nagging** 108:17
**name** 6:19,25 28:19 29:4 52:7 106:23
**named** 11:25 12:1 13:4 14:6
**narrative** 30:19 31:21 32:3,7,13 32:17,20 58:19
**narrowing** 42:13
**nature** 26:17 70:6 74:14 90:2 105:13 126:24
**necessitated** 58:17
**neck** 33:14,23 34:17 35:4,5,11 35:12,13 36:2,10 36:14,19,20,23 37:1,1,7 38:18,23 40:3,3,4 41:25 42:24 43:21,24 44:19 46:8,23 47:6,14 49:7,11 49:12 52:20 54:18 54:21 55:3,14,22 57:9,21 58:12 59:8,9,11,12,19 60:1,7,13,22 61:1 62:1 84:13,17 85:2,9 90:3 93:9 93:10 95:1,12,13 96:21,22 106:1 107:16,16 108:17 109:21,24 110:1,6 110:18,23 116:9 118:25
**neck's** 43:24
**necks** 37:9
**need** 4:10 6:8,12,15 10:25 21:6 38:13 38:21 43:22 46:7 48:17 57:19 86:12 99:7 113:13,25 114:4 124:3,5,6,8 124:9
**needed** 4:19 56:6

57:21 110:22 116:7 122:11
**needing** 61:2
**needs** 10:4
**negotiating** 126:21
**nerve** 35:12,23 36:8 40:16,16 42:16,18,25 43:1
**nerves** 35:3,21 36:6 43:17,18,19,25 44:7 49:16
**network** 77:13,13
**never** 22:24 24:18 55:3 61:21 73:16 88:16,23 89:1,17 89:17 90:11,19 91:1,6,12 106:4 110:12 114:10
**new** 47:8,22 52:15 79:7
**nice** 43:2,24 75:3
**night** 108:22
**nine** 34:4 37:13
**Nobody's** 88:18
**nonparty** 4:7 5:5,6 5:8,22 7:13 9:23 10:2,8 17:25 25:6 121:10,20
**nonsurgical** 45:18
**nope** 118:19
**normal** 37:1 39:25 41:8,14,16,17 43:11 44:11 56:7 84:22
**normally** 28:7 80:23
**nose** 59:1
**notably** 40:11
**notarized** 32:14
**notary** 6:19
**note** 9:5 21:20 24:24 69:12,13 89:14 102:7
**noted** 10:4 21:3 25:17 35:15
**notes** 21:1 22:9,14 23:2 24:11 89:11 91:5
**notice** 11:12 12:7

14:19 15:12,13 22:11 52:19
**noticed** 20:14 106:8
**noting** 4:13 33:14
**November** 1:16 5:14,16,17 6:23 7:19 8:5 13:21 15:16 16:3,11 23:18,25 24:6 33:15 34:4 58:8 118:17 119:23,24 120:14,16 122:7 122:14 125:22
**number** 7:3 19:17 56:12,19 98:16
**numbers** 31:16 75:15 79:19 80:15 101:23
**Nurse** 117:19
**nuts** 78:5

**O**
**o'clock** 99:5 113:13 120:17
**O.C.G.A** 126:10,10
**oath** 32:16
**object** 15:4 33:6 64:19 65:10 66:5 70:9,23 71:12 72:3 74:3 77:1,12 83:18 85:23 87:9 96:11 97:13 100:18 101:25 102:24 103:24 113:9 120:10 123:13
**objecting** 8:20
**objection** 4:13,24 6:10 8:21 9:1 45:17 67:5,8 70:10 77:24 95:21 102:7 123:6,9
**objections** 6:1 9:8 28:8,10,15
**objective** 84:19 112:2
**obtained** 86:22
**obviously** 63:7
**occasionally** 96:24

**occurred** 87:2 92:13 100:13 108:11
**October** 12:9 17:15 118:24 119:24
**offered** 122:16
**office** 29:9 100:19
**offices** 29:7
**OFFICIAL** 126:18
**oftentimes** 104:9
**Oh** 65:18
**okay** 10:22,23 16:14 24:23 26:19 31:17 38:11,19,25 39:9 42:2 43:6 46:6,16 48:10,20 48:21 50:16 53:3 54:5 56:17,19 58:5,23 69:4,22 70:1 71:7 76:16 76:20 84:20,23 87:1,4 92:7 96:25 98:8 101:15,20 103:22 105:5 107:5,8,21 108:18 112:2 114:16 115:18 120:19 122:21,23
**old** 1:5 7:1 47:11 115:14
**older** 57:12
**once** 6:8 30:1 42:4 42:22 43:2,16 48:8 49:11,13,20 50:19,23 51:11 55:19 66:7 71:14 88:24 90:11 91:12 93:4 103:11,13 111:25 112:24 113:22
**one's** 52:9
**ones** 77:18 115:1
**ongoing** 70:21 71:3
**online** 69:2,9 114:17
**onscreen** 21:19
**open** 46:8 50:8,13
**operate** 80:8,9 81:1
**operated** 57:10

60:13
operating 49:10
  80:25
opinion 57:8 61:19
  85:12,17 91:20,24
  94:24,25 95:7,25
  95:25 96:2 108:12
  109:13 111:12
  112:12 113:4,5
  114:3 122:5
opinions 32:11,18
  45:10 62:9,15
  95:17,19 122:18
opportunity 4:18
  8:11 17:1
option 14:14,25
  37:21,23 47:8
options 37:15 45:3
  45:18 46:11
oral 29:22
order 21:18 50:5
  50:11 83:15
  126:23
ordered 106:24
organized 6:13
original 55:2 124:6
  125:15
originally 45:19
Ortho 7:17 102:11
Orthopaedics 7:14
orthopedic 11:6
  28:22 29:16,20
  30:2 56:15 71:16
  72:8
orthopedics 2:10
  8:12,20,22 11:13
  11:17,18,20 29:5
  69:19 70:18 76:8
  82:23 89:25
Orthopedics' 8:16
ought 28:14
outcome 53:18
  125:20
outer 39:11,20,21
  42:5
outlined 11:7,12
  22:11 24:17 25:20
  26:25
outlining 4:21

over-call 46:3
overall 72:20
overlook 85:1
owe 75:3
owner 69:19,22
  78:2
ownership 70:1

P

P 2:7 3:7 64:8
p.m 1:16 6:24
  19:19 27:22 63:20
  63:25 68:3 124:12
Pacific 64:1
page 3:3 32:6 98:9
  98:15,20 109:23
pages 8:13 103:1
  103:12,13,19
paid 75:22 77:3
  78:13,20 83:9
pain 33:15,17,18,19
  33:20,21,23 34:1
  34:14,16,16 35:11
  35:24 36:9,14
  37:22 40:17,24
  41:20 42:10 43:18
  45:25 46:22 47:1
  52:20 55:22 57:19
  57:21 58:3,8,12
  62:1,4 84:17 85:9
  92:13,20,21 93:8
  94:10,11 95:1,13
  96:20,22,23 97:14
  106:1 107:16
  108:17 109:21,24
  110:6,17,18,23,24
  111:16 119:20
pain-relieving 45:9
  45:11 46:23
painful 37:6
pains 34:15 44:6
  53:22 111:22,24
painter 55:13
paper 78:5
paperwork 115:15
paralysis 46:9
paralyze 50:21
paralyzed 45:25
parathyroid 59:8

59:13 60:5
parathyroidecto...
  115:23 116:17
parathyroids 59:17
  59:23 60:1,15
Parkway 2:12
part 9:20 11:15
  43:11 44:11 56:7
  59:9,25 78:9
  108:14 120:8
  124:6
partial 116:17
particular 8:16
  20:17 21:9 37:12
  37:20 56:4 57:15
  61:16 80:6,16,17
  91:18 92:12 93:7
  96:18 126:19
particularly 107:5
parties 1:15 6:22
  31:22 125:18
  126:16
parts 36:2 54:24,24
  55:1
party 64:9 65:3
  123:8 125:19
  126:12,17,20,20
passed 29:22 30:1
Patel 46:22 58:16
  118:16,24
pathoanatomy
  73:20
pathology 92:16,17
patient 8:17 10:12
  11:25 12:1 13:4,8
  13:11 14:6 17:10
  20:25 22:16,19
  23:17,24 25:2,18
  26:9,24 27:10,15
  31:10 34:8 43:15
  50:22 53:8,11,20
  54:4,10 58:18
  60:3 61:18 63:7
  64:25 70:15 80:7
  80:12,17,23 88:13
  88:15,17 89:5
  92:5,24 93:4,18
  95:12 96:19 97:19
  109:22 113:21

114:10,14 115:2
  115:12
patients 29:24
  43:12 44:12 45:24
  56:8 61:5 63:1
  70:17,21 71:3,15
  72:8 75:6 77:3
  78:6,15 79:1,7,16
  79:20 80:10,17
  83:13 88:1,19
  104:7 116:23
patients' 76:13
pause 48:8
pay 74:8,24
paying 73:24
payment 74:23,25
  75:5 77:2,6
Pencil 21:1 22:14
  23:1 24:11
pencils 78:6
pending 76:23
people 45:21 61:9
  72:11,24 73:9
  74:1,24 79:20
  82:21,22 88:20
  90:4,5 104:9
  115:15 121:21
percent 56:13,23
  56:24 57:1 72:15
  73:6,11 74:1
  75:10,16,17,19
  76:12 79:12,15
  80:1,8,10,21,25
  81:5 82:16 83:8
percentage 75:24
  76:2,3
percentages 72:25
  73:8
Perfect 113:24
perfected 9:1
perform 47:5 97:21
  106:10
performed 48:25
  58:10 60:21 61:2
  97:17 122:12
period 55:16
periods 110:23
person 46:7 56:18
  79:3 86:13 92:8

114:14 126:19,24
personal 75:11,16
  75:17 76:22 79:13
  79:22 82:18
personal-injury
  71:3 72:21
perspective 115:25
pertain 13:24
pertaining 11:8
  13:14 64:16
  112:20
Phoenix 117:11
  119:4,6,7
phone 2:4,13 18:19
  19:17
photocopying
  125:12,13
photographs 104:2
  104:5,13,15
physical 10:14
  34:13 35:9 36:13
  37:5 53:2,4,7,15
  57:25 64:25 93:1
  108:25 109:7
  112:5 119:13
physical-on-phys...
  35:10
physician 31:8
physicians 106:13
  106:20 109:20
pick 51:18
picking 81:9
picture 39:4 50:17
  94:8
pictures 43:22
  66:13 69:7 104:9
piece 12:3 26:2
pieces 94:7,19
pills 37:13,17 45:2
  45:13,13
pinpoint 57:25
Pirkle 2:3
pituitaries 50:14
place 49:22 51:23
  52:7 65:4 69:24
places 41:23
plaintiff 1:3,13 2:2
  7:10 12:1 28:3
  90:14,21 104:18

113:20
**plaintiff's** 3:12,13
15:1 30:11 33:9
86:9 91:7
**plaintiffs'** 14:19
70:20 71:2,9,20
72:2,10
**plan** 36:21 75:5
77:6 95:4
**plane** 116:6
**plans** 77:17,19
**plastic** 52:4
**plates** 51:5
**plausible** 84:11,14
84:15 111:24
**play** 60:6,12 61:1
112:5
**played** 60:20
**player** 97:4
**please** 7:7 9:7
27:23 32:9 33:12
102:21
**plenty** 57:12
**plow** 16:24 99:9
**point** 11:18,23 13:2
19:25 44:21,24,25
45:4 46:13,16,19
47:13 53:1 54:6
54:13,16 56:4
58:25 59:6 73:7
82:15,19,22 85:6
91:19 93:9 111:2
111:3 113:13
**points** 85:11
**police** 103:6 104:21
105:7,25
**Ponce** 1:24
**population** 76:13
83:5
**populations** 83:5
**portable** 50:2
**portion** 73:4
**posed** 9:3
**position** 16:7,22
18:3,13 22:13,17
22:18 23:6,17,20
24:10,10,13,20,23
26:7,9,13,17
27:11 36:7 52:15

**positive** 35:14,16
**possession** 16:3
**possible** 94:19 95:2
96:13,15 104:9
124:6
**postaccident**
106:18
**postop** 52:19
**potential** 92:11
109:9
**potentially** 35:24
72:7 112:9
**practical** 19:24
**practice** 28:6 29:2
29:4,6 43:11
44:11 56:7 61:4,8
62:16,25 63:8
64:15,15 69:18
70:4,6,7,7,15
72:16 73:4,6
74:14 75:10,20
78:3,4,11,18,23
79:2,7,13 80:1,2
80:13 81:6 82:16
82:21 83:3,9
114:11
**practices** 76:18
**Practitioner** 117:20
**preceding** 111:23
**predate** 114:1
**predating** 120:14
**predeposition** 68:7
**Preetesh** 118:24
**prepared** 31:21
32:4 58:19
**present** 7:7 16:3,11
68:5,9
**presented** 4:1
22:21 107:19
**preservation** 28:4
**pressure** 35:20
50:11
**pretty** 9:24 52:22
55:1 78:18 81:2
114:18 116:9
117:16
**previous** 47:10
59:8

**Previously** 4:12
**primary** 34:19
117:24
**principal** 126:20
**principle** 55:25
**printed** 100:15
**prior** 4:3 8:19 9:3
9:15 17:16,19
34:1 59:12 60:5
60:10,24,25 97:19
98:6 103:23
107:14 109:24
110:16,22 114:20
115:9,20,23 116:3
116:3,13 121:4
**private** 29:2 94:5,7
104:22
**privately** 18:19
**privilege** 4:15,20
4:22,25 5:25 6:9
8:24 9:12,13
**probably** 28:14
55:11,15 79:3
93:24 105:8
**problem** 36:15
40:15 41:21 45:17
54:24 95:12 112:4
**problems** 33:12
36:17 53:21 62:1
84:10,10 111:16
114:15
**procedure** 49:3,7
59:14 60:6
**procedures** 46:23
**proceed** 7:14 13:16
**proceeded** 47:14
**PROCEEDINGS**
3:1
**process** 86:8
**produce** 12:20
19:11
**produced** 4:15 8:24
12:5 13:13 14:17
15:7,17,19 16:16
16:24 17:24 18:7
18:8 19:12 20:5
20:18 21:14 22:7
25:19 26:22 64:23
65:8 67:16 68:8

68:15,22,24
**producing** 15:2
27:1
**production** 4:7
5:23 7:17,18 8:4
10:19 12:7 16:19
23:9,19 24:1,7
26:11 64:17
**productions** 19:9
24:16 25:7,23
27:3 64:11
**profession** 28:21
**professional** 55:17
62:20 96:2
**program** 29:21
120:3
**progressively**
108:18,21
**prohibited** 126:10
126:21,21
**prolonged** 110:23
**promise** 120:22
**proper** 9:1
**properly** 51:7
**protect** 41:13
**PROTECTIVE** 1:6
**prove** 83:13,14
**provide** 4:23 9:7
23:14 113:8,19
114:3 116:24
126:7,11
**provided** 12:22
23:9 25:1 31:22
64:11 74:16 82:11
86:17,21,23 87:25
89:4 101:24 102:2
103:5 111:13
114:25 115:19
123:2
**providing** 67:15
93:19
**provisions** 123:16
**PT** 107:4,10 119:15
**public** 6:19
**pull** 49:20
**pulls** 49:21
**purposeful** 3:20
**purposes** 28:4,5
66:1

**pursuant** 1:13
126:3
**pursued** 45:8 46:25
**push** 36:5 39:19
51:24 91:7
**pushes** 39:17
**put** 32:25 35:19
38:16 48:6 49:21
50:6 51:6,13
54:25 67:4 80:5
94:7 95:10 102:3
120:9 121:2,7

**Q**

**qualify** 56:23
**qualm** 25:23
**quantitate** 33:18
**question** 4:16 8:8
8:23 9:6 10:15
15:21 20:21 21:15
21:22 28:11 48:9
60:24 64:20,22
65:11 66:6 71:13
72:4 76:17 85:13
85:14 87:10 92:22
94:15 95:23 96:6
100:18,25 102:1,8
102:20,21,25,25
103:3,25 111:15
111:17 113:6
120:11
**questioning** 112:17
**questions** 4:20 5:1
6:14 9:16 12:15
19:7 43:7 62:8
63:12,17 64:4
77:25 79:1 84:7
86:15 113:14,16
120:21 121:24
125:8
**quick** 5:3 18:16
19:16,18 120:21
**quicker** 95:11
98:25
**quickly** 70:5 98:23
124:5,6
**quiet** 11:1
**quit** 113:13
**quite** 62:6 116:5

**R**

**R** 2:2 3:6 5:2 8:2
  28:18 42:3 125:1
**radiating** 107:16
**rainy** 75:4
**raise** 48:17
**raised** 4:13 8:24
  9:1
**raises** 73:5
**raising** 4:24
**random** 52:8
**range** 35:11 53:12
  53:14 79:15 80:23
  83:10
**rarely** 73:17
**rates** 126:16
**rating** 56:21,23,25
  57:5,6
**ratings** 56:8,12
**reach** 123:14
**reached** 123:13
**read** 66:18 67:3
  76:10 82:14 99:19
  121:22
**reading** 15:24
  31:15 61:19
**ready** 5:3 6:13 7:14
  17:22 27:12,16,19
**real** 5:2 19:8,17
  49:15 70:5 75:23
  100:22
**realize** 94:21
**really** 26:1 45:12
  45:13 46:1 47:3
  54:15 59:5 72:23
  77:22 98:23 116:7
**reason** 19:7,25 31:6
  54:15 76:17 77:7
  87:1,11,24 92:16
  95:24 122:10
**reasonable** 62:9
  63:9 126:21
**reasoning** 84:6
**reasons** 84:9
**receive** 12:11 17:17
  23:25 103:23
**received** 4:6,12 8:5
  8:14,18 13:22
  21:12 24:6,8

25:16 34:12 46:22
  64:15 97:14
  102:18 103:6
**receiving** 74:22
**recess** 63:23
**recollection** 104:13
**recommend** 55:7
**recommendations**
  44:24
**recommended**
  45:19 46:24 59:6
  93:10
**record** 4:9,11,16,17
  4:19 5:22,23,24
  6:6,8,12,13,16,18
  7:15,16 9:3,6,6
  10:21 11:16 12:5
  16:1 18:18,23
  19:7,9,20,22
  20:20,21 22:12
  24:20,25 27:18,21
  31:4 58:5 63:21
  64:1,10,14,14
  65:7 66:3,18,19
  66:20 67:3,5,23
  67:24,25 68:2,5,6
  68:15 102:3
  114:18 117:18
  118:3,7,22 119:23
  121:2,7,15 125:10
**record's** 103:16
**recorded** 125:7
**recording** 4:10
  21:5
**recordings** 65:19
**records** 11:8,9,15
  11:21 12:24,24
  13:14 14:16 15:2
  15:7,18 16:2,5,15
  16:23 17:7 20:17
  22:20 23:21,23
  25:10 26:3,8,12
  26:22 53:24 68:21
  69:6 82:14 87:19
  98:16,18 99:1,10
  99:16,22 100:10
  101:6,18 106:9,10
  106:25 107:1,3,6
  109:10 110:22

112:20 113:8
  114:1,8,24 116:12
  116:13,14,21
  117:1,4,7,10,13
  117:16 118:11,14
  119:3,3,4,8,11,17
  119:21 120:1,9
  121:10,16,21
  122:4,9,16 123:1
  124:7
**recover** 74:17
  83:16
**recovering** 76:24
  76:25
**recovery** 74:8
**redacted** 21:11,21
**redirect** 113:11
  120:21
**reduce** 125:8
**redundant** 20:7
**refer** 38:1,10 44:10
  71:9,15 72:11
**reference** 56:16
  101:1
**referenced** 103:10
  106:17
**referencing** 115:11
**referral** 72:7
  126:13
**referrals** 71:6
**referred** 5:4 54:1
**referring** 10:17
  33:4 70:21 71:2
  115:17
**refers** 10:3 54:3
**reflect** 22:15 27:12
  80:2
**reflected** 43:15
**reflux** 59:3,5
**refusing** 17:4
**regard** 11:25 12:19
  13:3,7 98:9
**regarding** 13:10
  17:10 20:1 22:5,9
  23:23 24:21 26:25
  27:3 68:7 77:25
  126:23,24
**regards** 10:12 14:6
**Regulations** 126:3

**rehabilitative** 53:7
**rehashing** 24:14
**relate** 17:7 23:19
  25:12,15 26:8
  27:9
**related** 12:24 22:15
  23:5,22 26:13
  34:9 37:3 64:24
  71:16 72:21 84:8
  84:9 88:21,22
  89:12,19 91:5,6,8
  91:9,10,11 93:6
  95:23 113:5
  126:18
**relates** 24:13 27:14
  105:11
**relation** 38:7
  108:11
**relationship** 58:7
  126:20
**relative** 6:21
  125:17,18
**relaying** 33:21
**relevancy** 20:2
**relevant** 20:6,18
  66:12 73:25 96:9
  122:17
**reliable** 62:14
**relied** 26:23 65:15
  66:4 67:14
**relief** 34:19 45:6
**rely** 57:24
**remember** 62:3
  104:10,17
**remembered** 82:12
**remotely** 1:15 6:25
**remove** 37:23 50:5
  50:19 51:5 59:25
**removed** 104:22
**removing** 50:20,25
**repeat** 95:9 105:14
**repetitive** 55:14
**replace** 37:24
**replaced** 54:23
**replacement** 47:20
  47:24 55:12 58:10
**replaces** 52:11
**report** 30:19 32:13
  32:20 53:24 54:2

69:10 100:12,24
  101:21 103:4,6,20
  104:21,23 105:11
  105:25
**reported** 111:14,20
**reporter** 1:14 5:9
  5:18 7:22,23 21:7
  27:17,23 30:4,15
  31:3,5,22 66:17
  66:19 67:20,22
  124:3 125:24
  126:5,13,19,20,23
**Reporter's** 4:1
  126:25
**reporters** 1:23
  86:23 87:6 125:15
**reporting** 126:8,12
  126:13,18,19
**reports** 105:7
  109:15
**represent** 7:8,11
  78:12,14
**representation**
  38:22 48:24 121:3
**representations**
  27:13 43:8 65:6
  65:16 68:14 102:4
**representative**
  126:6
**represented** 66:3
  78:12
**representing** 7:10
  13:9 72:12 75:11
  82:17
**request** 4:7 5:5,6,8
  5:22 7:18 8:4
  9:19 10:2,11,18
  10:19 11:5,7,14
  12:18,20 13:4
  14:5 15:8 17:25
  18:5 21:24 22:4
  23:19 24:1,6 89:7
**requested** 12:19
  16:16,20 18:4
  22:5 23:22 56:9
  64:24 106:4
**requesting** 86:9
**requests** 11:9
  106:12

**required** 54:23
  59:25 63:1 91:12
  110:5
**research** 57:13
**resemble** 22:14
  25:11
**reserve** 28:10,15
  102:6
**residency** 29:20
**residual** 55:22
**resources** 57:4
**respect** 14:21
**respond** 5:1,3 6:14
  11:5 68:23
**responded** 4:20
  11:17,20
**response** 4:6 7:18
  8:6 11:6,9,21
  12:11,12 13:13,22
  17:17,24 18:12
  23:18 28:15
**responsiveness**
  28:11
**rest** 37:13,17 45:2
**result** 35:24 56:14
  57:2 58:3,13,16
  84:13 111:24
**results** 37:2 61:25
**Resurgens** 118:22
  118:23 119:1,3,19
**Retained** 3:16
**retractor** 49:22
**returned** 8:7
**revenue** 79:25
**review** 13:23 43:11
  69:11,13 97:19
  108:25 109:8
  112:21 113:22
  114:4,24 115:4
  122:17,18
**reviewed** 8:21,25
  25:1,18 32:20
  34:25 35:7 36:19
  44:21 86:16,18
  98:1,2 115:17,18
**reviewing** 98:4
  120:4 123:6
**right** 5:18 10:20
  11:4 13:14,18

15:20,24 16:14
  17:3 22:20 24:15
  27:4,19 29:2 31:1
  31:19 35:19 39:8
  39:20 40:1,2,7
  41:7,7,7,10,15,19
  41:19,24 42:3,6
  42:10,14,16,21,24
  43:1 47:5 48:10
  48:22 49:6,22
  50:6 51:7,14
  52:13 57:17 60:5
  60:20 63:21 65:17
  68:20 78:8 83:17
  87:17 88:5 90:16
  93:23 96:3,24
  100:15,23 101:17
  102:18 103:22
  104:18 105:19,22
  107:20 109:11,11
  110:12 111:8
  113:2 118:12
  119:8 120:19
  122:1 123:10,20
  123:22
**rightfully** 20:11
**risk** 46:9
**Road** 2:3
**role** 60:6,12,20
  61:1 94:16 95:15
**Ron** 5:11 7:19 8:4
  8:18 10:8 14:4
**Ronald** 11:4
**room** 34:11 35:23
  49:10 117:3
**rose** 56:5
**Roswell** 2:8 29:7
  69:23
**rough** 81:16
**rounds** 34:17
**routine** 52:19
**routinely** 56:16
**RPD** 9:23 10:8
**RPDs** 121:10,16,20
**rule** 94:19 96:8,9
  108:10 109:5,5
**Rules** 126:3
**run** 73:19
**runner** 55:10

**running** 78:3
**rushing** 62:5
_____
**S**
**sanctions** 16:13
**Sandy** 29:7
**sausage** 42:1
**save** 68:19
**saw** 34:23 40:9
  60:2,7 92:5 100:1
  100:3,5 118:6
**saying** 15:3 57:18
  73:18 75:17 97:25
  105:23 112:3
  123:12
**says** 10:13 11:6
  20:5 38:17 40:1
  76:11 85:2 93:4
  104:21 105:25
  111:7 123:4
**scale** 33:19
**scan** 116:8
**scar** 116:3
**scenario** 94:10
**scene** 105:23
**schematic** 39:4
  40:12 52:6
**schematics** 49:8
**school** 29:10,11
  86:12
**science** 85:7
**scrape** 51:5,8
**Scratch** 44:16
**scratched** 40:17
**screen** 5:19 7:22,25
  15:24 20:22 24:1
  24:7 30:14 76:5
  98:12 101:11
  113:1 121:22
**screw** 52:2
**screws** 50:6
**screwy** 79:10
**scroll** 87:17 98:24
  102:10
**scrolling** 10:21
  101:21
**seal** 125:15
**sec** 119:15
**second** 21:1,8 32:9

45:9 48:16 61:19
  69:16 109:23
**secrets** 27:3
**section** 39:18,18,19
  126:23
**see** 8:1,25 9:8 17:23
  18:25 20:22 30:14
  31:10,12,14 33:13
  37:9,11 38:11,12
  38:15 41:5,14
  42:11,13,17 45:7
  45:14 46:10,13
  48:15 49:25 50:10
  51:3 52:4,5,13
  59:4 66:10,11
  69:5 70:17,18
  72:8 76:5,14 79:6
  79:20 80:9,25
  83:1,4 84:20 90:4
  90:8 94:8 95:25
  96:6 98:12 99:17
  100:1,14 101:5,8
  101:12,18,18,21
  101:22 103:20
  109:12 110:23
  112:4,13,14
  114:21 115:20
  116:8,13 118:11
  118:13,21,21,23
  118:25 119:6,14
  119:14,18,19,22
  119:23 123:4
**seeing** 34:1,19 39:5
  39:25 41:2 42:4
  51:20 58:21,23
  59:1 79:16 104:13
  104:17,19 109:20
  114:20
**seek** 96:7
**seeking** 9:24 11:11
  73:13
**seen** 9:11 34:9 42:6
  58:18 70:13 88:1
  93:12 105:6,15
  107:17 109:14
  112:11
**send** 6:4 9:11 30:4
  65:22 69:2 72:7
  105:2,4

**sending** 88:17
**sensations** 43:18
  44:9
**sense** 13:5 18:6
  61:9,17 62:2
  63:18 81:4 82:19
  98:25
**sent** 4:6,21,21 5:10
  7:19 8:5,12 10:8
  11:5,8,13 12:9,11
  13:19 15:8,11
  16:17 17:15 21:25
  22:4 25:25 30:17
  30:21,25 64:17
  98:17 102:5
  104:24 105:5
  117:23 121:11,16
  121:20
**sentence** 3:21,21
  105:14
**separated** 39:7
**September** 32:1
  52:25 58:20,22
  100:8,8 118:7,9,9
  118:11
**service** 74:23 106:2
**services** 12:23
  99:18 126:8,12,18
  126:22,24,25
**sessions** 34:12,14
  107:9,10
**set** 1:13 18:11,14
  43:17
**sets** 38:9
**settles** 75:2,2
**seven** 12:10 90:18
  90:19 91:12
**severe** 104:22
  106:3
**shake** 61:10
**share** 5:19 7:22,24
  30:13 98:11
  112:21
**sharing** 101:11,14
**Shawn** 1:3 6:25
  7:10 12:1,21,25
  14:9 21:23 22:6
  23:2,11 31:8,10
  32:11,18 33:13

34:23 38:3,17
41:3 43:15 44:11
44:14,17,22,24
45:17 46:13,17
48:25 49:4,9 53:9
53:14 54:1,5,10
54:17 55:6 56:8
56:21 58:8,18
60:9 61:21,23
62:13,19 63:9
86:14 95:1 122:11
**Shawn's** 38:8,23
39:1 40:9 43:8
47:6 52:17 53:17
57:9 60:12,21
122:6
**she'd** 34:1 37:12
53:1 93:25
**sheet** 100:16 115:7
115:13 116:16
**sheets** 26:4
**shell** 39:11,21
**shock** 36:3,4 39:13
39:14,16,22
**shock-absorber**
40:20
**shoe** 51:15
**shooting** 33:24
42:16,18,25 43:1
44:6,7 110:18
**shoots** 36:9
**short** 40:2
**shoulder** 36:15,16
36:17,18
**shoulders** 36:18
**show** 5:22 8:6
25:12 43:22 66:9
83:24 87:14 104:8
112:6,15 113:3
120:8
**showed** 24:7 36:23
36:25 47:12 66:12
66:13 104:10
**showing** 21:10
52:15 103:4
**shown** 21:19 85:19
122:4,9
**shows** 40:12 50:17
57:13 84:21,23

**sic** 76:12
**side** 7:8 35:14,17
36:8,10,11 42:24
42:25 49:17 52:3
59:11 86:4 89:10
103:12 120:12
**sided** 33:21
**sides** 43:3
**sift** 114:8
**sign** 115:15
**signal** 124:11
**signals** 35:15
**signature** 32:6
125:15
**signed** 8:7
**similar** 67:13
110:17,24
**simple** 80:15
**simplest** 41:6
**simply** 75:14
**Simultaneous**
15:15 18:2 19:5
22:3,25 23:15
**sir** 4:8 20:23 79:18
105:17
**sit** 68:22 69:4 71:8
80:11,22 104:12
**sitting** 84:15
**situation** 75:8
**six** 53:11
**six-month** 108:20
**sixth** 61:17
**size** 51:13,14,15,15
**sized** 51:16
**skin** 59:21
**sky-is-falling** 46:4
**sleeping** 110:2
**sliced** 42:21
**slip-and-fall** 72:18
**slip-and-falls** 72:22
**slowly** 50:21 72:6
75:23
**smartphone** 104:8
**Smith** 2:11,11 4:3
5:24 6:8 7:13,13
8:3 9:4,16,18 11:4
12:4 13:12,18
14:14,21 15:6,11
15:18 16:14 17:14

17:21 18:1,10
19:1 20:24 21:3,4
21:8,17,24 22:4
22:18,23 23:7,12
23:21 24:3,8,14
25:3,17 26:19
27:6 65:10 66:5
67:2,14 71:12
72:3 76:7,17 87:9
100:18 101:25
102:6 103:24
120:10 124:7,8
**Smith's** 66:22
**smokers** 115:9
**soft** 35:2 39:10
**software** 120:3
**sole** 69:22
**somebody** 26:2
73:14,18 75:7
79:21 81:6 92:9
117:21
**somewhat** 96:4
**soon** 20:9
**sorry** 18:16 30:21
31:2,12,15 65:25
78:14 85:25 88:3
99:4 101:7 103:11
105:3 106:14
118:9
**sort** 20:1 69:10
81:7 83:9
**sorts** 68:17
**sought** 10:7 107:2
107:15
**sound** 16:21 30:16
**sounds** 10:24 28:16
54:9 81:11 92:24
94:2 96:3 109:11
**soup** 78:5
**source** 74:8 111:16
123:3
**sources** 71:15 72:7
97:6
**Southwestern**
29:11
**space** 41:15 42:13
50:8 51:22
**spasm** 40:25
**spasms** 37:3 43:20

44:1
**speak** 71:22 117:17
123:7
**speakers** 15:15
18:2 19:5 22:3,25
23:15
**speaks** 109:4
**special** 50:1,7 51:8
51:21
**specialist** 46:22
94:12
**specialists** 34:10
37:16
**specialized** 50:13
**specialty** 63:10
82:23
**specific** 9:24 13:4
77:18
**specifically** 10:3
22:8
**speech** 3:21
**speech-therapy**
59:7
**spend** 72:10
**spending** 17:2
**spinal** 41:10,13
50:10,11 51:24,25
117:14
**spine** 2:10 7:14,17
8:12,15,20,22
11:8,13,16,18,20
13:10 14:8 15:22
24:6 25:22 28:22
29:5 37:15 38:20
39:6 45:20 46:21
49:25 54:16 55:25
64:11 65:17 69:6
69:19 70:17,19
71:4,8,19 72:1
76:7 86:11 90:3
93:13 94:12 97:2
102:10 107:12
112:1 115:13,24
**Spine's** 12:3 16:2
76:18
**Sports** 76:12
**spread** 49:13 50:7
**Springs** 29:8
**Spurling** 35:13,18

**squeeze** 36:5 39:24
63:4
**squeezed** 36:25
41:15
**squeezing** 36:5,8
40:13 41:5 42:9
43:5
**squishy** 39:10
**stack** 115:15
**stamp** 8:11 98:16
101:23
**stand** 83:24,25
**standard** 28:10
80:6,7 108:1
**standing** 67:5,8
77:24
**standpoint** 80:3
**start** 9:15 10:16
21:5 27:19 48:7
49:14 50:19 86:20
102:10
**started** 6:3 7:16
10:9 64:9,10 65:5
67:8 77:17 93:18
101:22,23 102:5
**starting** 7:8
**state** 1:1,1 7:2,7
25:5 26:20 121:15
**stated** 11:10 13:13
13:15,18 14:16
15:6,18 16:14
18:11 21:24 22:8
22:10 23:12 24:15
24:18 25:4 67:16
102:1 109:23
125:7
**statements** 66:25
**status** 56:17
**statute** 33:2
**stay** 14:7
**stem** 57:19
**stemmed** 97:15
**stenographic** 1:11
**stenographically**
125:7
**step** 46:7
**stipulations** 1:13
**Stockbridge** 29:8
**stockbroker** 12:23

14:11 25:13
**stones** 60:10,11
**stop** 15:5
**stopping** 111:2,3
**store** 65:25
**straight** 42:1 43:21
  43:24
**straightening**
  36:25 37:1 84:21
**Street** 2:8
**Strike** 44:16
**structure** 41:10
  77:9
**structures** 40:23
**studies** 108:25
  109:16
**stuff** 56:1,2 66:7
  99:20 119:7
**subject** 4:22 70:10
  94:23
**submitted** 6:10
  76:11
**subpoena** 4:6 5:4,8
  17:24
**subsection** 126:23
**subsequent** 56:15
  57:2 69:16 97:23
**Subsequently**
  11:10
**subtext** 90:3
**success** 72:14
**successful** 53:17
**suck** 46:5
**sudden** 84:16
**suffered** 97:11
**suggest** 9:10
**suggesting** 4:15
**suggestions** 115:20
**suing** 73:17
**suit** 76:22 82:18
**Suite** 1:24 2:3,8,12
**summary** 32:11,17
**summit** 34:16
  107:12 117:14
  119:21
**super** 16:5
**superficial** 59:21
**supplemental**
  23:14

**supposed** 21:19
  36:14 40:20 43:23
  43:24 91:7
**supposedly** 113:2
**Supreme** 123:17
**sure** 5:4,10,16 9:19
  17:6,11 24:9 25:9
  36:13 48:1 49:8
  51:23 64:12 71:24
  73:7 74:12 76:4,4
  77:22 78:1,15
  79:11 80:20 81:18
  83:7 84:25 86:16
  90:9 93:11 98:9
  98:20 99:7 103:8
  103:16 107:18,20
  108:14 110:5,9
  111:10 116:25
  117:16,17,22
  119:2
**surgeon** 28:22
  45:20 46:4,21
  53:8 54:16 82:20
**surgeons** 56:15
  86:11
**surgeries** 115:9
**surgery** 29:16,20
  30:2 37:19,20,23
  45:4,19,21,22
  46:2 47:6,14,14
  47:17,17,19,24
  48:24 52:3,16,18
  52:22 53:5,17,22
  54:23,23 55:7
  58:10 59:8,10,12
  59:25 60:16,21
  61:2 63:4,6 69:23
  69:23 93:10 100:4
  111:13 115:24
  116:1,3,14 117:21
  117:23 122:11
**surgical** 49:3,7
  80:24
**surrounding** 40:23
**suspect** 61:5
**suspend** 14:14,18
  14:25 26:20
  123:22
**Suspended** 124:11

**suspending** 14:22
  120:23 121:5
  124:1
**suspicious** 61:13
**sustained** 54:20
  55:16 58:13
  122:13
**swallowing** 108:22
**swear** 27:18,23
**sweats** 108:22
**switched** 70:12
**sworn** 28:1
**symptomatology**
  93:15
**symptoms** 33:12
  35:8 44:14,17
  47:2 57:15 58:9
  110:17
**synthetic** 37:24
**system** 24:12 83:12
  108:25 120:5,9
**systems** 89:25
  109:8

---

**T**

**T** 1:12 3:4 27:25
  125:1,1
**table** 49:10 84:16
**take** 4:18 5:19,21
  6:2,3,5,9,14 16:7
  16:12,18 17:1,10
  19:16 20:19 24:19
  24:21 25:5 26:9
  26:13 27:6,11,12
  30:5 32:2,9 34:22
  46:16 47:1 50:11
  50:24 51:12 63:15
  66:16 80:5,15
  83:2 88:18,19,20
  89:24,25 98:8,19
  99:23 100:25
  102:9,13,15
  103:14 104:9
  106:23 110:15
  112:24 120:22
  124:9
**taken** 1:12 6:24
  8:10 28:3,7 52:14
  63:23 68:25 106:5

**takes** 89:17
**talk** 11:12 14:13
  15:12 17:14,19
  18:7,19,21 69:17
  123:18,20
**talking** 13:20 19:23
  23:13 25:19 48:7
  68:17 79:12,15
**tame** 33:13
**tandem** 15:13
**target** 121:13
**team** 70:24 71:5
**tear** 50:14
**teasing** 50:22
**telemedicine** 70:12
**televisit** 117:19
**tell** 5:2,20 13:23
  14:2 16:1,21,23
  26:21 28:21 32:16
  45:21,24 66:15
  73:16,17 101:20
  101:20 110:21
  116:12 119:16
**telling** 13:6 16:9,25
  18:6 19:14
**tells** 92:8
**temporary** 34:18
**ten** 81:15
**tend** 70:17 83:1,4,5
  90:4,5,6,8 114:19
**tender** 30:10
**tendons** 90:2
**tends** 76:1 83:3
  90:1 116:9,10
**tension** 44:3,5
**term** 10:1 53:25
  54:1
**terminated** 124:11
**terms** 70:6 72:14
  78:12 79:25 83:7
  83:13 108:9
**test** 35:18
**tested** 29:23
**testified** 88:12 89:5
  90:12,20
**testify** 63:2
**testimony** 21:13
  64:5 65:16 66:2
  67:6,12,15 71:7

84:1 85:18,20
  86:8 89:20 90:10
  95:6
**testing** 84:19
**tests** 30:1 36:13
  112:5
**Texas** 29:12
**than-not** 94:10
**Thank** 63:13,14
  64:3 69:4 76:4,16
  85:13 105:17
  106:4 113:6
  120:19
**therapies** 37:14
**therapy** 34:13
  37:17 45:2 53:2,4
  53:8,15
**thereto** 125:16
**therewith** 11:22
**thick** 42:8 43:2
**thing** 8:9 15:20
  21:17 24:14 30:17
  32:13 39:9 45:23
  47:12 56:10 79:3
  87:18 92:9,19
  97:25 115:16
  116:4
**things** 10:4 18:21
  19:25 20:2,14,17
  35:3 55:7,10 58:1
  61:12 67:12,15
  79:10 85:6 90:2
  91:15 94:21 96:18
  108:7,24 109:14
  110:7,18 111:11
  111:21 112:8
  115:9 118:20
**think** 10:4 13:1,8
  16:5 18:4,17
  20:16,21 21:6,7
  24:19 27:8 28:9
  28:14 35:6 36:18
  41:19 45:25 46:10
  46:12 47:8,15
  48:17 52:24 54:3
  54:5 61:14,25
  64:24 65:23 66:11
  67:16 82:2 83:10
  84:1,6,8 86:6

90:15,23 91:4,6
92:8,21 93:6,6,7
94:3,9,15 95:19
97:16,25 98:24
99:21 102:1 107:4
108:19 113:5
118:6,18 119:20
121:14
**thinking** 110:22
**thinks** 91:10
112:21
**third** 72:5,21,22,23
75:25,25,25
**Thor** 28:20
**thought** 9:21 30:15
45:5 83:21 97:10
**three** 37:11 40:10
99:5 120:21
121:24
**throat** 42:23 49:18
59:2
**thyroid** 59:18,22
**tight** 20:10
**tilt** 35:18
**time** 4:19 6:8,12,14
6:23,24 9:4 12:15
16:4 17:2 18:12
18:14 19:19 20:8
20:14 24:3 27:6
27:22 29:21 30:9
32:23 33:14 37:8
37:13,17,21 45:1
52:20 54:22 55:16
58:24 63:20,25
64:3 65:12 68:3
68:19 72:5 73:11
73:12 74:11,23,25
75:6,10,24 77:24
79:12 89:7 91:25
98:15,19 99:8
102:23 106:15,23
107:7 113:12
**times** 10:2
**tingling** 40:25
**tip** 61:13
**tires** 47:21,22
**tissue** 50:24 51:1
116:6
**tissues** 35:2 49:20

49:24
**today** 6:23 9:16,22
12:10,12 13:5
14:7 15:17 17:20
20:4 28:8 30:22
31:22 62:9 64:4
65:16 66:2 67:15
68:23 69:4 71:8
80:11,22 82:8
83:21 104:12
122:17
**today's** 32:21
**told** 8:19 37:8,21
44:25 46:8 55:12
55:17 67:9,10,12
84:15 104:18
110:12 121:14
**tomorrow** 82:13
**top** 40:18 98:16
**torn** 39:24 42:7,8
43:4
**totally** 41:8
**touched** 38:5 44:22
**tough** 39:21 42:5
**tow** 104:22
**town** 114:20
**trade** 27:3
**training** 29:23
**transcribed** 124:4
**transcript** 3:20
7:16 125:9,13
**transpired** 64:13
**trauma** 82:24
**travel** 96:23
**treat** 12:22 44:12
56:4 63:1 71:11
73:9 74:7,22
78:15 89:21 95:12
**treated** 82:22 88:2
88:15 90:13,21,22
**treating** 25:18 31:8
72:16 73:4 74:1,2
74:6,15 75:20
76:22,23 77:11
78:20 79:14,22
92:25 93:18 94:1
114:15
**treatment** 12:25
13:25 14:1,10,12

17:7 22:6,16 23:5
23:20 24:13 25:12
25:16 26:8,17,24
27:9,15 32:11,18
34:7 35:9 36:21
45:18 54:15 56:15
57:3,19,22 58:14
61:23 62:7,12,19
64:16 65:1 74:16
80:12 95:4 96:16
97:14 107:15
109:16 110:6,14
118:1
**treatments** 45:9,11
59:7
**treats** 76:12
**trial** 28:5,8 51:18
**trials** 51:17
**tried** 45:12 123:14
**trouble** 97:6
**troublemaker**
55:15
**troublemakers**
50:4
**troubles** 41:18
**truck** 55:17 84:12
104:22 112:1
**true** 65:5 74:9
90:14 117:8
125:10
**trust** 80:19,20
83:11,16,20,23
84:1 85:14 123:13
**truthful** 32:17
**try** 45:3,24 47:1
62:4,6 75:8 91:7,9
91:16 99:7 113:10
123:19
**trying** 14:20,24
15:1,3 18:23
19:13,24 20:7
26:15 32:25 45:17
46:25 75:7 93:17
93:25 95:1,14
**Tucker** 29:8,9
**turn** 38:12 48:5,11
48:14
**turned** 6:17 19:21
27:20 63:22,24

68:1
**two** 29:24,25 30:19
36:23 37:10,22
47:9,13,20 52:4,6
63:15 81:19,22,23
83:10 84:23 86:2
88:8 92:17
**type** 21:15 23:16
37:3 50:18 51:2
70:15,15 104:19
**types** 10:3 20:17
52:8 111:22
114:15
**typewriting** 125:9

---

### U

**ultimately** 45:7,8
45:14 46:25 47:5
47:7,13 54:22
57:24 59:25 60:16
61:1 77:3 92:15
124:2
**uncommon** 81:2
**understand** 20:22
24:10 26:17 31:7
46:9 71:17 72:6
73:25 74:14,19,20
74:21 75:24 76:3
76:20,24 77:8
79:11 81:18,21
83:12,16 84:2
85:15,21 86:8,14
90:9 91:23 92:23
93:17 95:5,14
97:7 98:1 104:12
120:18 123:7
**understanding**
8:15 33:25 34:6
60:9 64:13 68:22
69:18 70:4,19
73:24 78:10,19
79:6 81:3 84:5
86:7 96:17,25
97:7 111:11
**understood** 83:20
83:23 85:18 89:20
116:18
**underwent** 58:14
**unfinished** 3:21

**unfortunately**
34:13,15 40:21
45:11 47:2 54:21
**updated** 47:10,11
**use** 28:5 50:1,13
51:2 54:1 62:13
77:10
**useful** 95:2
**usual** 126:15
**usually** 37:3 53:11
61:18 88:16 89:16
113:21 115:7
**UT** 29:11

---

### V

**v** 123:17
**varies** 72:19 73:8
**variety** 108:23
**various** 47:1
**vary** 73:8
**vast** 74:21
**vehicle** 72:17 82:25
93:14 104:15,21
**vehicles** 104:2,5,14
104:20 105:12
**vein** 49:16
**Velez** 46:21 58:15
**versus** 7:1 23:8
70:12
**vertebrae** 39:6 50:2
**vessels** 49:15
**vestiges** 51:1
**vibration** 55:16
**video** 5:22,23,24
6:8,11,13,17,24
7:15 9:3,6 19:21
20:21 21:6 27:19
27:20 63:22,24
68:1,6 105:20
**Video-Conference**
1:11
**video-recorded** 7:4
**videographer** 4:8
6:2,18 19:19 21:4
27:17,21 63:19,20
63:25 68:2
**videos** 106:5
**videotaped** 1:11
**view** 39:4 41:2,22

42:11,12 51:3
52:3 94:13 97:1,9
**viewed** 95:15
**views** 41:22,24
52:13
**visible** 38:13,13
**visit** 25:16 34:21,24
58:22 69:15
109:24 117:18
118:8,16
**visited** 46:20,21
**visits** 52:19,24,24
53:12 70:13
119:15
**visual** 48:11
**volume** 7:4 70:7
**volunteered** 91:15
**vs** 1:4

──────────────

**W**

**wait** 75:1,4 77:2
**wall** 39:20,23 40:15
40:16 42:5,7 43:2
43:3,16 50:23,24
**want** 4:11 5:4,10
6:12 9:19 11:12
15:12,22,23 16:1
16:7,23 17:11
18:6 19:13 20:3
21:4,8 22:1,12
23:10 24:9,18,21
25:7,9 30:9,13
36:13,15 46:3,4
46:10 47:23 63:15
64:12 66:10,13,20
66:24,24 67:1,2,3
68:5,19 69:17
76:10 81:18 86:5
87:14,18 89:10
94:18 95:1,9 98:8
98:18,19,20,21,25
99:7,14,15,25
100:23 102:3
103:8,16 109:25
109:25 110:2,4,14
111:10 116:2,25
117:17 119:2
123:18
**wanted** 9:5 19:6

20:16 22:8,10
55:17 59:4 61:22
115:21
**warriors** 90:7
**wasn't** 9:25 47:3
62:4 68:10 89:6
103:11
**wasting** 102:23
**way** 4:17 9:11 19:7
19:14 28:13 41:6
42:5 43:3 49:13
49:24 50:10,20
52:23 54:19 55:4
57:20 59:19 85:8
109:5 123:23
**we'll** 16:8 26:11
49:10,11,25 50:7
50:15 51:16,18
68:21 87:18 99:6
123:24
**we're** 6:5,7,18 7:14
7:15 10:20,21
11:2 13:1,20 15:3
16:13 17:10 19:14
20:10,20 23:12
24:14 25:6,24
27:21 30:18 33:4
38:1 39:3,5,25
41:2,9,23 42:4,6
50:22 51:20 63:20
64:1 68:2,4 72:8
77:18 79:11,15
81:9 87:20 97:25
98:20 101:1
102:14,15,23,25
115:25 116:10
123:25
**we've** 16:25 20:1
24:19 31:7 42:6
48:10 51:11,25
58:21 70:11 99:19
103:9 111:2
**wean** 52:21
**website** 65:20 66:9
114:21
**websites** 69:9
**Wednesday** 1:16
**week** 63:4 81:12,14
81:19

**weekends** 90:7
**weeks** 81:19
**weigh** 26:20
**weight** 108:22
**Wellness** 119:20
**Wellstar** 123:18
**went** 4:19 26:10
29:11 34:10,11,14
34:16 46:20 58:15
85:11 95:15 97:21
98:1 99:21 103:20
107:11 110:16
**weren't** 45:13
60:15
**West** 1:24
**whatnot** 20:2
**whatsoever** 9:2
14:13 22:16 24:25
105:11
**whichever** 98:24
**white** 41:11
**Wi-Fi** 124:11
**willing** 74:23 77:2
88:18 122:18
**win** 77:5
**Windemere** 34:11
107:11 117:8,18
119:10,10,11,19
**windpipe** 49:18
**wisp** 42:17
**withdrawn** 125:11
**withheld** 4:22 6:2
6:11 9:14,15 10:5
10:5 27:9,14
**withholding** 11:19
12:12,17
**witness** 3:3 27:24
28:1 31:15,18
32:12 38:11,16
48:5,10,19,21
63:14 65:12 67:6
71:21 74:10 78:14
85:25 88:3 90:15
90:18 99:3,14,17
101:7,24 102:13
102:17,23 105:3
105:14 106:14
111:15 115:1
117:3 120:19

122:1,21,23
123:20
**woke** 110:1
**word** 102:13,15,17
103:14
**work** 18:14 46:11
50:20 62:20 72:22
73:19 75:4,16
83:17 88:22 89:13
90:7 92:10
**work-related** 89:23
**workers'** 73:3 74:9
74:18 79:14,21
82:18
**working** 47:3 48:19
55:13 59:20
116:10
**workings** 78:11
**works** 47:25 83:13
**world** 9:4 98:20
**worse** 33:22 35:15
108:18
**worsening** 108:21
**worst** 33:19
**worth** 110:6
**wouldn't** 65:18
76:16 84:14 123:7
**wrap** 113:11
**wreck** 54:19 58:7
60:11 85:2 122:6
122:13
**wrinkle** 47:9
**write** 89:14,14
**written** 3:22 9:5
29:22,25 91:5
**wrong** 10:9 26:16
31:16 84:7
**wrote** 93:7 116:19

──────────────

**X**

**x-ray** 35:1 50:1,2
52:14 84:21,21
112:6
**x-rays** 36:20,25
37:5 43:21 57:24
97:23 108:25
112:5

──────────────

**Y**

**y'all** 12:20,22 13:25

25:8,13
**yeah** 5:7 10:10
21:21 25:24 27:5
48:13,16 65:1
70:17 73:2 79:9
108:1 111:18
118:21 119:12
**year** 46:19 52:25
58:25 72:10,19,23
72:24 73:1,8
75:25 76:1,2 79:7
79:21 81:25 88:8
118:10
**year's** 110:6
**yearly** 80:1
**years** 29:24,25 61:9
81:15,20,23 82:21
83:11 85:15 87:8
89:5,18 90:11,18
90:19 91:12,13
108:17 114:10,12
**yellow** 41:10
**yesterday** 82:7
101:10 102:18
103:7,18,23
104:24
**younger** 83:4,5
90:4,4,5

──────────────

**Z**

**zero** 33:19 46:1
**Zoom** 1:11 6:25
66:11

──────────────

**0**

──────────────

**1**

**1** 1:7 3:12,15 30:5
30:10,11 87:21,22
102:11
**1,400** 79:20 80:17
**10** 33:19 100:7
102:11
**10-point** 33:19
**10.B** 126:3
**101** 3:16
**10th** 52:14
**11** 102:11
**112** 2:3
**12** 42:13 53:12

102:11
**12/7/18** 119:18
**120** 89:3 90:10
**122** 3:8,9
**12th** 41:3 100:4
**13** 102:11
**131** 87:25 88:3
**13th** 119:24
**14** 102:11
**147** 80:21
**15** 100:7 102:12
  108:17
**15-14-37** 126:18
**15-14-37(a)** 126:10
**150,000** 80:5,16,18
  80:22
**1500** 2:12
**150ish** 81:2
**16** 100:5 102:12
  118:24 119:24
**17** 102:12
**17th** 32:1 58:20
**18** 100:7 102:12
  118:13,23 120:13
**19** 33:15 34:4
  102:12 119:13
  120:13 122:7
**19th** 58:8 122:14
**1st** 118:2

**2**

**2** 3:13,16 31:23
  33:9 41:4 101:2,3
  102:11
**2-1/2** 123:10
**2-3** 40:1
**2,000** 79:7,15,20
**2:29** 30:25
**20** 47:12 56:23,24
  57:1 61:8 82:21
  88:8 89:18 91:13
  102:16 114:10
**20-C-07241-S1** 1:4
  7:3
**200** 2:8 80:25
**2002** 29:1
**2015** 86:18,23
  87:25 88:3 90:15
**2018** 33:16 34:5

58:8 118:17 122:7
  122:14
**2019** 31:14,19 35:5
  35:6 41:3 42:13
  77:21 92:6 100:1
  115:3 118:17,24
  119:14,23,24,24
**2020** 5:14,17 7:19
  8:5 13:21 14:7,7
  15:17 16:3,11
  23:19 24:1,6
  31:11,13 32:1
  35:6 45:15 46:15
  46:18 47:12,15
  52:15 58:11,20
  100:3,4,5,5,7,7
  117:19 118:2,13
  118:23 120:13,15
  120:16
**2021** 1:16 6:23
  52:24,25 58:22
  100:8,8,8 118:7
  125:22
**2022** 125:24
**20th** 16:3
**21** 102:16
**210** 80:18
**217** 2:8
**24** 5:14 16:11 23:18
  23:25 24:6 70:7
  102:22 118:17
  120:14
**24th** 5:17 7:19 8:5
**25** 46:17
**256-2886** 1:25
**25th** 31:11,13
  45:14 46:15 100:3
**26** 119:23
**27th** 12:9 17:15
**28** 3:6 58:22 100:8

**3**

**3** 1:16 33:22 40:2,2
  41:4 80:8,10,25
  102:11
**3-4** 40:6,10 56:5
  97:4
**3/18/20** 119:19
**3/19/201** 119:22

**3:33** 8:18
**30** 3:12 72:15
  107:10 118:17
**30(b)(6)** 11:12,15
  12:6,14 13:18,21
  15:12,13 17:18,20
  21:13 22:11 23:13
  25:21 26:5 27:1
  79:3
**30009** 2:8
**30030** 1:24
**30040** 2:4
**30330** 2:12
**31** 115:3 125:24
**315** 1:24
**31st** 31:19 92:5
  100:1
**33** 3:13
**3rd** 6:23

**4**

**4** 32:6 40:3 41:5
  102:11
**4-5** 40:10,11 42:6
  42:15 52:1 97:5
**4:00** 1:16
**4:17** 6:23
**4:34** 19:19
**4:50** 27:22
**40** 73:6
**400** 2:12
**404** 1:25
**418** 2:3
**455-3257** 2:4
**455-3469** 2:5

**5**

**5** 33:20 40:3 41:5
  102:11
**5-6** 40:10,11,14
  42:21 52:1 97:5
**5:00** 113:12
**5:37** 63:20
**5:43** 63:25
**5:52** 68:3
**50** 107:9 117:22
**57-year-old** 114:7

**6**

**6** 33:22 40:4 102:11

**6-7** 41:7
**6:33** 99:4
**627-7872** 2:13
**64** 3:7
**650** 1:24
**678** 2:4,5

**7**

**7** 40:4 102:11
**7/16/2019** 119:1
**7:00** 99:4 111:7
  120:17
**7:08** 124:11
**70** 73:11,25 75:9,15
  75:17,19 76:12
  79:12,15 80:1,21
  81:5 82:16 83:8
**75** 8:12
**770** 2:13
**7th** 100:8

**8**

**8** 58:11 102:11
**87** 3:15
**8th** 47:15 100:4

**9**

**9** 102:11
**9-11-28** 126:10
**96** 29:14
**9th** 125:22